1

2                    IN THE UNITED STATES DISTRICT COURT

3                      FOR THE DISTRICT OF PUERTO RICO

4                                 -oOo-

5    THE UNITED STATES OF AMERICA,    )
                                      )
6            Plaintiff,               )    Case No. 3:21-CR-00161-PAD
                                      )
7    -vs-                             )
                                      )
8    FELIX VERDEJO-SANCHEZ,           )
                                      )
9            Defendant.               )
     _____)
10                TRANSCRIPT OF JURY TRIAL - DAY FOUR
11         HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
              UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
12                       FRIDAY, JUNE 23, 2023
     _____
13
                        A P P E A R A N C E S
14
     FOR THE UNITED STATES OF AMERICA:
15
     AUSA Jonathan L. Gottfried &
16   AUSA Jeanette M. Collazo-Ortiz

17   FOR THE DEFENDANT:

18   Jason Gonzalez-Delgado, Esq. &
     Gabriela Jose Cintron-Colon, Esq.
19
     COURT INTERPRETERS:
20
     Carlos Ravelo &
21   Lynmar Vera

22   GOVERNMENT INTERPRETER:

23   Jose Luis Rosado

24

25

```
 1                          I N D E X
 2   WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:        PAGE:
 3   JOSE TORRES-BAYRON
 4   Direct Examination by Mr. Gottfried:                   5
 5   Cross-Examination by Mr. Gonzalez-Delgado:            16
 6   Redirect Examination by Mr. Gottfried:               27
 7   RAFAEL ORTIZ-PINEIRO
 8   Direct Examination by Ms. Collazo-Ortiz:             29
 9   Cross-Examination by Mr. Gonzalez-Delgado:           41
10   Redirect Examination by Ms. Collazo-Ortiz:           45
11   Recross-Examination by Mr. Gonzalez-Delgado:         46
12   JOSE BONILLA-RUIZ
13   Direct Examination by Ms. Collazo-Ortiz:             50
14   Cross-Examination by Mr. Gonzalez-Delgado:           66
15   Redirect Examination by Ms. Collazo-Ortiz:           81
16   Recross-Examination by Mr. Gonzalez-Delgado:         82
17   EXHIBITS:                                           PAGE:
18   Government Exhibit No. 19                             36
19
20
21
22
23
24
25
```

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

```
 1          (Proceedings commenced at 9:06 a.m.)

 2                              -oOo-

 3          (Whereupon the following proceedings were had in open court

 4          without the presence of the jury.)

 5               THE COURT:  How many cases do we have this morning?

 6               THE COURTROOM DEPUTY CLERK:  We have only one case,

 7     Your Honor.

 8               THE COURT:  Call the case.

 9               THE COURTROOM DEPUTY CLERK:  Criminal Case Number

10     21-161, the United States of America against Felix

11     Verdejo-Sanchez, for fourth day of jury trial.  On behalf of

12     the government are Assistant U.S. Attorneys Jonathan Gottfried

13     and Jeanette Collazo, and on behalf of the defendant are

14     Attorneys Jason Gonzalez and Gabriela Cintron.

15               The defendant is present in the courtroom.  He is --

16     and he is assisted by a certified court interpreter.

17               THE COURT:  Thank you.

18               Would counsel identify themselves?

19               MS. COLLAZO-ORTIZ:  Good morning, Your Honor.  This

20     is AUSA Jeanette Collazo for the United States.  We are ready

21     to proceed.

22               THE COURT:  Good morning, ma'am.

23               MR. GOTTFRIED:  Good morning, Your Honor.  AUSA

24     Jonathan Gottfried.

25               THE COURT:  Good morning, sir.
```

```
1              MS. CINTRON-COLON:  Good morning, Your Honor.
2    Gabriela Cintron on behalf of Defendant Felix Verdejo-Sanchez.
3              THE COURT:  Good morning, ma'am.
4              MR. GONZALEZ-DELGADO:  Good morning, Your Honor.
5    Jason Gonzalez-Delgado on behalf of Mr. Felix Verdejo.
6              THE COURT:  Good morning, sir.
7              Would the interpreter introduce herself?
8              THE INTERPRETER:  Good morning, Your Honor.  This is
9    Lynmar Vera, the court interpreter.
10             THE COURT:  Good morning, ma'am.
11             THE INTERPRETER:  Good morning, Your Honor.  This is
12   Staff Interpreter Carlos Ravelo at the services of your court.
13             THE COURT:  Good morning, sir.
14             THE INTERPRETER:  Good morning, Your Honor.  Jose
15   Luis Rosado for the prosecution.
16             THE COURT:  Good morning, sir.
17             The courtroom is open to the public.
18             Is there anything we need to touch on before we call
19   the jury in?
20             MR. GOTTFRIED:  Nothing from the government.
21             MS. CINTRON-COLON:  Nothing from the defense, Your
22   Honor.
23             MR. GONZALEZ-DELGADO:  No, Your Honor.
24             THE COURT:  All right.  Let's call the jury in.
25             (Whereupon the following proceedings were had in open court
```

```
1           in the presence of the jury.)

2                THE COURT:  Good morning.  Welcome back to the

3      courtroom.  Please take a seat.

4                MR. GOTTFRIED:  May it please the Court?  The

5      government calls Officer Jose Luis Torres-Bayron, B-A-Y-R-O-N.

6                THE COURT:  All right.

7                THE COURTROOM DEPUTY CLERK:  Mr. Torres, please raise

8      your right hand.

9           (Witness sworn.)

10               THE COURTROOM DEPUTY CLERK:  So help you God.  You

11     may take a seat.

12               MR. GOTTFRIED:  May I proceed, Your Honor?

13               THE COURT:  Go ahead.

14                         JOSE TORRES-BAYRON,

15           called as a witness on behalf of the Plaintiff,

16                having been previously duly sworn,

17              was examined and testified as follows:

18                        DIRECT EXAMINATION

19     BY MR. GOTTFRIED:

20     Q    Good morning, sir.

21     A    Good morning.

22     Q    Can you please tell the members of the jury your name?

23     A    Jose L. Torres-Bayron.

24     Q    Where do you currently work?

25     A    I work at the police -- Puerto Rico Police Strike Force
```

1    Division in Ponce.

2    Q    How long have you worked with Strike Force of Ponce?

3    A    Since October 2021.

4    Q    And how long have you spent overall in the police?

5    A    Approximately, 16 years.

6    Q    In April 2021, what police division were you assigned to?

7    A    The Caimito Police Precinct in San Juan.

8    Q    And during what timeframe did you work in the Caimito

9    precinct?

10          THE INTERPRETER:  I'm sorry, Counsel?

11   BY MR. GOTTFRIED:

12   Q    During what timeframe, how long did you work in the

13   Caimito precinct?

14   A    Since 2010 until October of 2021.

15   Q    And in April of 2021, what were your job responsibilities

16   as a police officer in the Caimito precinct?

17   A    I was an investigative agent.

18   Q    And, in general, as an investigative agent, what kinds of

19   things did you do in April of 2021, generally speaking?

20   A    To take care of all types of complaints.

21   Q    Now, were you working as a police officer in the Caimito

22   precinct on April 29th, 2021?

23   A    Yes.

24   Q    And, approximately, what was your shift?  What hours did

25   you work?

1    A    12:00 noon to 8:00 p.m.

2    Q    What happened, if anything, around 5:30 p.m. April 29th,

3    2021?

4    A    On April 29th, 2021, at, approximately, 5:30 p.m., Keila

5    Ortiz and Bereliz Rodriguez came to the police precinct.

6    Q    Okay.  And where did you first see them?

7    A    At the police precinct.

8    Q    How did Keila appear to you?

9    A    She was scared, concerned, and very anxious.

10    Q    How did Bereliz appear to you?

11    A    The same.

12    Q    Okay.  After seeing them, what did you do next?

13    A    She mentioned to me that they wanted to file a complaint

14    for disappear -- the disappearance of a person.

15    Q    And what, if anything, did Keila show to you?

16    A    She showed me a picture.

17    Q    What was the photo of?

18    A    It was a picture of her daughter Keishla showing her a

19    positive pregnancy test.

20         MR. GOTTFRIED:  With the Court's permission, I'd like

21    to publish what has been previously introduced as Government

22    Exhibit 13 already in evidence.

23         THE COURT:  Go ahead.

24    BY MR. GOTTFRIED:

25    Q    Do you recognize this photo?

1    A    Yes.

2    Q    And what is this photo?

3    A    This is a picture of Keishla holding in her hand a

4    positive pregnancy test.

5    Q    And did the, either Keila or Bereliz, show you any other

6    photos during that meeting?

7    A    Yes.  I asked them for another picture in order to file

8    the complaint and to do the referral.

9    Q    Describe that picture, please.

10   A    It's a picture where you can see Keishla with a dress.

11             MR. GOTTFRIED:  And I'm, with the Court's permission,

12   going to publish what has previously been introduced into

13   evidence as Government Exhibit Number 18.

14             THE COURT:  Go ahead.

15   BY MR. GOTTFRIED:

16   Q    Sir, do you recognize this photo?

17   A    Yes, yes.  That was a picture that was given to me.

18   Q    And who gave that picture to you?

19   A    Bereliz.

20   Q    After collecting this information, whom, if anyone, did

21   you call over the phone?

22   A    I called Felix Verdejo.

23   Q    Why did you call Felix Verdejo?

24   A    Because he was the last person with whom Keishla was going

25   to meet.

1    Q    Who told you that?

2    A    Keila.

3    Q    What phone number did you call when you called Mr.

4    Verdejo?

5    A    I do not know it by heart.

6    Q    Is there something that would refresh your recollection?

7    A    Yes.

8    Q    What's that?

9    A    My notes.

10        MR. GOTTFRIED:  Your Honor, permission to approach

11   the witness.

12        THE COURT:  Yes.

13   BY MR. GOTTFRIED:

14   Q    Again, sir, I'm going to ask you:  What phone number did

15   you call when you called Mr. Verdejo?

16        MR. GONZALEZ-DELGADO:  Your Honor, we have an

17   objection.  If it was to refresh his memory, he refreshed it.

18   The document should be provided back to the government.

19        It was to refresh his memory, not that he was going

20   to testify as to the contents.  It hasn't been admitted into

21   evidence.

22        MR. GOTTFRIED:  Your Honor, I think if he looks down,

23   refreshes his recollection and looks up and testifies.  I

24   understand the concern that he shouldn't be reading it, but I

25   think that if it's in front of him, he can refer to it and then

1    testify.

2                    THE COURT:  Objection overruled.

3                    MR. GONZALEZ-DELGADO:  Your Honor, it hasn't been

4    admitted into evidence.

5                    THE COURT:  Objection overruled.

6    BY MR. GOTTFRIED:

7    Q    Again, sir, what number did you call when you called Mr.

8    Verdejo?

9    A    (787)963-3693.

10   Q    And which phone did you use to make that call?

11   A    The one from the police precinct.

12   Q    And what happened once you called (787)963-3693?

13   A    When I called, Felix Verdejo answered upon the first

14   attempt.

15   Q    How did you know that it was Mr. Verdejo?

16   A    After introducing myself and explaining why I was calling,

17   I asked if he was Felix Verdejo, and he answered yes.

18   Q    And after he identified himself as Mr. Verdejo, what

19   happened next during that phone call?

20   A    I notified him that I was initiating an investigation to

21   address a complaint for a disappearance of a person and whether

22   he knew the young woman by the name Keishla Rodriguez-Ortiz, to

23   which he answered yes.

24   Q    What happened next during that phone call?

25   A    I asked him if he had any news about her, whether he had

1    communicated with her, whether via text message or phone call,

2    and he answered no.

3    Q    And, to clarify, you had asked him whether or not he had

4    called her or communicated with her on what date?

5    A    On the 29th.

6    Q    Okay.  And after Mr. Verdejo indicated that he had not

7    communicated either telephonically or via message with Keishla

8    on April 29th, 2021, what happened next?

9    A    I asked when was the last time he talked to her.

10   Q    And what did he respond?

11   A    He said that he had talked to her the day before, on April

12   28th, at night, and that they had agreed to meet in the

13   morning, on the 29th, in order for her to talk to him and to

14   show him the positive pregnancy tests, because the both of

15   them, they had a relationship.

16   Q    Did Mr. Verdejo indicate what he was doing on the morning

17   of April 29th?

18   A    Yes.

19   Q    What did he tell you?

20   A    He notified me that he was training.

21   Q    And what else, if anything, did Mr. Verdejo tell you

22   during that phone call?

23   A    He notified me that, after he finished training, he

24   verified and he had not received any message or phone call from

25   Keishla so he decided not to go to her apartment because he

1    knew that she worked.

2    Q    Did Mr. Verdejo indicate how he had learned about

3    Keishla's disappearance?

4    A    Yes.

5    Q    What did he say?

6    A    He notified me that he knew because Keishla's mom had

7    called him.

8    Q    Did Verdejo suggest to you where Keishla might be?

9    A    No.

10   Q    How did Verdejo sound, how did he seem to you during that

11   phone call?

12   A    Calm.

13   Q    Did he seem worried about Keishla's disappearance?

14   A    No.

15   Q    What, if any, address did -- personal address, did Mr.

16   Verdejo provide to you?

17   A    His address.

18   Q    And what was that address?

19   A    Antigua Via, Street 1, F. Vizcarrondo, apartment M3, San

20   Juan, Puerto Rico, 00926.

21            MR. GONZALEZ-DELGADO:  Your Honor, we have an

22   objection.  He's reading from the document.  He's showing the

23   translator where in the document is the information that he's

24   providing.  This document has not been introduced into

25   evidence.

1             THE COURT:  Objection overruled.

2             MR. GONZALEZ-DELGADO:  He's supposed to testify from

3      memory, Your Honor.

4             THE COURT:  Objection overruled.

5      BY MR. GOTTFRIED:

6      Q    Sir, how did the call conclude with Mr. Verdejo?

7      A    I told him that since I was starting a complaint for the

8      disappearance of a person, I was going to refer it to the

9      corresponding unit; and that the staff from the CIC was going

10     to communicate with him to interview him, and that he should be

11     available to answer any questions that they might pose to him,

12     to which he said that he was available to answer questions.

13     Q    After that phone call, did you open a complaint?

14     A    Yes.

15     Q    Why?

16     A    It is what is done with any complaint.  A number, a

17     complaint number is always given in order -- for any complaint

18     that comes to the precinct.

19     Q    And, sir, what, if any, phone number for Victim Keishla

20     did the family provide to you?

21     A    Keishla's number was (787)397-2408.

22             MR. GONZALEZ-DELGADO:  Your Honor, objection again.

23     The witness is reading from a document that has not been

24     admitted into evidence.

25             THE COURT:  Objection overruled.

```
 1    BY MR. GOTTFRIED:
 2    Q    What, if any, other names did the family mention to you
 3    during this interview?
 4    A    Marcelino's.
 5    Q    And what information was provided to you regarding
 6    Marcelino?
 7    A    That he was her ex-partner.
 8    Q    And was any other information provided to you regarding
 9    Marcelino?
10    A    No.
11    Q    Did you, in fact, call Marcelino?
12    A    No.
13    Q    Why didn't you call Marcelino?
14    A    Because upon asking Keila about Marcelino's whereabouts, I
15    was told that he was living outside of the country.
16    Q    Okay.  And what was your understanding as to how they knew
17    that he was outside of the country?
18    A    She had communicated with him.
19    Q    And what, if anything else, did either Bereliz or Keila
20    tell you about Marcelino?
21    A    Nothing else.
22    Q    What did you do next?
23    A    I then proceeded to investigate the other name that they
24    gave me.
25    Q    Which name was that?
```

1    A    Felix Verdejo.

2    Q    Okay.  And what did you do next?

3    A    After conducting my investigation, I referred the

4    complaint to the CIC unit.

5    Q    Okay.  And what did your investigation consist of of Felix

6    Verdejo?

7    A    Because the mother had told me that she was going to meet

8    with him in the morning of April 29th, he was the last person

9    that she was going to meet.

10   Q    Why did you refer the case to CIC?

11   A    Because of the unit specialized in investigating the

12   disappearance of people is there.

13   Q    After taking that initial information regarding the

14   complaint and calling Mr. Verdejo, did you have any other

15   involvement in this investigation?

16   A    No.

17          MR. GOTTFRIED:  Your Honor, I have no further

18   questions.  If I can just approach the witness and remove the

19   --

20          THE COURT:  Okay.

21          MR. GONZALEZ-DELGADO:  We'll request that he remain

22   with the document that he's been using.

23          THE COURT:  Okay.

24          MR. GONZALEZ-DELGADO:  May it please the Court?

25          THE COURT:  Go ahead.

```
 1                      CROSS-EXAMINATION

 2   BY MR. GONZALEZ-DELGADO:

 3   Q    Good morning, Officer Torres.

 4   A    Good morning.

 5   Q    Officer Torres, you were the, the officer who received Ms.

 6   Keila Ortiz and Bereliz Rodriguez on April 29th, 2021; is that

 7   correct?

 8   A    Yes.

 9   Q    And as part of your experience, that you had to ask them

10   the most amount of questions in order to have the information

11   necessary to start an investigation; is that correct?

12             THE COURT:  The record shows that one of the deputies

13   assigned to the courtroom fainted.  He's been taken out of the

14   courtroom for assistance.

15             MR. GONZALEZ-DELGADO:  May I, Your Honor?

16             THE COURT:  Yes.

17             Seconds before the deputy fainted in the courtroom,

18   you had asked a question.  Then the deputy fainted, and there

19   was no answer.  Perhaps you may want to repeat the question.

20             MR. GONZALEZ-DELGADO:  Yes, sir.

21   BY MR. GONZALEZ-DELGADO:

22   Q    Mr. Torres, I believe this was the question:  When you

23   interview a person, you need the most amount of information so

24   that you can start an investigation.  Is that correct?

25   A    Yes.
```

1    Q    And this isn't the first missing person warrant that you

2    work with; is that correct?

3    A    No.

4    Q    Actually, the law states that the person has to be -- has

5    to have disappeared at least for 24 hours; is that correct?

6         MR. GOTTFRIED:  Objection, Your Honor.  Calls for a

7    legal conclusion.

8         THE COURT:  Overruled.

9         THE WITNESS:  At least in the police, we understand

10   that the complaint is filed immediately.

11   BY MR. GONZALEZ-DELGADO:

12   Q    So there is no police rule that says that you need to wait

13   24 hours before you start a missing person investigation?

14   A    All complaints are investigated immediately.

15   Q    That's not my question.  My question is:  Is there a

16   police rule that you have studied, that you have learned, that

17   you have reviewed, that says that you need to wait 24 hours

18   before a person -- before you start a missing person

19   investigation?

20   A    Right now, I'm not aware.

21   Q    And in 2021, in April 2021?

22   A    On April 2021, the complaint was investigated immediately.

23   Q    That's not my question.  Did you, in April 2021, know that

24   there is a rule that the police says that a missing person

25   investigation starts after the person is missing for more than

1    24 hours?

2    A    I'm not aware.

3    Q    You said that you've done this before, correct?

4    A    Yes.

5    Q    And in most cases, people just -- they don't really

6    disappear.  It's just that they can't find them, and then they

7    show up a couple of hours later.  Is that your experience?

8    A    I only investigate preliminarily.  The Missing Persons

9    Unit is in charge of that.

10   Q    So you don't know that information either?

11   A    No.  I investigate preliminarily.  I don't continue

12   investigating missing persons.  I do not continue the case.

13   Q    Okay.  So on April 29th, around 5:30, you started taking

14   notes of the information that Ms. Keila Rodriguez was giving

15   you, correct?

16   A    That's correct.

17   Q    She gave you that information personally?

18   A    Personally, at the police precinct.

19   Q    She was in front of you?

20   A    I'm sorry?

21   Q    She was sitting in front of you?

22   A    We were at the back of the police precinct.

23   Q    So you weren't inside of the police department?

24   A    The parking lot is part of the police precinct.

25   Q    I mean, you weren't in a room with a desk, and you were

1    sitting in the desk taking this information?  That's my

2    question.

3    A    No.

4    Q    So you were writing in a notebook; is that correct?

5    A    Yes.

6    Q    And the first person that could give you information

7    related to Keishla's disappearance, Ms. Keila Rodriguez says

8    that it was Marcelino Perez; is that correct?

9    A    These were people that could provide information.

10   Q    That was not my question.  Listen to my question

11   carefully.

12        The first person that Ms. Keila Rodriguez told you

13   that could give you information relating to Keishla was

14   Marcelino Perez; is that correct?

15   A    Yes.

16   Q    And she also said -- you wrote this down in your notes --

17   in one occasion, he tried to harm her sister, and he lives

18   outside of the country.  Is that what you wrote in your notes,

19   page 2?

20   A    Yes.

21   Q    And, actually, the second person that she said that might

22   know something was Mr. Verdejo; is that correct?

23   A    Yes.

24   Q    But you didn't write down anything about Mr. Verdejo

25   trying to harm Keishla in any way; is that correct?

```
1     A     No.

2     Q     And when you called Mr. Verdejo, he picked up the phone?

3     A     Yes.

4     Q     He answered your questions?

5     A     Only my questions.

6     Q     That's what you wanted, right?

7     A     Yes.

8     Q     And, actually, you said that he seemed calm?

9     A     Yes.

10    Q     And then, Mr. Torres, in those notes that you have, there

11    are two different handwritings.  Which one is yours?

12    A     It's my handwriting.

13    Q     Which one?  The first two pages?  The first four pages?

14    Three pages?  Or the second two pages?

15    A     Everything that is written.

16    Q     You know that there is a difference in the handwriting

17    between the first two -- the first two pages -- three pages and

18    the second two pages, correct?

19              MR. GOTTFRIED:  Objection, argumentative.

20              THE COURT:  Overruled.

21              THE WITNESS:  All of it is my handwriting.

22    BY MR. GONZALEZ-DELGADO:

23    Q     That's not my question.  My question is:  Do you recognize

24    that there is a difference in the handwriting in the first

25    three pages of your notes and the other two pages of your
```

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

1    notes?  Is that correct?

2    A    What I recognize is that it's my handwriting, and it seems

3    the same to me.

4              MR. GONZALEZ-DELGADO:  Permission to publish, Your

5    Honor?

6              THE COURT:  Permission to what?

7              MR. GONZALEZ-DELGADO:  Excuse me?

8              THE COURT:  To what?

9              MR. GONZALEZ-DELGADO:  To show the witness --

10             THE COURT:  To publish?

11             MR. GONZALEZ-DELGADO:  Yes.

12             THE COURT:  Okay.  You want to admit that into

13   evidence in order to publish?

14             MR. GONZALEZ-DELGADO:  No, I don't want to admit it.

15   But he's been using it, and you've allowed the government to

16   use it.

17             THE COURT:  I've allowed you to use it as well

18   without publishing.  So if you want to publish, admit that into

19   evidence.

20             MR. GONZALEZ-DELGADO:  I'd ask that only two pages

21   are published, Your Honor.

22             THE COURT:  Request denied.

23             MS. COLLAZO-ORTIZ:  Your Honor, may we approach?

24             THE COURT:  Yes.

25         (Sidebar conference commenced.)

```
 1              MR. GONZALEZ-DELGADO:  For impeachment purposes, Your
 2     Honor, he has stated these are exactly the same handwriting,
 3     and that is not correct.  And all I'm asking him is if those
 4     two handwritings are his.
 5              THE COURT:  He said yes.
 6              MR. GONZALEZ-DELGADO:  And I said:  Are they the
 7     same?  And he said yes.  And they are not the same handwriting.
 8              THE COURT:  He said it is his handwriting.  But let
 9     me hear Ms. Collazo.
10              MS. COLLAZO-ORTIZ:  Your Honor, our objection is that
11     the notes themselves cannot be published without being
12     admitted.  And they're inadmissible because they have multiple
13     layers of hearsay.
14              The attorney can ask about the notes that he's
15     referring to and specify, have the witness specify how many
16     pages he wrote and which pages he wrote, but that doesn't mean
17     that he must publish the notes to the jury.  They haven't been
18     admitted.
19              THE COURT:  I understand.  That's the case.
20              MR. GONZALEZ-DELGADO:  But it's just to show that
21     they're not the same.  It's impeachment, Your Honor.  And if
22     it's for impeachment, I can request that only two pages be
23     admitted for purposes of impeaching the testimony of the
24     witness.
25              That's all I'm asking.  I don't want the rest of the
```

1    document in.  It doesn't harm me but --

2              MR. GOTTFRIED:  Your Honor, it's --

3              THE COURT:  One at a time.

4              MR. GOTTFRIED:  Your Honor, it's also, this is going

5    down a collateral issue, what's his handwriting, what's not his

6    handwriting.  At the end of the day, the question is what he

7    knows about Keishla's disappearance and the phone call with

8    Verdejo.

9              He asked him.  He tried to impeach him by saying that

10    the handwriting's different.  The witness denied it.  And I

11    think that's the end of the story.  To allow, kind of open a

12    door to try to have a handwriting expert prove whether or not

13    it's his handwriting or not his handwriting, publish a

14    Spanish-language text to the jury, is just, frankly, not an

15    efficient use of time.

16              THE COURT:  I heard you, Mr. Gonzalez.

17              MR. GONZALEZ-DELGADO:  This is cross-examination.

18              THE COURT:  Mr. Gonzalez.

19              MR. GONZALEZ-DELGADO:  You should give me leeway.

20              THE COURT:  I've given you leeway.

21              MR. GONZALEZ-DELGADO:  Listen, Your Honor.

22              THE COURT:  That's collateral, Mr. Gonzalez.

23              MR. GONZALEZ-DELGADO:  It's not collateral.  This is

24    the document that the government made, gave to the witness,

25    that the witness read through the direct examination, and I'm

```
1    just impeaching him with the same document that the government
2    used.
3              THE COURT:  You've been using the same document for
4    the same purpose.
5              MR. GONZALEZ-DELGADO:  Yes, because I'm impeaching
6    him because the Court allowed them to use it without having
7    been admitted into evidence.
8              THE COURT:  Mr. Gonzalez, that's my ruling.
9         (Sidebar conference concluded.)
10             MR. GONZALEZ-DELGADO:  If I may, Your Honor?
11             THE COURT:  Go ahead.
12   BY MR. GONZALEZ-DELGADO:
13   Q    Agent Torres, can you agree that the first three pages
14   that you wrote are in a handwriting in, in a solid handwriting?
15             MR. GOTTFRIED:  Objection, asked and answered,
16   collateral issue.
17             THE COURT:  Overruled.
18             THE WITNESS:  It seems the same to me.
19   BY MR. GONZALEZ-DELGADO:
20   Q    That's not my question.  My question is:  Is the
21   handwriting in block?
22   A    Yes.
23   Q    And the other three -- the other two pages are in cursive;
24   is that correct?
25   A    Yes.
```

1    Q    Isn't it true that the second notes were notes that

2    somebody took for you from an interview that they did regarding

3    this case?

4    A    Yes.

5    Q    So they're not your notes?

6    A    The one dated May 1st, no.

7    Q    Okay.  So they're not your handwriting; is that correct?

8    A    No.

9    Q    Now, you told whoever wrote these notes that when you,

10    when you were inquiring about who was the actual companion of

11    Ms. Keishla Rodriguez, you told them that it was Marcelino

12    Perez; is that correct?

13    A    No.

14    Q    Look at the second paragraph, the first line, where it

15    says --

16             MR. GOTTFRIED:  Objection, Your Honor.

17             MS. COLLAZO-ORTIZ:  Objection, Your Honor.

18             MR. GONZALEZ-DELGADO:  To refresh his memory, Your

19    Honor.

20             MR. GOTTFRIED:  Your Honor, the witness has not

21    adopted those statements.  He's referring to a separate set of

22    documents.

23             MR. GONZALEZ-DELGADO:  He said that they -- for --

24    I've been questioning him.  Maybe 10 times I've asked him if

25    they were the same notes, they were his notes, and he said they

1    were.  So how did he did not adopt what's in this document,

2    Your Honor?  The government gave it to them so he can refresh

3    his memory.

4              THE COURT:  Okay.  Stop.  Objection overruled.

5    BY MR. GONZALEZ-DELGADO:

6    Q    Go to the second paragraph and read the first two lines.

7              THE COURT:  Of what page?

8              MR. GONZALEZ-DELGADO:  Page 4 of the notes that he's

9    using.

10             THE WITNESS:  He asked her if she had a current

11   partner.

12   BY MR. GONZALEZ-DELGADO:

13   Q    And?

14   A    And she answered ex-husband Marcelino.

15   Q    That's what you told somebody else, correct?

16   A    That's what the person who wrote these notes wrote.  I

17   have no control over that.

18   Q    But isn't this supposed to be the information that you

19   gave them?

20   A    The information that Keila provided to me that Marcelino

21   was the ex-partner.

22   Q    But didn't you relay that information to the person who

23   took these notes?

24   A    I provided that information.  How they write it is not up

25   to me.

```
 1   Q    And you don't check it to make sure that the information
 2   that you have provided is accurate?
 3   A    I only provide the information.
 4   Q    And part of the information that you provided was that
 5   Keishla's sister, Bereliz, told you that Marcelino, on one
 6   occasion, had tried to harm Keishla; is that correct?
 7   A    Yes.
 8   Q    Now, did you go with Keila Ortiz and Bereliz to the house
 9   of Ivan that night to interview him?
10   A    No.
11   Q    So all you did was just take the information at the police
12   department?
13   A    Yes.
14   Q    You never got in a car with any other police officer,
15   Keila and Bereliz, to go investigate the case?
16   A    No.
17        MR. GONZALEZ-DELGADO:  I have no further questions,
18   Your Honor.
19        THE COURT:  Mr. Gottfried?
20        MR. GOTTFRIED:  Yes, Your Honor, brief redirect.
21                    REDIRECT EXAMINATION
22   BY MR. GOTTFRIED:
23   Q    Good morning again, sir.
24        Brother Counsel has asked you many questions
25   regarding your recollection.  Has anything that Brother Counsel
```

1    asked you changed your recollection that Mr. Verdejo told you
2    that on the evening of April 28th, 2021, he had agreed to meet
3    with Keishla on April 29th?
4    A    That's what he told me.
5    Q    Okay.  Has anything that defense counsel has asked you
6    over the preceding minutes changed your recollection that Mr.
7    Verdejo told you on April 29th that he had a meeting with
8    Keishla so that she would show him a positive pregnancy test?
9    A    Nothing of what he said changed the information that was
10   provided to me.
11            MR. GOTTFRIED:  No further questions, Your Honor.
12            MR. GONZALEZ-DELGADO:  I have none, Your Honor.
13            THE COURT:  Officer Torres, let me ask you this:
14   What you wrote in the notes, you wrote on April 29th?
15            THE WITNESS:  Yes.
16            THE COURT:  All right.  Any questions from counsel on
17   what I asked?
18            MR. GOTTFRIED:  No questions from the government.
19            MR. GONZALEZ-DELGADO:  No, Your Honor.
20            THE COURT:  All right.  I do not have additional
21   questions for the witness.
22            Officer Torres, thank you for your testimony.  You
23   are free to go.
24            THE WITNESS:  Good morning to everybody.
25            (Witness excused.)

```
 1              MS. COLLAZO-ORTIZ:  Your Honor, the government calls
 2    Rafael Ortiz-Pineiro.
 3              THE COURT:  Okay.
 4              THE COURTROOM DEPUTY CLERK:  Mr. Ortiz, please raise
 5    your right hand.
 6         (Witness sworn.)
 7              THE COURTROOM DEPUTY CLERK:  So help you God.  You
 8    may take a seat.
 9                       RAFAEL ORTIZ-PINEIRO,
10         called as a witness on behalf of the Plaintiff,
11              having been previously duly sworn,
12              was examined and testified as follows:
13                       DIRECT EXAMINATION
14    BY MS. COLLAZO-ORTIZ:
15    Q    Good morning.
16    A    Good morning.
17    Q    Please tell your full name to the members of the jury.
18    A    Officer Rafael Ortiz-Pineiro, Badge 5219.
19    Q    And what is your occupation?
20    A    I'm an investigative agent of the coordinating division of
21    the Missing Persons Unit of the deputy -- the Office of the
22    Deputy Superintendent for Criminal Investigations.
23    Q    And how long have you been working as a police officer?
24    A    37 years and a half.
25    Q    And prior to your current assignment, where were you
```

1   working?

2   A    I was assigned at the CIC to the Homicide Unit for the

3   Missing Persons Department, and in addition to that, to the

4   Theft Division.

5          MS. COLLAZO-ORTIZ:  Correction to interpretation:

6   Robbery Division.

7          THE WITNESS:  Robbery Division.

8   BY MS. COLLAZO-ORTIZ:

9   Q    Beside that, anything else?

10  A    In addition to that, I was assigned to the Youth Division,

11  to the Property Division, and before that, I was wearing my

12  uniform at the Loiza precinct.

13  Q    Okay.  And how long were you working for the Missing

14  Persons Division in San Juan?

15  A    From December of 2013 until October 17th of 2022.

16  Q    And was that the office where you were assigned in April

17  of 2021?

18  A    That's correct, the Missing Persons Division of the CIC.

19  Q    And what is the mission of that office?

20  A    Investigate missing persons cases.

21  Q    And let me ask you:  On April 29th, 2021, did you receive

22  a complaint related to a missing person?

23  A    That's correct.  I received a complaint from the Caimito

24  Police Precinct for a missing person.

25  Q    At what time was that complaint received?

1    A    In the afternoon of April 29th.

2    Q    And what was your participation in that complaint?

3    A    To conduct the corresponding investigation to that

4    particular investigation that was assigned.

5    Q    And how do you begin that investigation?

6    A    It was initiated by interviewing the complainant, in this

7    case, Keila Ortiz, the mother of the missing person:  Keishla

8    Rodriguez-Ortiz.

9    Q    And where did this interview take place?

10   A    On the second floor of the police headquarters in Hato Rey

11   at the CIC, the division of, the Homicide Division.

12   Q    And were there any other agents that were helping you in

13   this investigation?

14   A    Agent Elias Negron-Santiago.

15   Q    And how was the work distributed between you and Agent

16   Negron?

17   A    While I conducted the interviews of people at the

18   headquarters, he developed the investigation out on the field

19   related to what was coming up in the interviews.

20   Q    And what does it mean to develop the investigation in the

21   field?

22   A    During the interviews for -- of the witnesses, the

23   information that came up, if needed, other people were summoned

24   to be interviewed, or any additional information.  Since he was

25   out on the street with the supervisor, he worked with that, in

1    particular.

2    Q    And beside interviews, what other investigative techniques

3    were you using?

4    A    We check with hospitals.  We check with Forensic Sciences

5    Institute.  We check with psychiatric hospitals.

6    Q    And is that the case for all the investigations?

7    A    That's what's usual in all cases, plus interviewing

8    witnesses and relatives that are related to the missing person.

9    Q    And what kind of people were you interviewing at the

10   headquarters?

11   A    I interviewed Keila Ortiz, the mother of Ms. Keishla

12   Rodriguez.  I interviewed Bereliz, the sister of Keishla

13   Rodriguez.  I also interviewed Marcelino, who was an ex-partner

14   of Keishla.  And also, we took the steps to call in Mr. Felix

15   Verdejo, who was -- who also had a relationship with Keishla.

16   And also, all the related work.

17   Q    And what was the purpose or -- of these interviews?

18   A    To try to locate the missing lady:  Keishla

19   Rodriguez-Ortiz.

20   Q    And why did you want to interview Mr. Felix Verdejo?

21   A    Because as part of the testimony of the people that were

22   interviewed, they had expressed that she had a relationship

23   with Mr. Felix Verdejo.

24   Q    And why did you interview Mr. Marcelino?

25   A    Because also, according to the interviews with the

1    witnesses, they had expressed that he had also had a
2    relationship with Keishla.
3    Q    Okay.  Can you please describe the process of interviewing
4    Mr. Marcelino Perez?
5    A    The gentleman was cooperative during the interview.
6    Q    And at what time did that interview take place?
7    A    That interview took place after 11:00 p.m. on the night of
8    April 29th, 2021.
9    Q    And as part of that interview, did he provide you with any
10   documents?
11   A    That's correct.  During the interview, he alleged that he
12   had been, since March 24th, in New York City, and that he had
13   just arrived via JetBlue.  And I requested from him the flight
14   ticket in order to confirm the information that he had just
15   provided me.
16            MR. GONZALEZ-DELGADO:  Objection, and move to strike.
17   That's hearsay, Your Honor.
18            THE COURT:  Overruled.
19            MR. GONZALEZ-DELGADO:  Your Honor, may we approach?
20       (Sidebar conference commenced.)
21            MR. GONZALEZ-DELGADO:  The government informed the
22   Court that they had 29 witnesses.  He's not one of those
23   witnesses.  Those statements that he's making, they're pure
24   hearsay.
25            Nothing that he says, unless I have the opportunity

1    to cross-examine him, under the Sixth Amendment, *Crawford*,

2    that's testimony.  That's part of the investigation, and I have

3    a right to cross-examine that individual.  If they do not bring

4    him in as a witness, anything that Mr. Marcelino might have

5    said is hearsay, Your Honor.

6         MS. COLLAZO-ORTIZ:  My question was:  What document

7    did he provide.  That's what we're talking about.  We're not

8    going into the statements.  We are going into the documentation

9    he provided, which is a JetBlue ticket that has been provided

10   to counsel.  That is also part of the business records that

11   were produced and admitted from JetBlue.

12        MR. GOTTFRIED:  Your Honor, the other issue is that

13   the police officer is explaining why he took certain

14   investigative steps.  In order to explain why, you need to know

15   the background of the investigation.

16        So, again, it's not -- it's impact upon the listener

17   why he's decided to take certain investigative steps at the

18   outset of this case.

19        MR. GONZALEZ-DELGADO:  He can do that without going

20   into hearsay statements.

21        MS. COLLAZO-ORTIZ:  We're not intending to go into,

22   into the contents of the interview beyond the document that he

23   provided, Your Honor.

24        MS. CINTRON-COLON:  The problem is, Your Honor, not

25   only is he saying the document, he's saying what he told him in

1    the interview.  Even if that was not specifically directed, the

2    question to that elicited answer, that is what he answered.

3    Therefore, that is our objection.

4         Because his answer was hearsay, not for his response

5    on what he did, because he did not go to JetBlue and get this.

6    It was how I asked him:  He provided me the JetBlue ticket, or

7    et cetera, whatever.

8         So everything that Marcelino might have said, that is

9    the hearsay.  Even if that was not the question, the answer was

10   complete hearsay, Your Honor.

11        THE COURT:  Objection overruled.

12    (Sidebar conference concluded.)

13   BY MS. COLLAZO-ORTIZ:

14   Q    Now, you have just testified that you requested a ticket

15   from Mr. Marcelino.  Did you, in fact, receive any such ticket?

16   A    A flight ticket.

17        MS. COLLAZO-ORTIZ:  Your Honor, permission to

18   approach with Government ID 19.

19        THE COURT:  Granted.

20   BY MS. COLLAZO-ORTIZ:

21   Q    Agent Ortiz, do you recognize what I have just provided

22   you as Government ID 19?

23   A    That's correct.  I recognize it.

24   Q    Is that a fair and accurate copy of the boarding pass that

25   you received from Mr. Marcelino on April 29th, 2021?

1    A    That's correct.

2              MS. COLLAZO-ORTIZ:  Your Honor, we ask that the

3    exhibit be admitted.

4              MR. GONZALEZ-DELGADO:  Objection, Your Honor, under

5    Rule 1002, requirement of the original.

6              THE COURT:  The objection is overruled.  The document

7    will be admitted as government exhibit?

8         (Exhibit No. 19 admitted into evidence.)

9              MS. COLLAZO-ORTIZ:  Permission to approach and

10   retrieve the document, Your Honor.

11             THE COURT:  Yes, but first I need to know what

12   exhibit that is.

13             MS. COLLAZO-ORTIZ:  19, Your Honor.

14             THE COURT:  19?  Thank you.

15             MS. COLLAZO-ORTIZ:  Permission to publish.

16             THE COURT:  Granted.

17   BY MS. COLLAZO-ORTIZ:

18   Q    I am publishing Exhibit 19.  Can you please explain what

19   is that document?

20   A    That is the flight ticket provided to me by Mr. Marcelino

21   Perez from the JetBlue Airline that indicates that on April

22   29th of 2021, he boarded a plane from New York City to Puerto

23   Rico, leaving at 6:45 -- no.  I'm sorry.  He left at 7:30 from

24   New York City and arrived in Puerto Rico at 11:25 p.m. of April

25   29th, 2021.

```
1    Q    And how soon after that arrival time did you interview
2    him?
3    A    I would say about 25 minutes later, because he went
4    directly -- he arrived at the headquarters of the police after
5    11:00 p.m. on April 29th, 2021.
6    Q    And what other investigative efforts were conducted in
7    this case?
8    A    A missing persons document was generated.  It's a document
9    by the Police of Puerto Rico that contains a photo of the
10   missing person, and that document is distributed to the 14
11   police areas of Puerto Rico so that the precincts have evidence
12   that that is a person that is being sought as a missing person.
13   Q    And until what time did the Missing Persons Unit work on
14   that day?
15   A    To the best of my recollection, until 3:00 or 4:00 in the
16   morning.  And I would like to add to that, that besides a
17   missing persons notice, the pink alert was activated, which is
18   a mechanism that the government created for whenever a woman 18
19   or more is missing or kidnapped, the government entities unite
20   looking for that person.
21   Q    Okay.  And before moving on to the next day, I forgot to
22   ask you, as part of your interview with Mr. Marcelino
23   Perez-Soto, did you take his personal information?
24            THE INTERPRETER:  I'm sorry, Counsel.  What was the
25   last part of the question?
```

```
1    BY MS. COLLAZO-ORTIZ:

2    Q    Did you take his personal information?

3    A    That's correct.

4    Q    And did that include his date of birth?

5    A    That's correct, all of the general information:  address,

6    date of birth, social security.

7    Q    And what was his date of birth?

8    A    I cannot recall right now.

9    Q    Is there any document that would refresh your

10   recollection?

11   A    The interview that I conducted with him.  That information

12   should be there.

13            MS. COLLAZO-ORTIZ:  Permission to approach, Your

14   Honor.

15            THE COURT:  Granted.

16   BY MS. COLLAZO-ORTIZ:

17   Q    Can you please refresh your recollection with your notes

18   from the interview?

19   A    That's correct.

20   Q    Having refreshed your recollection, can you please tell us

21   Mr. Marcelino's full name and date of birth?

22            MR. GONZALEZ-DELGADO:  Your Honor, we have the same

23   objection.  We request that the witness not read from a

24   document that has not been admitted into evidence.

25            THE COURT:  Overruled.
```

```
 1   BY MS. COLLAZO-ORTIZ:

 2   Q    The full name and the birth date?

 3   A    Marcelino Perez-Soto, and the date of birth is February

 4   7th, 1964.

 5        MS. COLLAZO-ORTIZ:  Permission to approach to

 6   retrieve the document?

 7        THE COURT:  Granted.

 8   BY MS. COLLAZO-ORTIZ:

 9   Q    Now turning to April 30th of 2021.  How did the

10   investigation develop on that day?

11   A    That day, we had Mr. Felix Verdejo scheduled for

12   interview.

13   Q    And beside interviewing Mr. Verdejo, what other

14   investigative techniques were employed on that day?

15   A    We were verifying social media.  We were verifying the

16   telephone of the missing person, Keishla Rodriguez, and in

17   addition to that, we continued checking with the different

18   hospitals in the metropolitan area and outside of the

19   metropolitan area.

20   Q    When you mentioned the phones, what information were you

21   trying to obtain regarding phones?

22   A    Information about the telephones, regarding the accounts,

23   to whom the accounts belonged, the owner of the accounts.  That

24   type of information that is requested through a subpoena that

25   is obtained through the state prosecutor to then conduct a
```

1    search of the information.

2    Q    Okay.  A search of what information?

3    A    Information about the owner and the global positioning of

4    that phone.

5    Q    And, in particular, what phone are you talking about?

6    A    In particular, I'm talking about Mr. Felix Verdejo's

7    phone.

8    Q    And was it also for the victim's phone?

9    A    It was also being sought for the victim's phone.

10    Q    And what do you do with that request for information from

11    the phones?

12    A    We proceeded to file it with the particular company so

13    that that company would proceed to download the information.

14    Q    And what happened after you received the information from

15    the phone company?

16    A    Help was requested from the FBI through Officer Elias

17    Negron so that they would help us with the telephone's global

18    positioning.

19    Q    And how did your involvement in the case conclude?

20    A    After obtaining the search order for the telephones, by

21    May 1st, a body was found in the area of the bay, close to the

22    Teodoro Moscoso Bridge, and my participation in the

23    investigation for missing persons concludes having found a body

24    that had signs of violence.  And the Homicide Division then

25    came in.

1    Q    Do you know which agent took over the investigation?

2    A    Officer Manuel Colon from the Major Crimes Division.

3         MS. COLLAZO-ORTIZ:  We have no further questions for

4    this witness at this time, Your Honor.

5         THE COURT:  Mr. Gonzalez?

6         MR. GONZALEZ-DELGADO:  Yes, Your Honor.

7         May it please the Court?

8         THE COURT:  Go ahead.

9                          CROSS-EXAMINATION

10   BY MR. GONZALEZ-DELGADO:

11   Q    Good morning, Officer Ortiz.

12   A    Good morning, sir.

13   Q    Officer Ortiz, as part of your job, you interviewed other

14   police officers in this case; is that correct?

15   A    I directly participated in the interviews that I

16   mentioned.

17   Q    Which were Mr. Verdejo, was one, correct?

18   A    That's correct.

19   Q    The other one was Marcelino Perez?

20   A    Correct.

21   Q    And the other one was Mr. Ivan Santana?

22   A    I did not interview Mr. Ivan Santana.

23   Q    But you took notes regarding an interview that Mr. Ivan

24   Santana had been -- they had made of Mr. Ivan Santana; is that

25   correct?

1    A    At least I didn't interview Mr. Ivan Santana.  I believe

2    that he was interviewed by Lieutenant Bonilla.

3    Q    But when you interviewed Mr. Marcelino Perez, you found

4    out that he had left Puerto Rico March 24th; is that correct?

5    A    At least from the interview conducted of him, he indicated

6    that he had been out of Puerto Rico since March 24th.

7    Q    But, by coincidence, he was returning to Puerto Rico on

8    April 28th -- 29th.  I'm sorry.

9    A    That's correct.

10   Q    You know when he bought that ticket?

11   A    No.

12   Q    Did you ask him when he bought that ticket?

13   A    No.

14   Q    You don't -- you didn't go to the airport to see if he had

15   actually taken the flight that day; is that correct?

16   A    That's correct.

17   Q    You don't have a certification from, I believe it's

18   JetBlue, stating that he actually got on the plane?

19   A    That's correct.

20   Q    Now, you said that Marcelino Perez was cooperative when he

21   was being interviewed; is that correct?

22   A    That's correct.

23   Q    But there was a moment when he wasn't?

24   A    That's correct.

25   Q    And that's when you asked him for his phone?

1    A    His telephone number had been requested.

2    Q    Because you told him that you needed to investigate his

3    phone?

4    A    What I wanted was the telephone number.

5    Q    And the purpose for wanting his phone is because you

6    wanted to investigate with the company that carries his phone

7    number to see who he had called; is that correct?

8    A    That's correct.

9    Q    And then he admitted that he actually spoke with Keishla?

10   A    Yes.  He always admitted that he had talked to Keishla

11   days before the disappearance.

12   Q    And, actually, in your notes, you wrote that he seemed

13   [non-English language].  He seemed concerned?

14   A    He was concerned by Keishla's disappearance.

15   Q    But that's not what you wrote in your notes, correct?

16          THE INTERPRETER:  I'm sorry, Counsel?

17   BY MR. GONZALEZ-DELGADO:

18   Q    That's not what you wrote on your note?  All you wrote on

19   your notes is that he seemed [non-English language], concerned?

20   A    I do not understand the question.

21   Q    Okay.  You admit that you wrote notes of your interview

22   with Mr. Marcelino, correct?

23   A    That's correct.

24   Q    And in those notes that you wrote, you wrote that he

25   seemed --

```
1               MR. GOTTFRIED:  Objection, Your Honor.  He shouldn't
2    be -- objecting to defense counsel testifying to what's in the
3    notes.
4               MR. GONZALEZ-DELGADO:  I'm not testifying.  I'm
5    asking him if he wrote that.
6               THE COURT:  Overruled.
7    BY MR. GONZALEZ-DELGADO:
8    Q    Did you write on your notes Marcelino [non-English
9    language]?  Marcelino, sometimes they spoke; he seemed
10   concerned?
11   A    That's correct.
12   Q    And then you wrote down that he provided the name of Ivan?
13   A    That's correct.
14   Q    Because the information that Marcelino had was that Ivan
15   was another romantic partner of Keishla; is that correct?
16              MS. COLLAZO-ORTIZ:  Objection, hearsay, Your Honor.
17              THE COURT:  Overruled.
18              THE WITNESS:  That's correct.
19   BY MR. GONZALEZ-DELGADO:
20   Q    Now, from your investigation --
21              MR. GONZALEZ-DELGADO:  Can I have a second?
22              I have no further questions, Your Honor.
23              THE COURT:  Ms. Collazo?
24              MS. COLLAZO-ORTIZ:  Very briefly, Your Honor.
25              THE COURT:  Go ahead.
```

```
1                        REDIRECT EXAMINATION

2    BY MS. COLLAZO-ORTIZ:

3    Q    Agent Ortiz, to clarify, why did you write that Marcelino

4    seemed worried?  Why did you -- I'm sorry.

5    A    Well, it was a detail, as an investigator, because

6    sometimes when you interview somebody, that body language can

7    be important, and I took notes because I understood that I

8    should.

9    Q    And when you mean worried, worried about what?

10                MR. GONZALEZ-DELGADO:  Objection, Your Honor, calls

11   for state of mind of someone else.

12                THE COURT:  Overruled.

13                THE WITNESS:  Because of the disappearance of Keishla

14   Rodriguez.

15   BY MS. COLLAZO-ORTIZ:

16   Q    And regarding the phone number, did he provide you his

17   phone number?

18   A    That's correct.  He gave it to me.

19   Q    And did you have an opportunity to interact with Mr. Felix

20   Verdejo?

21   A    That's correct.

22   Q    And how did he --

23                MR. GONZALEZ-DELGADO:  Objection, Your Honor, outside

24   the scope.

25                THE COURT:  I will allow it.
```

```
 1              MR. GONZALEZ-DELGADO:  Your Honor --

 2              THE COURT:  I will allow it.

 3   BY MS. COLLAZO-ORTIZ:

 4   Q    And how did he seem at that time?

 5              MR. GONZALEZ-DELGADO:  Objection, Your Honor,

 6   reopening the direct.

 7              THE COURT:  Overruled.

 8   BY MS. COLLAZO-ORTIZ:

 9   Q    How did he seem?

10   A    He also seemed concerned, and he was uncooperative,

11   slightly uncooperative, during the interview.

12              MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

13              THE COURT:  Mr. Gonzalez?

14              MR. GONZALEZ-DELGADO:  Just one question, Your Honor.

15                       RECROSS-EXAMINATION

16   BY MR. GONZALEZ-DELGADO:

17   Q    Agent Ortiz, when you say that Mr. Marcelino Perez, Mr.

18   Marcelino Perez seemed [non-English language], preoccupied or

19   concerned, that was your perception, correct?

20   A    That's correct.

21   Q    He didn't tell you that he was worried because of the

22   disappearance of Keishla, correct?

23   A    Yes, he expressed it.

24   Q    But you didn't write that down anywhere?

25   A    That's correct.
```

```
 1              MR. GONZALEZ-DELGADO:  No further questions, Your
 2     Honor.
 3              THE COURT:  I do not have questions for the witness.
 4              Officer Ortiz, thank you for your testimony.  You are
 5     free to go.
 6              THE WITNESS:  Thank you.  Have a nice day.
 7          (Witness excused.)
 8              THE COURT:  At this point, let's take a 10, 15-minute
 9     break.  Remember, do not talk amongst yourselves about the
10     case, your impressions of the evidence and so forth.  Do not
11     conduct any research about the case, the persons in the case or
12     the individuals involved in the case.  Do not read reports
13     related to the case.
14              I look forward to seeing you back in the courtroom in
15     about 10 or 15 minutes.
16          (Whereupon the following proceedings were had in open court
17            without the presence of the jury.)
18              THE COURT:  All right.  We'll return in about 10 or
19     15 minutes.
20          (Whereupon a recess was taken at 10:49 a.m., until 11:15
21            a.m.)
22          (Whereupon the following proceedings were had in open court
23            without the presence of the jury.)
24              THE COURT:  Let's call the jury in.
25          (Whereupon the following proceedings were had in open court
```

```
 1              in the presence of the jury.)
 2                   THE COURT:  Welcome back to the courtroom.  Please
 3      take a seat.
 4                   MS. COLLAZO-ORTIZ:  Good afternoon, Your Honor.  May
 5      it please the Court?
 6                   Before calling the next witness, we would ask the
 7      Court's permission to publish what has been previously marked
 8      as Exhibit 10, which are JetBlue flight manifests.
 9                   THE COURT:  Go ahead.
10                   MR. GONZALEZ-DELGADO:  That wasn't admitted.  By
11      whom?
12                   Your Honor, we're objecting to the admission of these
13      documents again.
14                   MS. COLLAZO-ORTIZ:  They're already admitted, Your
15      Honor.
16                   THE COURT:  They're in evidence, Exhibit 10.
17                   Publish.
18                   MS. COLLAZO-ORTIZ:  Your Honor, at this time, the
19      government calls Lieutenant Jose Bonilla-Ruiz.
20                   MR. GONZALEZ-DELGADO:  Before you call --
21                   Your Honor, may I comment on the evidence that's been
22      admitted that we haven't had an opportunity to express anything
23      to the jury regarding the document?
24                   THE COURT:  Sidebar.
25             (Sidebar conference commenced.)
```

 1          MR. GONZALEZ-DELGADO:  I'm requesting the opportunity

 2     to express our opinion or our take of what's on the document.

 3     It's just brought in and put into, into evidence without having

 4     any explanation, other than it's a manifest.  We haven't had an

 5     opportunity to provide our side of the, of the, of -- our side

 6     of the story regarding that manifest, Your Honor.

 7          MS. COLLAZO-ORTIZ:  Your Honor, that's what closing

 8     arguments are for.  Any argument regarding the evidence that

 9     had been admitted is for closing argument, not at this point.

10     I didn't make any argument about the contents of the document.

11          MR. GONZALEZ-DELGADO:  But it's, it's -- it was

12     submitted and accepted and admitted as evidence for one

13     purpose, that that's a manifest of a flight in the name of Mr.

14     Marcelino Perez.

15          MR. GOTTFRIED:  Your Honor, it's a business record.

16     It was admitted into evidence.  We just published it to the

17     jury without any comment.  To the extent that defense counsel

18     wants to attack that line, he can do it in his case or he can

19     comment on it, certainly, in his closing.

20          MR. GONZALEZ-DELGADO:  How does the jury know what

21     it's for?

22          THE COURT:  Your point is noted.  Objection

23     overruled.

24          (Sidebar conference concluded.)

25          MS. COLLAZO-ORTIZ:  We're calling Lieutenant Jose

1     Bonilla-Ruiz.

2              THE COURTROOM DEPUTY CLERK:  Mr. Bonilla, please

3     raise your right hand.

4         (Witness sworn.)

5              THE COURTROOM DEPUTY CLERK:  So help you God.  You

6     may take a seat.

7                        JOSE BONILLA-RUIZ,

8            called as a witness on behalf of the Plaintiff,

9                having been previously duly sworn,

10               was examined and testified as follows:

11                     DIRECT EXAMINATION

12    BY MS. COLLAZO-ORTIZ:

13    Q    Good morning.  Please introduce yourself to the members of

14    the jury.

15    A    Good morning.  I am Lieutenant Jose A. Bonilla-Ruiz.

16    Q    And what is your badge number?

17    A    7-29650.

18    Q    And what is your --

19             MR. GONZALEZ-DELGADO:  Your Honor, may we approach

20    briefly?

21        (Sidebar conference commenced.)

22             MR. GONZALEZ-DELGADO:  I don't recall this witness

23    being announced to the jury or in the government's case in

24    chief.  I have the list of witnesses, and he wasn't mentioned.

25             MS. COLLAZO-ORTIZ:  Our list actually had, I believe,

1    32 names.  I don't know where the defense got that name.

2              MS. CINTRON-COLON:  Well, we got it after it was read

3    aloud because we don't have a witness list, per se.

4              MS. COLLAZO-ORTIZ:  I think it was 30 names that we

5    submitted to the Court.

6              MR. GONZALEZ-DELGADO:  Can we go to the record, Your

7    Honor?

8              MS. CINTRON-COLON:  Or be provided with a list of the

9    names that were stated in open court?  Because we don't have

10   the transcript of that day because that was jury selection, and

11   apparently our notes are possibly not aligning with the record.

12             THE COURT:  I don't have him.

13             MR. GOTTFRIED:  You do or do not, Your Honor?

14             MS. COLLAZO-ORTIZ:  You do, and it's in the list that

15   we submitted to the Court.

16             MR. GONZALEZ-DELGADO:  So I missed it.

17             THE COURT:  So what's his number on the list?

18             MR. GOTTFRIED:  12.

19             MS. COLLAZO-ORTIZ:  That's our list, but I think the

20   Court has a different numbering.

21             THE COURT:  Okay.  That's Jose Bonilla?

22             MS. COLLAZO-ORTIZ:  Jose Bonilla.

23             THE COURT:  He's on the list.

24             MS. CINTRON-COLON:  May we be provided with a copy of

25   the list?  Because apparently we didn't catch a few names.  It

1    was read in open court.

2              THE COURT:  I'll make sure you get a list by the end

3    of the day.

4              MS. CINTRON-COLON:  Thank you, Your Honor.

5              THE COURT:  Okay.  This is in color because it helps

6    me navigate through the list when I'm reading names to the

7    jury.

8              MR. GONZALEZ-DELGADO:  Yes, sir.  Thank you.

9       (Sidebar conference concluded.)

10   BY MS. COLLAZO-ORTIZ:

11   Q    I believe the last question was:  What is your occupation?

12   A    I am currently a Lieutenant in the Puerto Rico Police.

13   Q    And in what unit or division of the Police of Puerto Rico

14   are you currently assigned?

15   A    Currently, I am the director of the division in charge of

16   investigating robberies, illegal appropriations, aggravated

17   assaults and missing persons of the CIC in Bayamon.

18   Q    And how long have you worked for the Police of Puerto

19   Rico?

20   A    23 years.

21   Q    And before your current assignment, what other divisions

22   have you worked at?

23   A    At the beginning of my career, in 2000, I was at the

24   Division of Tactical Operations, and after that, I was

25   transferred as an investigator at the CIC Bayamon Homicide

1    Division.

2              I was an investigator in the Intelligence Division,

3    also in Bayamon.  Upon rising to the rank of sergeant, I was

4    Supervisor in the Homicide Division at the CIC in Bayamon.  And

5    after that, I was also supervisor at the Division of Major

6    Crimes at the police headquarters, and I answered directly to

7    the Commissioner back then.

8              For sometime, I was also the liaison officer between

9    the Task Force of the Police of Puerto Rico and the U.S.

10   Marshals, the Task Force.  Upon my promotion to Lieutenant, I

11   was put in charge of the Homicide Office of the CIC in San

12   Juan.

13   Q    And what, what timeframe were you working at the, or

14   directing the Homicide Division in San Juan?

15   A    For about a year.

16   Q    And what timeframe?

17   A    From 2021 to 2022.

18   Q    And where were you assigned in April of 2021?

19   A    I was the Director of the Homicide Division at the CIC in

20   San Juan.

21   Q    And in April of 2021, what type of cases were assigned

22   under the Homicide Division in San Juan?

23   A    Back then, the Homicide Division was in charge of

24   investigating violent murders, aggravated assaults, and they

25   were also charged with finding missing persons.

```
 1    Q    Okay.  And turning your attention to April 29th, 2021, did
 2    your unit receive a report of a missing person?
 3    A    Yes, that's correct.
 4    Q    At what time did you receive that complaint?
 5    A    Approximately, at 6:00 p.m.
 6    Q    And who was the person that was reported missing?
 7    A    Keishla Rodriguez.
 8    Q    And why does Missing Persons get involved?
 9    A    That complaint was referred, at the time, to our office,
10    because the protocol requires that the complaint is first
11    investigated by the precinct, and if further investigation is
12    required, then it's referred to our office.
13    Q    Okay.  In particular, who was the complaint assigned to?
14    A    That complaint was assigned to Officer Rafael
15    Ortiz-Pineiro.
16    Q    And what was the plan for the investigation?
17            THE INTERPRETER:  I'm sorry?
18    BY MS. COLLAZO-ORTIZ:
19    Q    What was the investigation plan at that time?
20            THE INTERPRETER:  Plan?
21            MS. COLLAZO-ORTIZ:  (Nods head.)
22            THE WITNESS:  At the time, the plan that was
23    established, since this was -- we were looking for a missing
24    person, the plan was to look for that person in places where
25    she was believed to be, the young woman.  That would be close
```

1    friends and people close to her.

2    BY MS. COLLAZO-ORTIZ:

3    Q    And how were the tasks distributed?

4    A    Officer Rafael Ortiz-Pineiro would be in charge of

5    everything having to do with the interviews of these people,

6    together with Officer Elias Negron.  They were going to share

7    that task.

8          Other staff was in charge of locating the places

9    close to the job, the workplace of the youngster -- of the

10   young woman at the time.  And yours truly, along with the

11   captain at the time, Luis Diaz-Munoz, we were in charge of

12   visiting two specific places.

13   Q    What do you mean that there was some personnel that was

14   going to go to places near her work?

15   A    Well, they were in charge of going there to locate

16   cameras, to interview co-workers, people that were part of the

17   daily life of this young woman that could shed light on where

18   she could be.

19   Q    And you mentioned that you went to two places.  What two

20   places are that?

21   A    That's correct.  First we went to the residency of a

22   gentleman by the name of Ivan.

23   Q    And what was the purpose of going to that residence?

24   A    The investigation showed that this gentleman, who had a

25   residency at Escorial, had a very good relationship with the

1    young woman.

2    Q    And at, approximately, what time do you go to this

3    location?

4    A    Approximately, 10:00 or 11:00 p.m.

5    Q    I'm sorry if you already said this, but who was with you?

6    A    Captain Luis Diaz.

7    Q    Okay.  And how did you know where to go?

8    A    It came up in the interviews to relatives of the young

9    woman.

10   Q    And what happened upon arriving at this location in

11   Escorial?

12   A    When we arrived at the place, we were able to locate the

13   gentleman by the name of Ivan.  He received us in a very

14   cooperative manner.  He allowed us access to the residence.  We

15   interviewed him in order to find out if he had had

16   communication with the young woman.

17           He answered that he hadn't; that recently, he had no

18   type of communication with the young woman.  And he even,

19   spontaneously and voluntarily, shared with me some text

20   messages that he had exchanged with the young woman and that

21   corroborated that recently he had no communication with her.

22           MR. GONZALEZ-DELGADO:  We have objection and move to

23   strike all testimony of Ivan.  He is not a witness, and it's

24   hearsay, Your Honor.

25           THE COURT:  Overruled.

1    BY MS. COLLAZO-ORTIZ:

2    Q    And what happened after you went to Ivan's house and

3    checked the house and the phone?

4              THE INTERPRETER:  I'm sorry.  And checked the?

5    BY MS. COLLAZO-ORTIZ:

6    Q    House and the phone.

7    A    Well, once he allowed us access to the residence, he

8    granted us access to a room where he kept some cats that he

9    said that he cared for, and the young woman also did that for a

10   living.  And after that, we went to the residence of the young

11   man Felix Verdejo in the area of San Jose.

12   Q    Okay.  And what happened when you went to the residence in

13   San Jose?

14   A    There we were received by the former wife of the young

15   man.  If I remember correctly, her name was Yvette, the

16   ex-wife, the ex-partner, the ex-wife of Felix Verdejo.

17   Q    That person, what happened when that person received you?

18   A    She was very cooperative and very calm, and she allowed us

19   access to the residence.  At all times she was cooperative, and

20   she told us that she had had no communication with her

21   ex-husband.  And she also told us that the last time that she

22   had had communication with the young woman was some days before

23   in a situation that had taken place where the young woman had

24   gone to her with her sister in order to tell her that she was

25   pregnant.

```
 1              MR. GONZALEZ-DELGADO:  Objection as to the hearsay
 2    testimony in that answer, Your Honor.
 3              THE COURT:  Overruled.
 4    BY MS. COLLAZO-ORTIZ:
 5    Q    And let me ask you:  Why did you visit the residence of
 6    Mr. Ivan Santana?
 7    A    As I indicated at the beginning, as part of the protocol
 8    in searching for missing persons, at the beginning, when we
 9    interviewed -- we interview people who are close, close friends
10    of the missing person, relatives, and people who can shed light
11    on where this young woman could be in this specific case.
12    Q    Okay.  Do you visit any other location beside those two
13    that you have mentioned?
14    A    On that day, no.
15    Q    Okay.  Did you -- okay.  Let's turn to April 30th of 2021.
16    What happened in the investigation on April 30th, 2021?
17    A    As part of the people that had to be interviewed, we
18    interviewed the young lady's boss, also close relatives.  We
19    were able to interview her father, her mother, and her sister.
20              And also, we were able to interview -- we tried to
21    contact a gentleman by the name Marcelino.  The mother had told
22    us that that gentleman casually was arriving in Puerto Rico at
23    the time when we needed to interview him as part of the
24    investigation.
25    Q    And who interviewed Mr. Marcelino?
```

1     A     Officer Rafael Ortiz-Pineiro.

2     Q     And how do you know that that interview happened?

3     A     Because when the gentleman arrived, Officer Rafael

4     Ortiz-Pineiro indicated to me that that was the young man that

5     we needed to interview.

6     Q     And did you ever -- did you, at any point, see the person?

7     Did you, at any point, see that person?

8     A     Yes, I saw him.  I saw him, he -- when he was introduced

9     to me, and I saw that he went into the office and talked to my

10    fellow officer.

11    Q     Okay.  And after the interviews were conducted, what other

12    investigative techniques were used?

13    A     A strategic plan was devised, and I proceeded to request

14    the cooperation of the telephone companies in order to find the

15    location where the young woman could have been during prior

16    days and up to the time of the investigation.  We verified

17    possible cameras that could be found nearby to try to establish

18    a possible route that could have been taken by the young woman

19    or to see if she got on a vehicle or took a certain path.

20    Q     And where did the investigation lead you?

21    A     Well, we requested also -- once we requested the

22    cooperation from the FBI based on the telephone numbers, they

23    had an analysis that they shared with us, and they showed us

24    some routes where the vehicle -- where her vehicle had been.

25    And they had one conclusion, which was that the location of the

1    missing young woman at the time was also close to where Mr.

2    Felix Verdejo's phone was.

3              There we were able to better establish locations in

4    order to try to identify cameras and possible, more specific

5    routes to locate -- in order to find out where the young

6    woman's vehicle had been, and also, the young man's vehicle had

7    been.

8    Q    And where, what location did that lead you to?

9    A    That led us to the area of the Teodoro Moscoso Bridge.

10   Q    Okay.  And what instructions did you give your agents

11   regarding the Teodoro Moscoso Bridge?

12   A    To verify the security cameras that could be in the

13   surroundings of the bridge and on the bridge itself.

14   Q    And after the body -- I'm sorry.  Strike that.

15             After the footage was reviewed, what happened next?

16   A    I did not understand your question.

17   Q    Okay.  Let me turn your attention to May 1st, 2021.  What

18   happened on "April" 1st, 2021?

19             THE COURT:  May.  You said "April" 1st.

20   BY MS. COLLAZO-ORTIZ:

21   Q    I'm sorry.  May 1st, 2021.  I stand corrected.

22             MS. COLLAZO-ORTIZ:  Thank you, Your Honor.

23             THE WITNESS:  Once we verified the cameras, we were

24   able to locate the area on the Teodoro Moscoso Bridge using the

25   images.  We were able to locate a vehicle that was parked

1    towards the middle of the bridge that had -- that shared the

2    description with the black Dodge Durango vehicle, property of

3    Mr. Felix Verdejo.

4    BY MS. COLLAZO-ORTIZ:

5    Q    Okay.  And after that footage was reviewed, what else

6    happened on May 1st, 2021?  Saturday, May 1st.

7    A    Thank you.

8         That day, we received a message through the FBI where

9    they informed us that the young woman had been thrown off the

10   Teodoro Moscoso Bridge.

11   Q    And after receiving that information, what did you do?

12   A    After that, we went there.  There were divers from the

13   Puerto Rico Police Bureau there.

14   Q    And what happened?

15   A    And the body of the young woman was found laying in the

16   lake.

17   Q    Okay.  Can you please describe what your participation was

18   in the recovery of the body?

19   A    Yes.  I was accompanied by the investigative agents and

20   the state prosecutor at the time.  And we boarded boats, and we

21   were able to get close to the area where the young woman's body

22   lay in the lake.

23   Q    And when you're talking about the lake, to be clear, is

24   that the San Jose Lagoon?

25   A    Yes, that's correct, the lagoon where the bridge is.

```
1    Q    Can you please describe to the members of the jury what
2    you saw from the body that was in the water?
3    A    Yes.  The young woman was laying face-down, and I could
4    see that she had hands and feet tied.  And there was, between
5    the area of the hands and the waist, she had a cinder block,
6    and the body was completely swollen.
7    Q    You mentioned that she was tied.  What was she tied with?
8    A    With a wire.
9    Q    And when you talk about a block, what kind of block are
10   you talking about?
11   A    The well-known blocks that are used for construction.
12   Q    Okay.  And where did you go after the body was recovered?
13   A    I went to the area of the Teodoro Moscoso Bridge.  There
14   were some pieces of evidence there that, in my experience, were
15   not related with the events, but even then, it was determined
16   that they would be seized.
17   Q    What type of evidence are you talking about?
18   A    There there was a stain, apparently, a blood stain, and
19   two shells.
20   Q    And can you describe the shell casings?
21   A    The shell casings were far apart from each other, and they
22   were completely deformed and rusted.
23   Q    And why did you say that, in your experience, they were
24   not related?
25   A    Well, I have had many experience investigating murder
```

1    scenes, and also, in the handling and use of firearms, and

2    there was no way that those shell casings could have been shot

3    recently.

4    Q    So why were they seized?

5    A    Because of the sensitivity and the seriousness of the

6    investigation, it was determined that because that detail -- it

7    was determined to seize that evidence in case the evidence was

8    needed for any other reason, so that the Puerto Rico Police had

9    done its work responsibly.

10   Q    And how, how common, in your experience, is the -- how

11   frequently are shots fired on the bridge?

12            MR. GONZALEZ-DELGADO:  Objection under 401, Your

13   Honor.

14            THE COURT:  I will allow it.

15            THE WITNESS:  Frequently.  When I worked at Tactical

16   Operations, almost every night we heard complaints by fellow

17   officers on the radio that the detonations were heard in that

18   area and in the surrounding area.

19   BY MS. COLLAZO-ORTIZ:

20   Q    And while you were on the bridge and the evidence was

21   being processed, did anything happen while you were there?

22   A    Yes.  We were trying to control the vehicular flow, and I

23   was able to listen, hear over the radio that they were

24   informing that the young man, Verdejo, was transiting in a

25   vehicle on the Teodoro Moscoso Bridge.  And casually I looked

1    over my right, and I noticed that Felix Verdejo was transiting

2    in a vehicle that I was able to identify as a black Honda

3    Pilot.  He was in the backseat.

4    Q    And this person that you have mentioned as Mr. Verdejo, is

5    he in court today?

6    A    Yes, that's correct.  He is sitting over there.

7    Q    What is he wearing?

8    A    A T-shirt, a long-sleeved black shirt.

9             MS. COLLAZO-ORTIZ:  Let the record show that the

10    witness pointed and identified the defendant.

11             THE COURT:  The record will so reflect.

12    BY MS. COLLAZO-ORTIZ:

13    Q    After the process in the bridge concluded, where did you

14    go next?

15    A    I proceeded to accompany investigative agents to the area

16    of Caguas in order to seize a firearm that was registered

17    legally to Mr. Felix Verdejo.

18    Q    Okay.  And how did the police know that he was in Caguas

19    at that time?

20    A    Once Felix Verdejo was determined to be a suspect by the

21    Police of Puerto Rico, it was established in the plan to follow

22    him so that he could be located in case he needed to be

23    interviewed, and the last place he was located was there, in

24    the Caguas area.

25    Q    Okay.  And what happened in Caguas?

1    A     When we arrived at the residence, the young man was there

2    with a lady.  And the officer in charge of the case, Manuel

3    Colon, he conducted an interview of him, and also, seized the

4    firearm.  I also noticed immediately that the vehicle that I

5    mentioned before, a minute ago, was there, the one where I saw

6    him on the Teodoro Moscoso Bridge.

7    Q     Okay.  And did you ever return to the residence of Mr.

8    Verdejo's ex-partner?

9    A     Yes.  Once we finished the process at that residence in

10   Caguas, the agent, Manuel Colon, informed me that we had to

11   move to the residence of the lady because there were some other

12   firearms belonging to Mr. Verdejo that were in a safety box in

13   that residence.

14   Q     And what was the purpose of the visit?

15   A     To seize the weapons that were at the place.

16   Q     And how would you describe the woman's demeanor at that

17   time?

18   A     At the time, she was completely different from the first

19   time that we talked to her.  She was very nervous.  She was

20   very concerned, and she was accompanied by her father and her

21   mother.

22         And she told us that she didn't have anything to do

23   with what was happening; that in social media and in the media,

24   she was being blamed for what had happened to the young woman,

25   and that she didn't have anything to do with it.  That if Felix

1    had to do something with it, he should pay, but that she didn't

2    have to pay for it.

3                    MS. CINTRON-COLON:  Objection, Your Honor, move to

4    strike, hearsay, and self-serving statements as well.

5                    THE COURT:  Overruled.

6    BY MS. COLLAZO-ORTIZ:

7    Q    Did you participate in the, at all in the seizure of the

8    Dodge Durango?

9    A    Yes, that's correct.

10   Q    Where was that seized?

11   A    In the surroundings of the residence of the parents of

12   Felix Verdejo.

13                   MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

14                   THE COURT:  Mr. Gonzalez?

15                   Ms. Cintron?

16                   MR. GONZALEZ-DELGADO:  May it please the Court, Your

17   Honor?

18                   THE COURT:  Go ahead.

19                   MR. GONZALEZ-DELGADO:  Thank you.

20                               CROSS-EXAMINATION

21   BY MR. GONZALEZ-DELGADO:

22   Q    Good afternoon, Agent Bonilla.

23   A    Good afternoon.

24   Q    Agent Bonilla, when you were at, at the police station on

25   April 29th, 2021, they called you about a missing person; is

1    that correct?

2    A    That's correct.

3    Q    From a fellow police officer?

4    A    From the desk officer.

5    Q    And then you go, and you actually interviewed Ms. Keila

6    Ortiz and Ms. Bereliz Rodriguez; is that correct?

7    A    No.

8    Q    So you never spoke with them?

9    A    I did.

10    Q    Before you left for the street or, or prior to that?  I

11    mean, after you left for the street or prior to leaving?

12    A    The two young -- I'm sorry.  The two ladies were

13    interviewed by Officer Rafael Ortiz-Pineiro, and I had an

14    opportunity to listen in to part of the answers and questions

15    that he was asking them and any answers they were giving to

16    him.  That was at the beginning.

17    Q    And you knew that Ms. Keila Ortiz and Ms. Bereliz gave

18    three names as possible persons of interest, correct?

19    A    They gave more.

20    Q    But you stated that it was Marcelino Perez, correct?

21    A    That's correct.

22    Q    Mr. Felix Verdejo?

23    A    Correct.

24    Q    And Mr. Ivan Santana?

25    A    That's correct.

1    Q    Who else did they name?

2    A    Well, they also mentioned other people that could also be

3    good to talk to.  She mentioned -- they mentioned some of her

4    co-workers.  They also mentioned her boss.  What I answered was

5    based on where I went to interview those three people.

6    Q    And Ms. Keila Ortiz and Bereliz Rodriguez got on the

7    police car with you when you went to Ivan Santana's house; is

8    that correct?

9    A    That's correct.

10    Q    But they did not get out when you went to interview him;

11    is that correct?

12    A    That's correct.

13    Q    And you were the one who actually did the questioning?

14    A    That's correct.

15    Q    And you stated that Ivan was cooperative?

16    A    That's correct.

17    Q    And he told you that he hadn't spoken with her recently,

18    and actually showed you the text messages that he had with her?

19    A    Correct.

20    Q    And Mr. Santana made some statements that he had not

21    communicated with Keishla for sometime?

22    A    Well, what I said was that it wasn't recently.  He didn't

23    establish a timeframe, but it wasn't recently.

24    Q    And Mr. Santana told you that he had pulled away from this

25    relationship with Keila because he did not want to antagonize

1     Marcelino Perez; is that correct?

2     A     That's correct.

3     Q     But he was having a relationship with her; is that

4     correct?

5               MR. GOTTFRIED:  Objection, Your Honor.  This is going

6     into hearsay, and beyond the scope.

7               MR. GONZALEZ-DELGADO:  Your Honor, that's --

8               THE COURT:  Well, sidebar.

9          (Sidebar conference commenced.)

10              THE COURT:  So the question was:  Because Marcelino

11    was having a relationship --

12              MR. GONZALEZ-DELGADO:  With Keishla.

13              THE COURT:  -- with Keishla.  Objection.

14              What's the objection based on?

15              MR. GOTTFRIED:  That Ivan told you that Marcelino --

16    Ivan told this officer --

17              THE COURT:  The witness.

18              MR. GOTTFRIED:  -- the witness that Marcelino had

19    told him to back off from Keishla because they were in a

20    relationship.  So you've got two levels of hearsay going on.

21    It's what Marcelino told Ivan that he told this guy.

22              And in addition to that, it's just, it's

23    double-hearsay, is basically the objection.

24              THE COURT:  Well, during direct examination, you

25    placed -- during direct examination, you placed this officer

1    all over in interviews.

2              I'm sorry.

3              So you placed him all over, and as part of your

4    questioning, he responded to information he received as part or

5    during those interviews.  I'm going to apply the same ruling.

6              MS. COLLAZO-ORTIZ:  Your Honor, but the difference

7    here is, that is one thing, to introduce what he, himself,

8    heard from a person with personal knowledge, and then now we're

9    talking about two levels of hearsay.  Because it's what this

10   person heard that the other person heard from a third person.

11             THE COURT:  I'm not persuaded.  So objection

12   overruled.

13             MR. GOTTFRIED:  Sure.

14        (Sidebar conference concluded.)

15             MR. GONZALEZ-DELGADO:  May I repeat the question,

16   Your Honor?

17             THE COURT:  Go ahead.

18             MR. GONZALEZ-DELGADO:  Thank you.

19   BY MR. GONZALEZ-DELGADO:

20   Q    Agent Bonilla, isn't it true that in your interview with

21   Mr. Ivan Santana, he told you that he had pulled away from his

22   relationship with Keishla because he did not want to antagonize

23   Marcelino Perez, another man who had had a relationship with

24   her?

25   A    That's correct.

1    Q    And he also told you how he knew Marcelino, correct?

2    A    No, he did not tell me that.

3    Q    He didn't tell you that Marcelino had confronted him

4    regarding their relationship?

5    A    He did not go into details.

6    Q    Okay.  Now, Mr. Santana, you didn't say that he had an

7    alibi, correct?

8    A    Well, I explained that, when I went to his residence, he

9    showed me the text messages.  He allowed me to go into the

10    residence.

11    Q    That's not my question.  My question is:  Did Mr. Ivan

12    Santana give you an alibi?

13    A    No.

14    Q    You didn't investigate where he was on April 29th, 2021?

15    A    Correct.

16    Q    Where was he?

17    A    Working.

18    Q    And you went to his job and corroborated that?

19    A    That was going to be done by the investigative agents.

20    Q    So you don't know if he actually went to work or not; is

21    that correct?

22    A    At the time, what I was investigating was a missing young

23    woman.  I wasn't investigating any crimes.

24    Q    Isn't it part of investigating the crime, investigating

25    the people who they believe might have something to do with

1    this?

2    A    That is the reason why I went to the residence to

3    interview him to see if he knew where she could be.

4    Q    Why didn't you corroborate that day that he was actually

5    working, or something else, with this case?

6    A    I understood that that was not a priority at the time.

7    Q    Even though Ivan Santana had been mentioned as a suspect

8    or a possible person of interest?

9    A    At no time was he considered --

10            THE INTERPRETER:  Correction.

11            THE WITNESS:  At the time, he was not considered a

12    suspect, or even Mr. Verdejo.  What we were told is that they

13    were people who were close to the young woman, and we were

14    looking for her alive.

15    BY MR. GONZALEZ-DELGADO:

16    Q    So my prior question regarding the fact that you do not

17    have any personal knowledge if Mr. Ivan Santana was actually

18    working on April 29th is no?

19    A    I'm not aware, beyond what he told me that day.

20    Q    Okay.  Now, you were in charge of the investigation?

21    A    I was the Drug Division Director at the time.

22    Q    My question is:  Were you the lead investigator at this

23    time?

24    A    Officer Rafael Ortiz-Pineiro.

25    Q    And you were helping him, correct?

```
1    A    That is my function, to be a facilitator for my staff.

2    Q    And on May 1st, they found the body of Ms. Keishla

3    Rodriguez?

4    A    That's correct.

5    Q    And at what time were you at the bridge when you say that

6    you saw Mr. Verdejo passing the bridge?

7    A    I do not remember the time, but it was at the time when we

8    were working on the evidence that was on the bridge.

9    Q    Mr. Verdejo lives close to the bridge?

10   A    I'm not aware.

11   Q    I thought you said that you went to his house in San Jose.

12   A    Yes, but I do not recall the approximate distance.  I

13   cannot find myself in regards to the distance between the house

14   and the bridge.

15   Q    Now, you say that you found some shell casings on the

16   bridge, and that you picked them up as part of the evidence?

17   A    Can you please ask the question again?

18   Q    Yes.  You said that when you were at the Teodoro Moscoso

19   Bridge, you found two bullet casings that were far from -- I

20   don't know where because you didn't mention where.  They were

21   deformed and oxidized?

22   A    No, I was not the person who found them.

23   Q    But you saw where they were found?

24   A    That's correct.

25   Q    And then you say that you knew that they weren't related
```

1    to recent firing; is that correct?

2    A    Based on my experience, I'm sure that they were not.

3    Q    But you don't have any expert to certify what you're

4    saying today?

5    A    I am not aware of what came up in analysis.

6    Q    There was an analysis of these bullet casings, correct?

7            THE INTERPRETER:  I'm sorry, Counsel.  Was or wasn't?

8    BY MR. GONZALEZ-DELGADO:

9    Q    There was an analysis of these bullet casings?

10   A    I'm not aware.

11   Q    Now, you say that the -- at the bridge, there are frequent

12   shootings; is that correct?

13   A    Yes.

14   Q    Okay.  And you know that there is a program called

15   "Shot-Spotter" that is located in San Juan to help you identify

16   where the fire, the shooting happens; is that correct?

17   A    That's correct.

18   Q    But the bridge doesn't have "Shot-Spotter?"

19   A    I am not aware of whether the system reaches the area of

20   the bridge.

21   Q    Do you have any knowledge if "Shot-Spotter" identified any

22   shootings that day at around -- on August -- on April 29th,

23   2021, in the morning hours?

24   A    Among the tasks that were delegated, one of them was to

25   verify if the system had identified shots that were fired that

1    morning that could have reached the place.

2    Q    And there was a shot or two fired that day?

3    A    Well, I did not have the opportunity to corroborate that,

4    because as we know, throughout the investigation, being the

5    director, I have several cases that I have to tend to, and I

6    did not have the opportunity at the time.  I'm not aware of the

7    results of the instructions that I gave at the time.

8    Q    When those bullet casings were put in evidence bags, you

9    didn't tell anybody that they had nothing to do with the case?

10   A    It was talked about with the investigating agents, and

11   even with the forensics, and they agreed, as we say in our

12   jargon, that the more the better.

13   Q    But there is no evidence that you actually said that,

14   correct?

15            THE INTERPRETER:  I'm sorry.  There is no evidence?

16   BY MR. GONZALEZ-DELGADO:

17   Q    Evidence.

18            THE INTERPRETER:  That you actually?

19   BY MR. GONZALEZ-DELGADO:

20   Q    Said that to anyone?

21   A    It was a comment that was made between the investigators

22   and yours truly, and from what I saw, they opted to seize it.

23   Q    And this was on May 1st, 2021?

24   A    That's correct.

25   Q    Now, Felix was a suspect by May 1st, 2021; is that

```
 1    correct?
 2    A      Yes, that's correct.
 3    Q      Actually, you had somebody follow Felix for a couple of
 4    days?
 5    A      No.  Since that day.
 6    Q      The same day.  But was it before you saw him pass the
 7    bridge, or after?
 8    A      Before.
 9    Q      So you have -- you're on the bridge May 1st, correct?
10    A      That's correct.
11    Q      Felix Verdejo is a suspect, correct?
12    A      Correct.
13    Q      You have somebody following Felix; is that correct?
14    A      Correct.
15    Q      Were they video-recording what he was doing, or recording
16    him in any other way?
17    A      I'm not aware.
18    Q      Aren't they under your charge?
19    A      No.
20    Q      Okay.
21    A      Not that division.
22    Q      So you don't know if there is any videos, reports, or
23    anything related to these police officers that were following
24    Felix since May 1st?
25    A      No.
```

```
1    Q    You don't -- I mean, when Felix is passing by, did you
2    already have the order to seize his firearms?
3    A    We were working on seizing the evidence.  At the time, we
4    did not have it.
5    Q    So that order was issued after Felix had passed by you?
6    A    That was determined by the investigator at night.
7    Q    But didn't you go in the afternoon to go seize those
8    weapons?
9    A    No.  It was nighttime already.
10    Q    7:00 p.m., or later than that?
11    A    I do not recall the time.  I do know that it was still
12    light out when we were working on the scene on the bridge.
13    Q    And you went first to Caguas?
14    A    I do not understand the question.
15    Q    After you finished investigating the bridge, you say that
16    you went to take Mr. Verdejo's weapons; is that correct?
17    A    It should be made clear that I did not develop the
18    investigation.  I was a director, and I was in a position of
19    facilitating the work for my staff.  I did accompany them to
20    seize Felix Verdejo's weapons.
21    Q    My question was:  Did you go to Caguas to seize Mr.
22    Verdejo's weapon after you left the bridge?
23    A    I went there to accompany the investigating agents.
24    Q    So my answer is yes -- your answer is yes?
25    A    Yes.
```

1    Q    Okay.  And after -- when you got to Caguas, Mr. Verdejo

2    gave you his weapon?

3    A    No.

4    Q    You had to go to his house to pick up the weapon, correct?

5    A    Accompanied by the officers.

6    Q    And you had to return to San Jose?

7    A    To accompany them to look for other weapons that were

8    there.

9    Q    Now my question is:  Why didn't you stop Mr. Verdejo when

10   you saw him pass the bridge?

11   A    When I saw him, he was practically laying back in the

12   backseat of the vehicle, and the officers were developing the

13   scene at the time.

14   Q    My question was:  Why didn't you stop him?

15            THE INTERPRETER:  Correction.  The interpreter wishes

16   to correct the prior record.  To the end of the statement

17   should be added:  "And he was leaving."

18            THE WITNESS:  I didn't think it was necessary at the

19   time.

20   BY MR. GONZALEZ-DELGADO:

21   Q    He was a suspect, passing by the place where you're

22   investigating, and you just let him go?

23   A    I was not in charge of the investigation.

24   Q    Did you see the police officers that were following go

25   after him?

1    A    I did not see anybody following him.

2    Q    Now, you say that you went to Mr. Verdejo's wife -- I

3    mean, to his house, and his wife was interviewed prior to you

4    getting to the bridge; is that correct?

5    A    On the day that Keishla was reported missing, the first

6    day.

7    Q    Okay.  So when you get to Mr. Verdejo's home, Eliz was

8    there, you stated a little while ago?

9    A    That's correct.

10    Q    And you went to pick up the weapons that were in a safe?

11    A    It wasn't at that time.

12    Q    Not the second time?

13    A    When I accompanied the officers to seize the weapons.

14    Q    I'm sorry.  That's what I'm talking about, when you

15    actually went to pick up the weapon.

16          Okay.  Okay.  You needed a code to open the safe,

17    correct?

18    A    Yes, that's correct.

19    Q    And Mr. Verdejo gave you the code?

20    A    I believe that during the interviews that he had with the

21    officer, he provided him with a code.

22    Q    But then you said, a little while ago, that Eliz's

23    demeanor was different from the first time that you interviewed

24    her?

25    A    She was scared.

1   Q    And she was there with her father, Miguelito, Miguel

2   Santiago-Laiz, correct?

3   A    Correct.

4   Q    And her mother was also there?

5   A    Correct.

6   Q    Now --

7        MR. GONZALEZ-DELGADO:  May I have a second?

8   BY MR. GONZALEZ-DELGADO:

9   Q    In your notes, you stated a little while ago that Ms. Eliz

10  made some statements, correct?

11  A    No, not in my notes.

12  Q    That's my question.  You testified a little while ago that

13  Ms. Eliz had made some statements when you were there?

14  A    She made some statements, correct.

15  Q    But you just answered you did not include those in your

16  notes?

17  A    What she mentioned was that she was nervous because she

18  was receiving threats through social media.

19  Q    That wasn't my question.  My question was:  You did not

20  include that in your notes?

21  A    No.

22  Q    And you were present when they took Mr. Verdejo's Durango?

23  A    That's correct.

24       MR. GONZALEZ-DELGADO:  I have no further questions,

25  Your Honor.

1              MS. COLLAZO-ORTIZ:  Very briefly, Your Honor.

2              THE COURT:  Yes.

3                          REDIRECT EXAMINATION

4    BY MS. COLLAZO-ORTIZ:

5    Q    Good afternoon, Lieutenant.  Just to clarify, how many

6    weapons were seized from Mr. Verdejo?

7    A    I remember seizing the one in Caguas.  I do not recall how

8    many were seized at the residence in San Juan.  I was not in

9    charge of that.

10   Q    Who specifically was in charge of seizing the firearms

11   both in Caguas and in San Juan?

12   A    Agent Manuel Colon, who is assigned to the Major Crimes

13   Unit.

14             MS. COLLAZO-ORTIZ:  If I may, one last thing, Your

15   Honor.

16   BY MS. COLLAZO-ORTIZ:

17   Q    Counsel, in cross, mentioned the parents of Ms. Eliz being

18   present the second time you spoke to her.

19   A    That's correct.

20   Q    What was her mother's demeanor during that time?

21   A    The parents of the young woman told me that they were

22   separated, but that they were there together because they were

23   protecting the young woman because they were fearful of the

24   threats that she had been receiving through social media; and

25   that she was nervous because she didn't have anything to do

1   with that.  She didn't know about that, and it was not fair for

2   her to pay for something she did not have to do with.

3   Q    And how cooperative were they in the process?

4   A    Completely cooperative.

5           MS. COLLAZO-ORTIZ:  No further questions.

6           MR. GONZALEZ-DELGADO:  Just one, Your Honor.

7           THE COURT:  Go ahead.

8                        RECROSS-EXAMINATION

9   BY MR. GONZALEZ-DELGADO:

10  Q    No, no illegal weapons were seized, correct?

11          THE INTERPRETER:  I'm sorry, Counsel.  Did you say

12  legal or illegal?

13  BY MR. GONZALEZ-DELGADO:

14  Q    Illegal.

15  A    No.

16          MR. GONZALEZ-DELGADO:  No further questions, Your

17  Honor.

18          THE COURT:  Mr. Gonzalez?

19          MR. GONZALEZ-DELGADO:  Yes, sir.

20          THE COURT:  Your question was:  "No illegal weapons

21  were seized, correct?"

22          MR. GONZALEZ-DELGADO:  Yes, Your Honor.

23          THE COURT:  Answer:  "No."  So it is not correct?

24  It's the way it comes out.  It's the way it comes out in

25  translation.

```
 1              MR. GONZALEZ-DELGADO:  Okay.  I'll rephrase the
 2    question.
 3              THE COURT:  Do you understand what I am saying?
 4              MR. GONZALEZ-DELGADO:  Yes, sir.  I'll rephrase the
 5    question.
 6    BY MR. GONZALEZ-DELGADO:
 7    Q    Agent, when you went to seize Mr. Verdejo's weapons at his
 8    house, the truth is, no illegal weapons were seized in the
 9    house?
10              MR. GONZALEZ-DELGADO:  Better?
11              THE COURT:  Right.
12              THE WITNESS:  That's the knowledge that I obtained,
13    no.
14              THE COURT:  That no illegal firearms were seized.
15              THE WITNESS:  No, at least I did not become aware
16    that illegal weapons were seized.
17              THE COURT:  All right.  I think the record is clear.
18              I do not have questions for the witness.
19              Lieutenant, thank you for your testimony.  You are
20    free to go.
21              THE WITNESS:  Thank you very much.
22         (Witness excused.)
23              THE COURT:  Sidebar.
24         (Sidebar conference commenced.)
25              THE COURT:  Okay.  It's close to 1:00.  I have to
```

1    split at 1:00, we have talked about.

2              What's the plan?

3              MR. GOTTFRIED:  Your Honor, we have a short witness

4    whom I think we might be able to squeeze in.

5              MR. GONZALEZ-DELGADO:  But he's got a boss.

6              MR. GOTTFRIED:  Yes, but if --

7              THE COURT:  Who is that?  Not who is the boss.  I'm

8    clear about that.  But who is the witness?

9              MR. GOTTFRIED:  Someone from Forensic Sciences who

10   would introduce certain photos of the car, a photographer.

11             THE COURT:  You may finalize in three or four

12   minutes.  But then you will have cross, and that will take

13   beyond 1:00.

14             MR. GOTTFRIED:  Okay.  Yes, Your Honor.

15             THE COURT:  I'm not criticizing or anything.  I'm

16   just stating a fact.

17             MR. GONZALEZ-DELGADO:  I understand.

18             THE COURT:  Okay.  Who is your next witness on

19   Monday?

20             MR. GOTTFRIED:  It will be this witness then, the

21   photographer who took the photos of one of the cars.

22             MS. COLLAZO-ORTIZ:  Not necessarily this one.

23             THE COURT:  Okay.

24             MR. GOTTFRIED:  That's my best guess.

25             THE COURT:  Okay.  Well, I'm going to release the

```
1    jury for the day until next Monday.  On Monday, we'll start at
2    9:00 a.m.
3                    MR. GOTTFRIED:  Okay.
4                    MR. GONZALEZ-DELGADO:  Yes, Your Honor.
5                    THE COURT:  As with every day of trial, I'll be here
6    at 8:30 in the morning to deal with housekeeping, in the event
7    we need housekeeping.
8                    MR. GONZALEZ-DELGADO:  Yes, sir.
9                    MR. GOTTFRIED:  And next Friday, a week from today,
10   is a full day?
11                   THE COURT:  Yes, sir.
12                   MR. GONZALEZ-DELGADO:  Again, next week is completely
13   --
14                   MS. CINTRON-COLON:  Monday through Friday.
15                   MS. COLLAZO-ORTIZ:  Monday through Friday, full day.
16                   MR. GONZALEZ-DELGADO:  Then it's only three days, if
17   we get there, because three and four --
18                   THE COURT:  4th of July.
19                   MR. GOTTFRIED:  Okay.
20                   THE COURT:  Okay?
21                   MS. CINTRON-COLON:  Our last thing, Your Honor, is
22   that you had mentioned that we would be made available the
23   witness list by the end of the day.  I don't know if that's
24   going to be entered or sent to us or provided.
25                   THE COURT:  How would you prefer that to be done?
```

1          MS. CINTRON-COLON:  However it is easier to the Court

2     is fine.  A copy would be fine.

3          THE COURT:  Okay.  I'll instruct my courtroom deputy

4     clerk to give you a copy.

5          MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

6          MR. GOTTFRIED:  And just to be clear, the witness is

7     our best guess of our case in chief.  It is possible that there

8     are witnesses whom, based on the testimony, we decide not to

9     call.  It's also possible there may be a witness or two who we

10    decide to call based on how, in addition to that, whom we

11    decide to call based on how the case is going.  So I just

12    wanted to indicate that we don't view that as set in stone

13    necessarily.

14         THE COURT:  I understand.

15         MR. GONZALEZ-DELGADO:  It's just that I missed the --

16    maybe two or three witnesses while I was writing down.  That's

17    why I didn't --

18         MS. COLLAZO-ORTIZ:  The *Jencks* that was provided

19    corresponds to the witness that were notified to the Court.

20         THE COURT:  Okay.  Well, thank you all.

21         MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

22      (Sidebar conference concluded.)

23         THE COURT:  Ladies and gentlemen, it's close to 1:00.

24    As I said, today we would be working until 1:00.  So I've

25    decided this is a good point to break for the weekend.

1          We will resume trial work next Monday at 9:00 a.m.

2     Thank you for your patience.  Thank you for having been here

3     early, right on time, and for paying close attention to what is

4     taking place in the courtroom.

5          Now, before I allow you to go back to your families,

6     let me go over the list I cover before we break for the day.

7     Remember, do not talk about or communicate with anybody about

8     your impressions of the case or the evidence in the case.  Do

9     not view, read or hear reports, comments or articles about the

10    case.

11         Do not conduct any research about the case, the

12    matters in the case or the individuals involved in the case.

13    Keep an open mind until after you've heard and seen all

14    evidence and heard my instructions and you've gone to the jury

15    room to deliberate and all of you have discussed all evidence

16    amongst yourselves.  That's how a verdict is reached.

17         If you need to let me know anything, simply give a

18    side note to the court security officer or to court staff, and

19    they will provide that note to me.

20         With this, I look forward to seeing you all next

21    Monday at 9:00 a.m.  Thank you.

22    (Whereupon the following proceedings were had in open court

23         without the presence of the jury.)

24         THE COURT:  With all this, thank you for having been

25    here today.  The Court adjourns until next Monday at 9:00 a.m.

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

```
 1        (Whereupon the evening recess was taken at 12:55 p.m.)

 2                              -oOo-

 3    UNITED STATES DISTRICT COURT )
                                   )  ss.
 4    DISTRICT OF PUERTO RICO      )

 5

 6                      REPORTER'S CERTIFICATE

 7

 8        I, CINDY LEE BROWN, RPR, Federal Official Court

 9    Reporter for the United States District Court for the District

10    of Puerto Rico, appointed pursuant to the provisions of Title

11    28, United States Code, Section 753, do hereby certify that the

12    foregoing is a true and correct computer-aided transcript of

13    proceedings had in the within-entitled and numbered cause on

14    the date herein set forth; and I do further certify that the

15    foregoing transcript has been prepared by me or under my

16    direction.

17

18        Dated this 23rd day of June, 2023.

19

20

21                              /s/ Cindy Lee Brown

22                              _____
                                CINDY LEE BROWN, RPR, Federal
                                Official Court Reporter
23                              150 Carlos Chardon, Room 150
                                San Juan, PR  00918
24                              (787) 772-3478

25
```