1                    IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF PUERTO RICO

3                                  -oOo-

4     THE UNITED STATES OF AMERICA,    )
                                       )
5              Plaintiff,              )   Case No. 3:21-CR-00161-PAD
                                       )
6     -vs-                             )
                                       )
7     FELIX VERDEJO-SANCHEZ,           )
                                       )
8              Defendant.              )
      _____)
9
              TRANSCRIPT OF JURY TRIAL - DAY SEVEN - A.M. SESSION
10           HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
               UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
11                      WEDNESDAY, JUNE 28, 2023
      _____
12                     A P P E A R A N C E S
13
      FOR THE UNITED STATES OF AMERICA:
14
      AUSA Jonathan L. Gottfried &
15    AUSA Jeanette M. Collazo-Ortiz

16    FOR THE DEFENDANT:

17    Jason Gonzalez-Delgado, Esq. &
      Gabriela Jose Cintron-Colon, Esq.
18
      COURT INTERPRETERS:
19
      Carlos Ravelo &
20    Lynmar Vera

21    GOVERNMENT INTERPRETER:

22    Jose Luis Rosado

23

24

25


                    Cindy Lee Brown, RPR, Official Court Reporter
                     U.S. District Court, District of Puerto Rico
                               (787) 772-3478

```
1                        I N D E X

2    WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:        PAGE:

3    ROSA RODRIGUEZ-CASTILLO

4    Cross-Examination by Ms. Cintron-Colon:                6

5    Redirect Examination by Ms. Collazo-Ortiz:           68

6    Recross-Examination by Ms. Cintron-Colon:            71

7    EXHIBITS:                                           PAGE:

8    Defense Exhibit No. A1                                16
     Defense Exhibit No. E1                                40
9    Defense Exhibit No. E2                                45
     Defense Exhibit No. E3                                54
10   Defense Exhibit No. E4                                54
     Defense Exhibit No. E5                                55
11   Defense Exhibit No. B                                 60

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1          (Proceedings commenced at 9:01 a.m.)

2                            -oOo-

3      (Whereupon the following proceedings were had in open

4      court without the presence of the jury.)

5          THE COURT:  How many cases do we have on schedule

6   today?

7          THE COURTROOM DEPUTY CLERK:  We have one case, Your

8   Honor.

9          THE COURT:  Call the case.

10         THE COURTROOM DEPUTY CLERK:  Criminal Case Number

11  21-161, the United States of America against Felix

12  Verdejo-Sanchez, for seventh day of jury trial.  On behalf of

13  the government are Assistant U.S. Attorneys Jonathan Gottfried

14  and Jeanette Collazo, and on behalf of the defendant are

15  Attorneys Jason Gonzalez and Gabriela Cintron.  Defendant is

16  present in the courtroom, and he is being assisted by a

17  certified court interpreter.

18         THE COURT:  Thank you.

19         Would counsel identify themselves?

20         MS. COLLAZO-ORTIZ:  Good morning, Your Honor.  AUSA

21  Jeanette Collazo for the United States.

22         THE COURT:  Good morning, ma'am.

23         MR. GOTTFRIED:  Good morning, Your Honor.  AUSA

24  Jonathan Gottfried.

25         THE COURT:  Good morning, sir.
```

1              MS. CINTRON-COLON:  Good morning, Your Honor.

2    Gabriela Cintron-Colon on behalf of Felix Verdejo-Sanchez.

3              THE COURT:  Good morning, ma'am.

4              MR. GONZALEZ-DELGADO:  Good morning, Your Honor.

5    Jason Gonzalez on behalf of Mr. Felix Verdejo.

6              THE COURT:  Good morning, sir.

7              Would the interpreters introduce themselves?

8              THE INTERPRETER:  Jose Luis Rosado-Santiago for the

9    prosecution.

10             THE COURT:  Good morning, sir.

11             THE INTERPRETER:  Good morning, Your Honor.  Lynmar

12   Vera, interpreter for the defense.

13             THE COURT:  Good morning, ma'am.

14             THE INTERPRETER:  Good morning, Your Honor.  Staff

15   Interpreter Carlos Ravelo at the services of your court.

16             THE COURT:  Good morning, sir.

17             The courtroom is open to the public.

18             Anything we need to touch on before we call the jury

19   in?

20             MR. GOTTFRIED:  Nothing from the government.

21             MS. CINTRON-COLON:  Yes, Your Honor.  We may approach

22   ex-parte?

23        (Ex-parte sidebar conference commenced.)

24        (Sealed transcript filed separately.)

25        (Ex-parte sidebar conference concluded.)

```
 1                    THE COURT:  Ready to call the jury in?

 2                    MR. GOTTFRIED:  Yes, Your Honor.  Should we sit the

 3      witness now or --

 4                    THE COURT:  Your call.

 5                    MR. GOTTFRIED:  Okay.  We'll get her.

 6                    THE COURT:  Let's call the jury in.

 7           (Whereupon the following proceedings were had in open

 8              court in the presence of the jury.)

 9                    THE COURT:  Good morning.  Welcome back to the

10      courtroom.  Please take a seat.

11                    Ladies and gentlemen, before we go ahead, I need to

12      ask you a question.  If your response were yes, what I would

13      ask you to do is to raise your hand.  All right?

14                    Do you know a person -- do you personally know an

15      individual by the name of Carlos Colon-Vilches?  Carlos

16      Colon-Vilches?

17                    The record shows no affirmative response.

18                    Thank you.

19                    Doctor, good morning.

20                    THE WITNESS:  Good morning, Your Honor, all of the

21      members of the jury, and everybody present.

22                    THE COURT:  Just a reminder, ma'am, that you are on

23      oath.

24                    MS. CINTRON-COLON:  May it please the Court, Your

25      Honor?
```

```
1                    THE COURT:  Go ahead.

2                    MS. CINTRON-COLON:  May it please the Court, Your

3     Honor?

4                    THE COURT:  Go ahead.

5                         ROSA RODRIGUEZ-CASTILLO,

6            called as a witness on behalf of the Plaintiff,

7                   having been previously duly sworn,

8           resumed the stand and testified further as follows:

9                         CROSS-EXAMINATION

10    BY MS. CINTRON-COLON:

11    Q    Good morning, Dr. Rodriguez.

12    A    Good morning.

13    Q    I'm going to be asking you a few questions regarding

14    yesterday's testimony.  Most of these questions can be answered

15    with a yes or a no.

16             Dr. Rodriguez, you testified yesterday that you are a

17    forensic pathologist, and you performed the autopsy procedure

18    in Case Number 17-9821; is that correct?

19    A    That's correct.

20    Q    And I ask you if you prepared an autopsy report regarding

21    your autopsy procedure?

22    A    That's correct.

23    Q    And can you please explain to us, what does your autopsy

24    report contain?

25    A    The autopsy protocol contains the internal and external
```

1    evaluation.  Also as part of the protocol, it contains the

2    toxicology analysis.  The other, the other reports that the

3    file contains are addenda and correspond to Case 17-9821.

4    Q    Does your report contain anything else?

5    A    Well, as part of the protocol, what it contains is the

6    toxicology, the identification, and the findings of the

7    autopsy.

8              MS. CINTRON-COLON:  Hold on a second.

9              MR. GOTTFRIED:  Your Honor, may we approach sidebar?

10             THE COURT:  Yes.

11      (Sidebar conference commenced.)

12             MR. GOTTFRIED:  Your Honor, we understand that

13   defense counsel wants to admit the report of this expert, which

14   we have a hearsay issue with.  She's here to testify as to her

15   findings, but in terms of admitting a report that she wrote,

16   it's an out-of-court statement they're trying to admit for the

17   truth of the matter asserted.  That's one issue.

18             There is also a lengthy translation, which we haven't

19   had a chance to review.  Yeah, that's the second issue.

20             The third issue I think we can get around, which is

21   that she issued an original report and then an amended report.

22   This is the original report, not the amended report.  And it

23   would have to be clarified, were it admitted, that this is not

24   -- there was an amended report.

25             The principal objection we have is, it's an expert

1    report.  That's hearsay.  She's here to testify regarding her

2    conclusions.  She testified about them.  She can be crossed.

3    But in terms of admitting stuff that she wrote outside of

4    court, we would object.

5           MS. CINTRON-COLON:  Your Honor, this is exactly what

6    document prepared by the witness --

7           THE COURT:  I'm sorry.

8           MS. CINTRON-COLON:  -- documents prepared by a

9    witness and certified copy provided by the government in

10   discovery, which was drafted and signed and adopted by the

11   witness.  It is not hearsay because she is here to testify

12   about that, and especially, and specifically, about her

13   findings in her report.

14          She, on direct examination, she testified on the

15   contents of this report.  She may not have mentioned it, but

16   I'm going on to that question to ask her if this is, this

17   contains all her findings, which she already said it contains

18   findings and their analysis on her report.  They can examine

19   her on redirect as well.  It's not hearsay if she is literally

20   here to testify about the contents of this report, which she

21   did.

22          As to part of the translation, Your Honor, I

23   understand counsel's concern.  And I proffer the only

24   difference between the amended report and the initial report,

25   which we had translated before and we didn't notice that we had

1    provided the court translator the initial report, are three
2    words, which are clearly a typographical error, which was
3    included in the errata by the witness.
4         And we have no problem with having that part
5    translated again, if the Court so allows us to submit it, in
6    one or two days, if this were allowed to be admitted into
7    evidence, Your Honor.  She's going to authenticate the
8    document.  She -- well, that's what we're moving towards, to
9    authenticate the document, to state that it was hers, because
10   she adopted as hers.  She prepared it.  It's a document that
11   she's here to testify about.
12        And in terms of being an expert that prepared a
13   report and is testifying about it, that is literally what the
14   government's experts have done here, especially the one about
15   the phone records.  He prepared a report, and he testified
16   about it.  And the contents of the report that he testified
17   about weren't even statements written by him, were statements
18   by other people.
19        This is a report that is prepared by this witness
20   with statements by her.
21        MR. GONZALEZ-DELGADO:  Your Honor, if I may.  If the
22   government's assertion today is that she wrote on that document
23   hearsay, she testified regarding that hearsay yesterday in
24   court.  If they now want to agree that what she testified
25   yesterday was hearsay, and what's in this report is hearsay,

1     what we would request, Your Honor, is that her testimony be

2     stricken from the record, and she not be allowed to testify as

3     an expert witness under Rule 703, where the expert may not

4     relate hearsay basis for opinion.

5           And that is what he just stated that she would be

6     relating from the document that she prepared and from the

7     testimony that she gave yesterday in court.

8           THE COURT:  I'm not persuaded that the document

9     should be excluded, Mr. Gottfried.

10          MR. GOTTFRIED:  Okay.

11          THE COURT:  So objection overruled.

12          Now, it's going to be your exhibit.

13          MS. CINTRON-COLON:  Yes, Your Honor.

14          THE COURT:  You will have to go through the motions

15    of showing it to her.

16          MS. CINTRON-COLON:  I didn't understand.  I'm sorry?

17          THE COURT:  You will have to go through the motions

18    of showing it to her --

19          MS. CINTRON-COLON:  Yes, Your Honor.

20          THE COURT:  -- and so forth.

21          MS. CINTRON-COLON:  Understood.  Yes, Your Honor.

22          As to the -- I don't know if we have an agreement, or

23    do you want to take a second to review the translation?

24          THE COURT:  No, not at this point.

25          MR. GOTTFRIED:  With respect to the translation, Your

1    Honor, if we could -- if it's going to be conditionally

2    admitted, but if the Court could give us 24 hours to come back

3    with any issues with the translation.

4              THE COURT:  But then -- okay.  If I were to go along

5    that route, then we might have a problem if this were to be

6    published or not.

7              MS. COLLAZO-ORTIZ:  The thing is, Your Honor, this is

8    an eight-page-long document, or nine-page, the main document is

9    nine-page, and it's very technical.

10              THE COURT:  Yes.

11              MS. COLLAZO-ORTIZ:  So to verify the translation is

12    not something we can do in a --

13              MS. CINTRON-COLON:  Your Honor, this is a certified

14    translation by Mr. Carlos Lao-Davila, a federally-certified

15    interpreter.

16              THE COURT:  Yes.

17              MS. CINTRON-COLON:  It's presumed to be accurate and

18    correct.

19              THE COURT:  Okay.  So we are dealing with a certified

20    translation.

21              MS. CINTRON-COLON:  Yes, Your Honor.

22              THE COURT:  Okay.  I thought we were dealing with --

23              MS. CINTRON-COLON:  No, no.  It's a certified

24    translation.

25              THE COURT:  -- a counsel-generated translation.

```
 1              MS. CINTRON-COLON:  No.  It's a certified
 2     translation.
 3              THE COURT:  No problem then.  Still, you want to go
 4     over the translation, fine.  We'll deal with that later.
 5              MS. CINTRON-COLON:  It's a certified translation.
 6              THE COURT:  But it's certified.  I have no problem
 7     with that.
 8              MS. COLLAZO-ORTIZ:  We still have the issue that
 9     there is a difference between the translation -- we still have
10     the issue of the fact that the amended document is not the
11     translated one.
12              THE COURT:  So what's the difference?
13              MS. CINTRON-COLON:  Here, Your Honor, the difference
14     is, for the record, on page, it's page 5 of the translation,
15     it's on "Autopsy Findings."  Number 5, in the amended exhibit,
16     on page number, it says:  "Liquid in the sphenoidal sinus,
17     product of conception."
18              The amended report eliminated the phrase "product of
19     conception" because it was a typographical error.  It has an
20     errata at the end of the amended report.
21              THE COURT:  Wait.  The doctor amended that.
22              MS. CINTRON-COLON:  Eliminated these words.
23              THE COURT:  What I'm understanding in Ms. Collazo's
24     observation to mean that there is something, my word, weird
25     with the translation.
```

```
 1              MR. GOTTFRIED:  No, Your Honor.  It's not with the
 2       translation.  It's that there was a report, and then there was
 3       an amended report.  What is being sought to be introduced is
 4       the original report, not the amended report.
 5              THE COURT:  No.  You need to produce both.
 6              MS. CINTRON-COLON:  Yes, Your Honor.  And what I am
 7       proffering to the Court is because we just last night realized
 8       that we had translated the original, we already put a motion
 9       and requested from the translator to prepare the amended report
10       translation.  So we would request then, may we show her in the
11       Spanish version and conditionally admit it and be allowed to
12       submit the English translation tomorrow?  Because, literally,
13       the only difference between the amended report is those three
14       words, which she can attest that that was the only thing that
15       was eliminated.  Because I was going to go into how many
16       reports she had prepared, if there was an amended one, and what
17       was the difference between the reports, precisely because of
18       this issue.
19              MR. GONZALEZ-DELGADO:  And the government provided
20       the documents, so we didn't generate it.
21              THE COURT:  Okay.  We'll do it that way.  But then we
22       need the translation.
23              MR. GONZALEZ-DELGADO:  We will provide it tomorrow,
24       Your Honor.  We already did the, called Mr. Lao to have him
25       amend the translation.
```

```
 1                  MS. CINTRON-COLON:  The amended report.

 2                  MR. GONZALEZ-DELGADO:  I'm sorry, yes.

 3                  MR. GOTTFRIED:  And just to be clear, so you're going

 4         to introduce the Spanish amended --

 5                  THE COURT:  No.

 6                  MR. GOTTFRIED:  Introducing the original.

 7                  MS. CINTRON-COLON:  The original in English, and I'm

 8         going to present tomorrow --

 9                  THE COURT:  You can ask her.

10                  MS. CINTRON-COLON:  Exactly.  I'm going to ask her

11         about the amended and then what's the difference between the

12         original, which I'm presenting, and the amended, and tomorrow

13         I'll submit the English translation of the amended report.

14                  THE COURT:  Okay.

15                  MR. GOTTFRIED:  Okay.

16                  MS. CINTRON-COLON:  Thank you.

17         (Sidebar conference concluded.)

18    BY MS. CINTRON-COLON:

19    Q    Dr. Rodriguez, how many reports did you prepare, autopsy

20    reports, did you prepare in relation to this case?

21    A    Well, in all of the autopsies that I have done, 14,500.

22    Q    But my question is for this case specifically.  How many

23    reports have you prepared in relation to the autopsy related to

24    this case?

25    A    One report was done.
```

1   Q    But that report was amended, correct?

2   A    Yes, yes, but it's the same report.

3   Q    Can you please tell us what is the amendment that you made

4   in the report?

5   A    In the final part in the findings of the autopsy, in the

6   protocol, it indicated that the water in the sphenoidal cavity

7   was a product of the product of conception, and that was not

8   correct.  The water was not the water of the pregnancy.  It was

9   the product of what I explained yesterday.

10           MS. CINTRON-COLON:  Okay.  May I approach the

11  witness, Your Honor?

12           THE COURT:  Yes.

13  BY MS. CINTRON-COLON:

14  Q    Dr. Rodriguez, without going into the content of the

15  document I just handed, do you recognize that document?

16  A    That's correct.  I recognize it.

17  Q    How do you recognize it?

18  A    It bears my signature on the last page.  It bears my name,

19  my signature and the date in which I signed the document.

20  Q    Is this a document that you prepared?

21  A    That's correct.

22  Q    Based on the findings on the autopsy that you prepared on

23  Ms. Keishla Rodriguez-Ortiz?

24  A    That's correct.

25  Q    And it contains all of your findings and reports on that

1    autopsy?

2    A    That's correct.

3           MS. CINTRON-COLON:  Permission to approach, Your

4    Honor, to retrieve the document.

5           THE COURT:  Yes, granted.

6           MS. CINTRON-COLON:  At this moment, Your Honor, the

7    defense requests that the admission of Defense ID A1 be

8    admitted in evidence.

9           MR. GOTTFRIED:  Your Honor, just to object to the

10   objections which have been ruled upon.

11          THE COURT:  All right.  Request granted.  So

12   Defendant's ID A1 becomes Defendant's Exhibit 1A.  I'm sorry,

13   1A.  ID 1A, Exhibit 1A.

14    (Exhibit No. A1 admitted into evidence.)

15          MS. CINTRON-COLON:  And tomorrow we'll present the

16   translation as 1 --

17          THE COURT:  All right.  The Court stands corrected.

18   It is not 1A.  It is A1.  All right?

19   BY MS. CINTRON-COLON:

20   Q    Okay.  Dr. Rodriguez, yesterday you testified that during

21   your autopsy procedure, you also performed a procedure to

22   verify if the woman was pregnant, correct?

23   A    That's correct.

24   Q    And you observed embryonic material, correct?

25   A    That's correct.

1    Q    Which you preserved for DNA analysis?

2    A    That's correct.

3    Q    So that DNA analysis would be done on that material,

4    correct?

5    A    That's correct.

6    Q    Showing now what has been admitted as Government's Exhibit

7    102.

8         Dr. Rodriguez, this shows where you put the embryonic

9    material for the DNA analysis, correct?

10   A    That's correct.

11   Q    And this container is relatively small, correct?

12   A    Yes.  It has a volume of, approximately, 120 CCs, 150 CCs.

13   Q    And, approximately, in inches, how tall would you say is

14   this container?

15   A    I would have to measure it.  I cannot recall the

16   measurement in inches.

17   Q    Could you say it's, more or less, two inches?

18   A    No.  It's bigger than two inches.

19   Q    Around four inches?

20   A    I would have to measure it in order to tell you

21   accurately.

22   Q    If you had to give us an approximation of your best

23   recollection?

24         THE COURT:  That's your answer, ma'am.

25         Go ahead.  Sorry.

```
 1                THE WITNESS:  That would be speculative.  I believe
 2      that having measured it, that would be the appropriate answer.
 3                THE COURT:  That's your answer, ma'am.
 4      BY MS. CINTRON-COLON:
 5      Q    Dr. Rodriguez, what do we see at the bottom of this
 6      picture, right here?
 7      A    At the bottom part, you can see a ruler.
 8      Q    And did you put that ruler there before the photograph was
 9      taken?
10      A    That picture was taken in the DNA area.  The DNA staff
11      places a ruler in order to take a picture of the evidence that
12      was sent.
13      Q    And were you present when this picture was taken?
14      A    Yes, that's correct.
15      Q    And did you -- can you tell us, approximately, the
16      measurement that this ruler gives as to the diameter of this
17      container?
18      A    I would need something to rotate the container and place
19      the ruler so that I could take the appropriate measurement.
20      Q    So what we see in this picture that appears to be the
21      measurement of this container is not necessarily accurate?
22      A    I do not understand what's the measurement given by the
23      ruler.
24      Q    And usually -- well, this ruler measures in centimeters;
25      is that correct?
```

1    A    Centimeters, and inches on the other side.

2    Q    So the side that we're seeing is in centimeters?

3    A    That's correct.

4    Q    What is -- by observing the measurement of this ruler,

5    what is the measurement, in centimeters, wide?  What is the

6    wide measurement of this container based on this ruler?

7    A    I cannot understand your question.

8    Q    If we look at the ruler right here, how much does the

9    container measure?  What is the -- and wide?  Not tall, but

10   wide measure.

11   A    That's a circumferential.  You have to measure it --

12              THE INTERPRETER:  Correction.

13              THE WITNESS:  You would have to measure it

14   circumferentially.  You're giving me a vertical measurement.

15   BY MS. CINTRON-COLON:

16   Q    Dr. Rodriguez, you're an expert and forensic pathologist,

17   right?

18   A    That's correct.

19   Q    And this is not the first container that you prepare with

20   embryonic material?

21   A    No.  It's not the first one, but we don't measure it.

22   Q    And by looking at this picture, you cannot measure it?

23   A    What happens is that that is approximate, and I would have

24   to measure it in order to give you an exact measurement.  I

25   mean, we can see here that it goes from four to eight, but

1    that's a general range.  It is not specific.

2    Q    So we can say that it's about four centimeters wide based

3    on what you just explained to us?

4    A    So placing the ruler from here to here?  It could be from

5    four to six centimeters, speculating.  It's not specific.  We

6    have a ruler that is not positioned straight.  It's turned.

7    Q    And, but, Dr. Rodriguez, you previously stated that it was

8    between four and eight inches.  So that would mean that -- I

9    mean, centimeters.  So that would mean that's, approximately,

10    four centimeters?

11    A    Yes, it could be.

12    Q    And four centimeters is, approximately, one and a half to

13    two inches?

14    A    That's correct.

15            MS. CINTRON-COLON:  Publishing what has been admitted

16    as Government's Exhibit 103.

17    BY MS. CINTRON-COLON:

18    Q    Dr. Rodriguez, we're seeing here the embryonic material

19    that you obtained during your autopsy procedure, correct?

20    A    The material recovered from the uterus.

21    Q    And what is seen in the picture is that there is also a

22    ruler below the embryonic material?

23    A    That's correct.

24    Q    And, but this ruler is not placed at the same level as the

25    embryonic material?  Is it not?

 1    A    It's towards the bottom of the material, and it's slanted.

 2    Q    Therefore, the material and the ruler are not at the same

 3    level?

 4    A    Well, they're at the same level because it's on the

 5    surface, and the ruler is there.

 6    Q    Can you tell us, what does the ruler -- what is the

 7    measurements of, wide measurements of this material, as per

 8    this ruler?

 9    A    I would have to place the ruler horizontally and

10    vertically in order to give you the precise measurement.

11                MS. CINTRON-COLON:  Ms. Otero, may I approach for a

12    second?

13                THE COURTROOM DEPUTY CLERK:  Uh-huh.

14                MS. CINTRON-COLON:  May I approach the witness, Your

15    Honor?

16                THE COURT:  Yes.

17                THE WITNESS:  Thank you.

18                MS. CINTRON-COLON:  May the record show that the

19    witness was provided a ruler and a paper copy of Government's

20    Exhibit 103 and is measuring the material that is shown in the

21    picture?

22                THE COURT:  The record will so reflect.

23                THE WITNESS:  I have in my hands a ruler that's in

24    inches.  Placing the ruler in the vertical position, it

25    measures three inches, and, horizontally, two and a half.

```
 1              MS. CINTRON-COLON:  May I approach, Your Honor?
 2              THE COURT:  Yes.
 3    BY MS. CINTRON-COLON:
 4    Q    Thank you, Doctor.
 5              Now, yesterday you also testified that it was your
 6    estimate that the gestation period was, approximately, three
 7    weeks, correct?
 8    A    From four to six weeks.
 9    Q    And genetic material that is from four to six weeks is
10    medically referred to as an "embryo;" is that right?
11    A    Yes.  The embryonic stage is from two to 12 weeks.
12    Q    So the correct medical term is "embryo" and not "baby?"
13    A    It is defined as an embryo, but it is a human being that
14    is in the process of being formed completely.
15    Q    Dr. Rodriguez, but my question is that the medical term,
16    scientific term, correct for this stage is "embryo" and not
17    "baby?"
18    A    At the stage that we're looking at, based on the evidence,
19    evaluating it, what we have is an embryo.  Medically, it is
20    defined as an "embryo."  But it is a human being that is
21    started to being formed, and the organs being differentiated.
22    It's defined as an embryo.
23              After all of those stages, and it becomes a fetus.
24    It continues forming.  And at the end, we call it a "baby."
25    Q    But at this specific stage, it's called an "embryo?"
```

1    A    That's correct.

2    Q    You previously testified that you obtained embryonic

3    material and submitted it for DNA testing, right?

4    A    Yes.  The material was transferred to the DNA area.

5    Q    And the DNA analysis did not match Mr. Felix

6    Verdejo-Sanchez, right?

7    A    Well, that analysis was performed by an expert in the DNA

8    department.  That I would have to refer to the correct person

9    to say.  That would be the department of DNA.  I provided the

10   evidence, and they issue the report.

11   Q    Did you see the results of this report?

12   A    You're asking me if I saw it physically or if I saw it in

13   descriptive form?

14   Q    Let's start with physically.

15   A    No, because that is a process where they intervene in

16   their specific area, and I should not intervene.  After they

17   conduct their evaluation, they issue an official report.  And

18   they show their analysis and their conclusions on the evidence

19   that was sent, and they issue a report.

20   Q    And have you reviewed this official report?

21   A    It has some information as reference.  Yes, because I had

22   the report.

23   Q    And who was the expert that conducted this testing?

24   A    Ruth, whose last name I cannot recall.

25   Q    Would this be Ms. Ruth Cardona?

```
 1    A    That's correct.

 2    Q    In fact, the -- you provided an order to Dr. Ruth Cardona

 3    from the Institute of Forensic Sciences Forensic Laboratories

 4    to conduct, specifically, the DNA?

 5    A    Yes, that's correct.  That's correct.  A request is made

 6    to the appropriate area for the evidence that is sent.

 7    Q    Yesterday you were presented, and you testified, that the

 8    body was tied to a cement block.  Remember that?

 9    A    That's correct.

10    Q    Did you take a sample from that block for DNA testing?

11    A    No.

12    Q    Did you take a sample from the wire for DNA testing?

13    A    For the what?

14    Q    From the wire that was tied to the body.

15    A    No.

16    Q    Did Dr. Ruth Cardona ever provide you with the official

17    report of the DNA testing from the embryonic material?

18    A    She issued a report describing all of the evidence that

19    she indicated related to the case.

20    Q    And my question to you, Dr. Rodriguez, is if you reviewed

21    that report.

22    A    At some point, I did review it.

23    Q    Can you please tell us what the result of that report was?

24    A    I do not recall because it is an extensive document.

25    Q    And that document is not part of an attachment to your
```

1    autopsy report?

2    A    That's correct.  That is an attached report because it is

3    a document that belongs to another department.  It's not part

4    of the protocol.

5             MS. CINTRON-COLON:  Your Honor, may we approach

6    briefly with the government?

7         (Sidebar conference commenced.)

8             MS. CINTRON-COLON:  Your Honor, we -- our concern is

9    that we have not reviewed any report regarding any DNA analysis

10   results.  We understand that that could, potentially, be *Brady*

11   material, as we had anticipated in one of our motions in

12   limine.  We don't know if the government has a report.

13            The witness just testified the report exists, that

14   she had reviewed it; that it was ordered; and it was actually

15   done by an expert, Dr. Ruth Cardona, who we actually received

16   reports for DNA testing of other things in discovery, but not

17   for the results of the DNA testing done on the embryonic

18   material, Your Honor.  And that would be our concern because

19   it's, potentially, *Brady* material, Your Honor.

20            THE COURT:  Was a DNA sample taken from your client

21   that you know of?

22            MS. CINTRON-COLON:  That I know of.  I've seen --

23   remember, I've seen reports, if I'm not mistaken, that there

24   were, especially when he was arrested.

25            THE COURT:  A DNA sample?

1          MS. CINTRON-COLON:  As far as I understand, when he

2     was arrested, they took DNA sample.  I'm not 100 percent

3     certain if they gave that to the ICF.  However, it's still a

4     report that, even if they don't have, assume that they wouldn't

5     have Mr. Verdejo-Sanchez's DNA, they could have other persons'

6     DNA to do a comparative analysis.

7          And she just said that the analysis was done.

8     Therefore, they must have had samples of at least someone to

9     test it to because, if not, they wouldn't have a result of this

10    examination.

11         THE COURT:  So your bottom line here is *Brady*?

12         MS. CINTRON-COLON:  In essence, Your Honor.

13         MR. GOTTFRIED:  Your Honor, the reports were produced

14    to them.  Any reports that were done by Forensic Science

15    relating to DNA were produced to defense counsel.  With respect

16    to the paternity test, there was no paternity test done.  There

17    was no DNA sample for Mr. Verdejo to compare to.

18         And in addition to that, it's legally irrelevant to

19    the charge.  If they want to make the argument, they can go

20    ahead, but there is no basis to saying that there was a

21    negative paternity test because there was no paternity test.

22    And we have provided, from Forensic Sciences, any DNA report

23    from Ruth Cardona or from anyone that we had.

24         MS. CINTRON-COLON:  Now you're contradicting what

25    your witness just said, that there was, in fact, done,

1    paternity testing was done.

2              MS. COLLAZO-ORTIZ:  That's not what she said.

3              MS. CINTRON-COLON:  Well, DNA analysis done for the

4    embryonic material.

5              MS. COLLAZO-ORTIZ:  She's misquoting the witness.

6    She said she submitted it for testing, and that testing was --

7    there was a report that was generated, but she did not say that

8    a paternity test was conducted.

9              MR. GONZALEZ-DELGADO:  No, no, no.  We're requesting

10   the DNA test that was --

11             THE COURT:  Wait.  The witness did not say that a

12   paternity test had been conducted.

13             MR. GONZALEZ-DELGADO:  That's correct.

14             THE COURT:  Take it from there.

15             MR. GONZALEZ-DELGADO:  Our request is that she said

16   that she requested, she ordered a DNA test of the --

17             MS. CINTRON-COLON:  Embryonic material.

18             MR. GONZALEZ-DELGADO:  In the flask that had the

19   embryonic material.  She said there was a report made on that,

20   and the report was -- she saw it, and it was prepared by Ms.

21   Ruth Cardona.  We don't have that report, Your Honor.

22             MS. COLLAZO-ORTIZ:  Your Honor, we provided, on

23   several discovery packages, with DNA reports.  There is one

24   report for all DNA evidence, including the samples that were

25   taken from the body, and that has been provided to the defense.

 1              THE COURT:  When?

 2              MS. COLLAZO-ORTIZ:  On several occasions.

 3              THE COURT:  When?  So they can check.

 4              MS. COLLAZO-ORTIZ:  Most recently, with the *Jencks*,

 5    it was provided -- I'm sorry.  I stand corrected.  But it was

 6    provided.  I'm trying to look up the specific date.

 7              MS. CINTRON-COLON:  As I recall, we do have a report

 8    for DNA analysis by Ruth Cardona.

 9              MS. COLLAZO-ORTIZ:  That's the only one.

10              MS. CINTRON-COLON:  Let me finish, please.

11              However, we can check for the thousandth time, but I

12    do not believe that that report also includes this other

13    analysis for the embryonic material.  We can check for the

14    hundredth time.

15              MS. COLLAZO-ORTIZ:  It does.

16              MR. GONZALEZ-DELGADO:  May we have at least five

17    minutes?

18              THE COURT:  Yeah, look for it.

19              MS. COLLAZO-ORTIZ:  There is only one report from

20    DNA, has all of the evidence, and it has been provided to

21    defense, as they have acknowledged.

22              THE COURT:  Look for it.  I'm not going to say this

23    aloud, but is there a paternity test --

24              MR. GOTTFRIED:  No.

25              THE COURT:  -- for Mr. Verdejo?

1             MR. GOTTFRIED:  No.  There is no paternity test for
2      Mr. Verdejo or for anyone else.
3             MS. CINTRON-COLON:  Which was going to be my next
4      question but --
5             MR. GONZALEZ-DELGADO:  You can still ask it.
6             MS. CINTRON-COLON:  I know.
7             THE COURT:  We're at sidebar.
8             MS. CINTRON-COLON:  I know.  We're going to go check.
9             MR. GONZALEZ-DELGADO:  Thank you.
10       (Sidebar conference concluded.)
11            THE COURT:  Let's take a short, 10-minute break.
12            Before we start the break, ladies and gentlemen,
13     remember not to discuss the case or the evidence in the case
14     with anybody, including yourselves.  Do not view reports or
15     articles about the case.  Do not conduct research about the
16     case, the individuals in the case or the matters in the case.
17            With this, we'll be back in the courtroom in about 10
18     minutes.
19       (Whereupon the following proceedings were had in open court
20          without the presence of the jury.)
21            THE COURT:  Doctor, we're going to take a short
22     break.  You do not have to stay where you are.  You can walk
23     around and so forth.
24            THE WITNESS:  Thank you.
25            THE COURT:  Only, do not talk about your testimony.

1    Do not review materials related to the case.  Do not send out

2    messages in social media related to the case.

3              THE WITNESS:  Understood.

4              THE COURT:  Thank you.

5              All right.  Break until about 10:10.

6              MR. GOTTFRIED:  Your Honor, can we resolve this issue

7    at sidebar?

8              THE COURT:  Yes.

9         (Sidebar conference commenced.)

10             MR. GONZALEZ-DELGADO:  She said that genetic material

11    was made, but we're going into the fact that no other genetic

12    material was compared to whatever was found.

13             MR. GOTTFRIED:  So the defense counsel said that we

14    had not produced potential *Brady* material and a DNA analysis.

15    For the record, on November 30th, 2022, and April 11th, 2023,

16    we produced to defense counsel the DNA analysis of all of the

17    material.

18             MR. GONZALEZ-DELGADO:  There was one --

19             MR. GOTTFRIED:  Produced the DNA analysis from

20    (non-English language) of all of the DNA material in the case

21    that they had collected.  That included the endometrial tissue

22    from Keishla Rodriguez, which included that it had a genetic

23    profile consistent with Keishla.  That was it.

24             There was no comparison done of anyone else,

25    according to the report.  That's what we have.  And as far as

1    we know, there is nothing else.

2         MR. GONZALEZ-DELGADO:  We acknowledge that we

3    received that document.  It's just that in the way that the

4    witness is answering, it seems that there was another specific

5    DNA test ordered by her.  And that's why she was probing into

6    that.

7         And because if it's that, the report at page 5 only

8    has a comparison of Ms. Keishla Madlane Rodriguez-Ortiz, even

9    though, in page 1, it is clearly an investigation of Mr. Felix

10   Verdejo-Sanchez.  And standard operating procedure is that they

11   analyze the DNA from the witness -- from the accused, to see if

12   it appears in the rectal applicators, the vaginal applicators,

13   if there is DNA material under the nails of the, of the victim,

14   inside her, in the car, the steering wheel of the Kia, of the

15   shift of the Kia, the emergency brake of the Kia, cloth in the

16   Kia, which I believe would be the, the, the seats.

17        They've got from the Dodge Durango; that is, Mr.

18   Verdejo's Dodge Durango, his boxing gloves, the concrete wall

19   on the bridge, and multiple other places.  When she asked the

20   question, it seemed that she ordered that the DNA be compared.

21        THE COURT:  That's not the impression I got.

22        MR. GONZALEZ-DELGADO:  But that's the impression we

23   got, and that's where we were going.  And that's why we were

24   probing into the embryonic material DNA test because it was not

25   compared to Mr. Verdejo.

```
 1              THE COURT:  In fact, she asked something about Mr.
 2    Verdejo's DNA in that testing.  She said no.  And in the
 3    absence -- I mean, that is misleading.  See, if no DNA sample
 4    from Mr. Verdejo was taken and analyzed in a paternity test,
 5    there is no way to know whether, whether the embryonic material
 6    was co-generated by Mr. Verdejo.
 7              MR. GONZALEZ-DELGADO:  But standard operating
 8    procedure calls for all of the DNA to be analyzed, and it was
 9    the order that she gave Ms. -- no.  She made an order to the
10    DNA lab.
11              THE COURT:  To analyze --
12              MR. GONZALEZ-DELGADO:  Analyze it.
13              THE COURT:  To analyze the DNA, the DNA lab to
14    analyze the DNA material.  That's what she said.
15              MR. GONZALEZ-DELGADO:  And all of the other DNA that
16    was collected.
17              MS. COLLAZO-ORTIZ:  The DNA, she didn't even collect.
18              THE COURT:  No, no.  What she said was -- and we can
19    double-check that in the transcript -- was that she sent the
20    embryonic material to the DNA lab for DNA testing.  That's what
21    she said.
22              MS. COLLAZO-ORTIZ:  Then it's out of our hands, Your
23    Honor, at that point.
24              MS. CINTRON-COLON:  That's why I inquired if she had
25    seen the report, and she said yes.
```

1              THE COURT:  Yes, she saw it.

2              MS. CINTRON-COLON:  And that was the question that I

3    was eliciting.  And with regards to what counsel just said,

4    that it was out of her hands, and that's why I asked her if she

5    had seen the report.  She answered yes, and that's the end of

6    it, as to the report that she saw.

7              MS. COLLAZO-ORTIZ:  Your Honor, we just want to just

8    emphasize that we believe paternity is legally irrelevant.

9    That was the subject of a motion in limine in relation to the

10   sexual history.  So whether or not paternity was established,

11   it doesn't even affect motive, and it does not go to any of the

12   elements of the offense.

13             To the extent that Ms. Keishla had told Mr. Verdejo

14   that she was pregnant with his child, the actual paternity is

15   legally irrelevant.  And we would like to have a ruling from

16   the Court excluding questioning into that subject matter.

17             THE COURT:  No, I won't do it.  I understand the

18   legal issue, and I agree with you.  But in this area, I need to

19   give some leeway to the defendant, so I'm not issuing that

20   order.

21             MS. COLLAZO-ORTIZ:  But, in any case, this expert --

22             THE COURT:  It will be part of the instructions at

23   the end of the day, once we discuss the whole thing, when we

24   discuss the elements of the crime, the elements of the offense.

25   Okay?  But at the end of the day, no paternity test was done.

```
 1                MS. CINTRON-COLON:  She hasn't answered it.  I'm
 2      going to ask her.
 3                MS. COLLAZO-ORTIZ:  If she knows.  She didn't
 4      participate in the tests.
 5                MS. CINTRON-ORTIZ:  I'm just going to ask her.  If
 6      she doesn't know, she'll say she doesn't know.
 7                THE COURT:  What she said was that she sent the
 8      embryonic material for DNA testing to the DNA section of the
 9      institute.  She's been consistent.
10                MR. GONZALEZ-DELGADO:  Sure.
11                THE COURT:  Okay?
12                MS. CINTRON-COLON:  Thank you.
13                MR. GONZALEZ-DELGADO:  I'm going to run to the
14      bathroom, and I'll be right back.  Thank you.
15         (Sidebar conference concluded.)
16         (Whereupon a recess was taken at 10:06 a.m., until 10:18
17          a.m.)
18         (Whereupon the following proceedings were had in open court
19          without the presence of the jury.)
20                THE COURT:  All set to call the jury in?
21                MR. GONZALEZ-DELGADO:  Yes, Your Honor.
22                MR. GOTTFRIED:  Yes, Your Honor.
23         (Whereupon the following proceedings were had in open court
24          in the presence of the jury.)
25                THE COURT:  Welcome back to the courtroom.  Please
```

1    take a seat.

2              MS. CINTRON-COLON:  May it please the Court, Your

3    Honor?

4              THE COURT:  Go ahead.

5    BY MS. CINTRON-COLON:

6    Q    Ms. Rodriguez, do you know if a paternity test was

7    conducted with regard to the embryonic material?

8              THE INTERPRETER:  The interpreter requests

9    repetition.

10             MS. CINTRON-COLON:  No problem.

11   BY MS. CINTRON-COLON:

12   Q    Do you know if a paternity test was conducted with regard

13   to the embryonic material?

14   A    I'm not aware of that.

15   Q    Dr. Rodriguez, is -- you yesterday testified that you had

16   seen, in different areas of the body, fractures, correct?

17   A    Yes.

18   Q    And a fracture is the medical term for "broken?"

19   A    That's correct.

20   Q    So we can use the term "fracture" and "broken"

21   interchangeably, and they mean the same thing?

22   A    It's correct.  We call it "fracture."

23   Q    And if a human being has a fracture, it entails that the

24   person will have lots of blood in the area where the fracture

25   occurred?

1    A    It's probable.  It's compatible.

2    Q    "It's compatible" means yes?

3    A    That's correct.

4    Q    And if there is a recent injury in a body, then there

5    should be blood in that specific area, if the injury is recent?

6    A    That's correct.

7    Q    Now I am going to show what has been admitted as

8    Government's Exhibit 93.

9            Dr. Rodriguez, you testified yesterday that there was

10   trauma in the neck, indicating that there was -- well, scratch

11   that.

12           You indicated yesterday that there was trauma in the

13   neck of the body; is that correct?

14   A    Yes.  There was a circumferential abrasion that was more

15   prominent in the back.

16   Q    And the definition of "abrasion" is like a scraping off on

17   the surface?

18   A    That's correct, a partial detachment of the surface of the

19   skin.

20   Q    It's not a puncture wound?

21   A    No.

22   Q    It's not an open wound either?

23   A    No.

24   Q    Looking at Government's Exhibit 93, you don't see lots of

25   bruising around the metal wire, do you?

1    A    Not in this view, no.  This is a lateral view of the neck,

2    the right side.

3    Q    And for -- by an external examination of the body, you

4    cannot tell whether there is -- you cannot determine, I'm

5    sorry, injuries -- it's difficult to determine injuries in a

6    decomposing body; is that correct?

7              Let me rephrase.  Apologize.

8              Because of the decomposing state of the body, it's

9    difficult to determine injuries that the body has sustained by

10   an external examination, correct?

11   A    You have to be more careful.  That's the reason why you

12   wait hours later for the body, and the next day it is

13   reevaluated because of the process of decomposition.

14   Q    And that's why you have to look underneath the skin to

15   find if there are injuries sustained to different areas of the

16   body?

17   A    In this particular case, the injuries, contusions to the

18   face, could be determined the next day because they became more

19   determined in a circular pattern in the mandibular area, the

20   cheeks, the temples and the nose.

21   Q    But, Doctor, I'm asking in general, when you have a

22   decomposing body, that it's difficult to determine injuries

23   from the outside; you have to look underneath the skin to see

24   if there are injuries that the body had sustained?

25   A    You have to be more meticulous, and you have to be more

1    extensive in your evaluation.  And you do evaluations of a more

2    extended area in order to corroborate the extension of that

3    injury.

4    Q    And, Doctor, is it -- so the appropriate procedure there

5    would be to make an incision of the body, to open it to look

6    further, to be more thorough, like you explained?

7    A    In some cases, they are needed, but if there is evidence

8    that attests that they're correct, that they're true, you do

9    not have to do an incision.

10   Q    Dr. Rodriguez, and in this case in particular, you

11   testified that you did do an incision, and through the face, to

12   evaluate if there were any injuries to the face, correct?

13   A    Yes, that's correct.

14   Q    And you, you previously, correct me if I'm wrong, you

15   previously testified to my questions that fractures leave --

16   recent fractures to any part of the body cause bleeding,

17   correct?

18   A    Yes, they cause bleeding.

19   Q    Now I'm going to show government's -- what has been

20   admitted as Government's Exhibit 100.

21          Now, Dr. Rodriguez, looking at the lower part of this

22   picture, that we can see the left side of the jaw; is that

23   correct?

24   A    Yes.

25   Q    And in that left side of the jaw, we don't see any

1    bleeding, right?

2    A    That's correct, because we're not seeing the skin.

3    Q    And the tissue that's at the bottom right of the screen,

4    which is tissue that is -- that used to be attached to the

5    jawbone on the left side, there is no sign, as well, of recent

6    bleeding in that area, correct?

7    A    What is depicted in the picture is the lateral aspect.

8    Q    Doctor, excuse me.  My question is if that tissue at the

9    bottom right of the screen that used to be attached to the

10   jawbone to the left of the face shows recent activity of

11   bleeding in that area.

12   A    The part of the picture that is at the very bottom, it

13   corresponds to the jaw, but the area with the most contusion is

14   the maxillary area, which you cannot see the skin.

15   Q    Okay.  So the answer is no, we cannot see any sign of

16   recent bleeding from the left side of the jaw, in this picture?

17   A    It is not evidenced in this picture.

18   Q    And the jaw doesn't have any sign, the jawbone, excuse me,

19   doesn't show any sign of it being dislocated, for example?

20   A    The jaw is not fractured, and it is not dislocated.

21   Q    Now looking at the cheek bone on the left side in this

22   picture, which is Government's Exhibit 100.  There is also no

23   sign of recent activity of blood in that area, correct?  Of

24   bleeding.  I'm sorry.

25   A    In the maxillary region, you can observe, in this area, an

```
 1    increase in the reddish color of the bone, which means
 2    bleeding.
 3            MS. COLLAZO-ORTIZ:  Your Honor, I think the witness
 4    is trying to use the drawing tool, but it's not enabled.
 5            MS. CINTRON-COLON:  Please, and thank you.
 6            THE COURT:  Let me ask the courtroom deputy clerk.
 7            THE WITNESS:  If you can see, that area looks
 8    reddish, different from this other area.  Therefore, there is
 9    evidence of bleeding.
10            MS. CINTRON-COLON:  May we have a print screen of
11    this drawing?
12            Thank you.
13            We ask the Court if this can be marked as Defense
14    Exhibit D1 -- I mean E.  I'm sorry.
15            THE COURT:  Mr. Gottfried?
16            MR. GOTTFRIED:  No objection.
17            THE COURT:  Without objection, so ordered.  This
18    would be the Defendant's Exhibit E, as in "echo," 1.
19        (Exhibit No. E1 admitted into evidence.)
20            MS. CINTRON-COLON:  May I remove the image?  May I
21    remove it?
22    BY MS. CINTRON-COLON:
23    Q   Dr. Rodriguez, earlier we talked about the definition of
24    abrasion and fracture.  Contusion means a bruise, right?
25    Bruising?
```

1    A    It is compatible with a strong impact where the skin is

2    not broken, and blood and filtration is produced.  Commonly we

3    call it a "bruise" in our daily parlance.  It is a strong

4    impact that does not break the skin, and it collects blood in

5    that area.

6    Q    So the, to simplify the answer, a contusion indeed is a

7    bruise, in the colloquial term?

8    A    That's correct, a bruise.

9    Q    And you said it's the product of an impact, but we cannot

10   tell exactly what kind of impact produces a contusion, correct?

11             Doctor, excuse me.

12   A    When -- in the forensic context, when we have this type of

13   injury, that is localized, it's an injury that is round, and

14   it's localized, like in this case, in the left mandibular

15   region, in the right maxillary region, in the right temporal

16   region --

17   Q    Doctor, excuse me.  My question was -- rephrase the

18   question.

19             If, during an autopsy procedure, not necessarily --

20   it cannot, not necessarily it can be determined what has caused

21   a contusion, and I mean not necessarily, correct?

22   A    In the forensic context, when we have an injury such as

23   this, with these characteristics and this location, we can

24   issue an opinion that it is compatible with a punch or a hand.

25   In the forensic context, we can see evidence of these injuries

1    when they are in a pattern.  They can be in other parts of the

2    body as well.

3    Q    Does an area of the body that have a contusion, would have

4    internal bleeding in that same area?

5              THE INTERPRETER:  I'm sorry, Counsel?

6    BY MS. CINTRON-COLON:

7    Q    Would an area that has a contusion show internal bleeding

8    in that same area?

9    A    It is evaluated "subdermically."  It is localized.  There

10   is no broken skin, and it stays in the area of impact.

11   Q    I'm going to publish what has been marked as Defense

12   Exhibit A1, at page 3.

13             Doctor, can you please read paragraph 11?

14   A    Number 11 says:  Two contusions in the left jaw region of

15   one by a quarter inch by three quarters.

16   Q    And this was, like we stated previously, this was one of

17   your findings in the autopsy procedure?

18   A    That's correct.

19   Q    Showing again Government's Exhibit 100.

20             And, Doctor, you had previously mentioned that in the

21   jaw area here, in the left side of the jaw, we cannot see

22   bleeding, correct?

23   A    At the level of the bone, you cannot see the infiltration.

24   Q    Yesterday, Doctor, you testified that there is trauma in

25   the ankles of the body, correct?

1    A    Yes.

2    Q    Presenting Defense Exhibit A1, again on page 3.

3         Doctor, can you please read paragraph 3, at the top

4    of the page?

5         MS. CINTRON-COLON:  Your Honor, for the record, AUSA

6    Gottfried had asked me to provide the autopsy report in Spanish

7    to the witness so that she can read it, and the translator

8    reads the English version.  I have no problem with that, if the

9    Court so allows.

10        MR. GOTTFRIED:  Your Honor, she's just translating

11   from the English translation back into Spanish, and she's

12   testifying in Spanish.  So it might just facilitate if she has

13   the Spanish version, that she's comfortable with, in front of

14   her.

15        THE COURT:  All right.  Go ahead.

16        MS. CINTRON-COLON:  May I approach the witness?

17        THE COURT:  Yes.

18   BY MS. CINTRON-COLON:

19   Q    Dr. Rodriguez, I believe, while you were reading, you said

20   -- and I'm going to line, the fourth line of paragraph 3, that

21   says "without the associated fracture."  I believe, while you

22   were reading it, you mentioned with the associated fracture?

23   A    There is no fractures.

24        THE INTERPRETER:  This is the interpreter.  What she

25   said was not interpreted so requesting permission to enter

1    that.

2              THE COURT:  Go ahead.

3              THE WITNESS:  A contusion is identified in the

4    posterior anterior medial of the left ankle measuring two and a

5    half by one and a half inch.  Upon examination of the skin,

6    hemorrhagic infiltrates are identified in the soft tissues and

7    muscles.  The contusion measuring four by one and a quarter

8    inch, and the hemorrhagic infiltrate, two and a half by one and

9    a quarter -- correction, one and a half inches, without the

10   associate fracture.  A circumferential abrasion is identified

11   in the lower part of the lower extremity at the level of the

12   ankle of one quarter of an inch by three quarters of an inch

13   circumferentially with a vital reaction.

14   BY MS. CINTRON-COLON:

15   Q    Now showing what has been marked as Government's Exhibit

16   94.

17              Dr. Rodriguez, in the area where -- in this picture,

18   we can see two legs, tennis shoes and a wire tied around the

19   ankles, correct?

20   A    That's correct.

21   Q    And in the surrounding area of where the wire is tied,

22   there isn't significant bruising, is there?

23   A    At the left ankle level, a contusion and abrasions can be

24   identified.

25              MS. CINTRON-COLON:  Can we clear the screen, please?

```
 1              Thank you.
 2    BY MS. CINTRON-COLON:
 3    Q    But, in your opinion, can you say if this is significant
 4    bruising?
 5    A    That's correct.
 6    Q    Can you please make a defined circle around where you see
 7    significant bruising?
 8              MS. CINTRON-COLON:  Can we get a print screen of
 9    that?
10              Thank you.
11              Your Honor, we move to admit this as Defendant's
12    Exhibit Number E2.
13              THE COURT:  All right.  This would be Defendant's
14    Exhibit E, as in "echo," 2.
15         (Exhibit No. E2 admitted into evidence.)
16    BY MS. CINTRON-COLON:
17    Q    Dr. Rodriguez, you also testified that the wires were also
18    -- or, subsequently, removed from the body, correct?
19    A    That's correct.
20    Q    And you continued evaluating the body after the wires had
21    been removed?
22    A    That's correct.
23    Q    Were there pictures taken of the body without the wires?
24    A    Yes, that's correct.
25    Q    And, specifically, were there any pictures taken of the
```

1    area of the ankles without the wires?

2    A    Yes.  Pictures were taken.

3    Q    Dr. Rodriguez, you also testified yesterday that, upon

4    your examination, you concluded that the nose had a deviated

5    septum, correct?

6    A    That's correct.

7    Q    But a deviated septum isn't necessarily caused by an

8    injury, right?

9    A    Yes, that is correct, but in this case in particular, it

10   was due to a blow that was received.

11   Q    So the answer to my question is, yes, there are other ways

12   of a person having a deviated septum?

13   A    That is correct.

14   Q    Even a condition that is present at birth?

15   A    It could be.

16   Q    And, also, with the aging process, natural aging process?

17   A    I believe that there would have to be some initial

18   condition or some trauma, but I do not believe that with aging

19   the septum would be deviated.  I believe that there would have

20   to be some sort of infection or trauma or preexisting

21   condition.

22   Q    And a person can, in fact, live years with that deviated

23   septum?

24   A    Yes.  It would all depend on the damage and the extension

25   of that damage.  There are surgical treatments for that, but

1    all of that would depend on the damage and the magnitude of

2    that damage to the septum.

3    Q    So a deviated septum does not necessarily impede

4    completely the breathing through the nose of a person?

5    A    It could have complications:  not breathing well,

6    recurrent sinusitis, an event that is not trauma.

7    Q    So the answer is yes, a person does not necessarily have

8    -- can't breathe because of a deviated septum?

9    A    There are going to be some consequences.  The person is

10   going to have difficulty breathing.  They are not going to

11   breathe normally, like other people, because they will have a

12   small obstruction in the flow of air breathing through the

13   nose.

14   Q    But the airflow is not necessarily completely impeded?

15   That's my question.

16   A    In a case that is not traumatic.

17   Q    A recent deviated septum that is caused by an injury or a

18   blow leaves tons of blood in the area, right?

19   A    That's correct.

20   Q    Breaking a nose causes bleeding?

21   A    Correct.

22   Q    And a not recently deviated septum would not show tons of

23   bleeding in the area?

24   A    No.

25   Q    In fact, it could show no blood in the area?

1   A    In a recent, septum?

2   Q    Not recent.

3   A    Not recent.  But you can observe certain changes in the

4   area.

5   Q    But in terms of blood, you would not see blood?

6   A    They could have a hematoma, coagulated blood, secretions.

7   Q    But not blood flowing?

8   A    Exactly.

9   Q    Nor a splatter?

10  A    Not a fluid bleeding.

11  Q    Now, a nasal bone is different than the nasal septum,

12  correct?

13  A    That's correct.

14  Q    In fact, the nasal bone is a little upper on the side of

15  the nose, on the upper side of the nose?

16  A    That's correct.

17  Q    And the nasal septum is what is in between the two little

18  holes we have on our noses?

19  A    Correct.

20  Q    So a fracture in the nasal bone does not necessarily mean

21  a fracture in the nasal septum?

22  A    It could happen separately, but in this case, both areas

23  were affected.

24  Q    I'm going to publish Defendant's Exhibit A1.

25        I'm sorry.  I am showing now page 3 of Defendant's

1    Exhibit A1.

2              Can you please read paragraph 13, Dr. Rodriguez?

3    A    A dissection of the skin is performed in the facial

4    muscles, which upon examination of it, identifies hemorrhagic

5    infiltrate in the nasal septum area with a fracture and

6    separation of the nasal septum and deviation in the upper part

7    toward the right.

8    Q    So we're talking right here, what I'm marking in paragraph

9    13, I underlined the words "nasal septum."  So this paragraph

10   is talking about the nasal septum, a fracture in the nasal

11   septum; is that correct?

12   A    That's correct.

13              MS. CINTRON-COLON:  May I clear the screen, please?

14   BY MS. CINTRON-COLON:

15   Q    Now showing Defendant's Exhibit A1 and page 5, and the

16   section of autopsy findings, paragraph number 3(b).

17              Can you please read that, Dr. Rodriguez?

18   A    Purple and green color visualization of the surface

19   vessels of the body surface.

20   Q    Excuse me, Doctor.  Let me rephrase.  Paragraph 3(b),

21   please.

22              THE COURT:  B, as in "bravo," or D, as in "delta?"

23              MS. CINTRON-COLON:  B, as in "bravo," Your Honor.

24              THE COURT:  Thank you.

25              MS. CINTRON-COLON:  I'm sorry, Your Honor.

 1    BY MS. CINTRON-COLON:

 2    Q    In The document that you have, it's page 7, I apologize,

 3    in the Spanish version.

 4    A    Fine.  We have facial trauma.

 5              (b) Nasal bone fracture at the septum level with

 6    deviation toward the right.

 7    Q    Okay.  I am underlining the first two words, which are

 8    "nasal bone."

 9              Now, Dr. Rodriguez, in your autopsy findings, you

10    wrote that there was nasal bone fracture, correct?

11    A    That's correct.

12    Q    However, in no page of your report of the findings, or in

13    your analysis, did you describe a nasal bone fracture?

14    A    It's described there in part (b) of 3.

15    Q    But this section is the autopsy findings, correct?

16    A    Yes, that's correct.

17    Q    And before that, there are other sections where you

18    describe your process and your examination, correct?

19    A    That's correct.

20    Q    And in no other section where you describe your process

21    and your examination do you describe a nasal bone fracture?

22    A    But it is described as an autopsy finding.

23    Q    Would you agree that it's -- with me, that it's stated as

24    a conclusion of nasal bone fracture, as opposed to a

25    description of a nasal bone fracture?

1    A    No.  It is documented that it is a nasal fracture, and at

2    the septum level.

3            MS. CINTRON-COLON:  I think the interpreter missed a

4    word.  I think she said "nasal bone."

5            THE INTERPRETER:  The interpreter stands by the

6    interpretation.

7    BY MS. CINTRON-COLON:

8    Q    Dr. Rodriguez, let me ask you again.  The section of

9    autopsy findings are your conclusions on your examination,

10   correct?

11   A    That's correct.

12   Q    And in prior sections, you describe your examination of

13   the autopsy, correct?

14   A    Correct.

15   Q    Therefore, what you have in the section of autopsy

16   findings, which includes nasal bone fracture, is a conclusion

17   of your analysis, as per your report?

18   A    Not only did she have the fracture, she had the nasal

19   contusion.

20   Q    Doctor, excuse me.

21   A    Number 5 of the protocol.

22   Q    Let me repeat my question.

23           Autopsy findings, Section 3, subsection (b), as in

24   "bravo," this area right here states your conclusions, as

25   opposed to describes your analysis and process, correct?

1    A    That's correct.

2    Q    And in previous sections, like the one -- let me show you.

3    Showing Defendant's Exhibit A1 at page 3.

4         These paragraphs, 3 through 13, for example, these

5    are descriptions of your evaluations?

6    A    Correct.

7    Q    So in paragraph 13 that we're looking here, you're

8    describing a fracture in the nasal septum, correct?

9    A    Yes, that's correct.

10   Q    But that paragraph does not describe a fracture in the

11   nasal bone, correct?

12   A    It is not described there, but she had it in the upper

13   part on the side.

14   Q    So you say that you found that in your evaluation, yet you

15   did not document it in your report; is that right?

16   A    Yes, it should be present.  I am going to look it up.

17        Could you please repeat the question?

18   Q    Yes.  In the description of your evaluation, you did not

19   describe a nasal bone fracture.  You described a nasal septum

20   fracture, correct?

21   A    That's correct.

22   Q    You previously stated that a recent deviated septum that

23   was caused by an injury would leave significant bleeding in the

24   area, correct?

25   A    Yes, that's correct.

1    Q    Now going to show what's been marked as Government's

2    Exhibit 99.

3              Doctor, did you take this picture?

4    A    Yes.  It was taken by my assistant in my presence.

5    Q    Would you agree with me that this picture was not taken

6    from a direct angle to the face?

7    A    No.  It is in the correct position.  You can observe here

8    the deviated septum, and you can see here, in this area, the

9    deviated septum and the infiltration.

10    Q    Doctor, but my question was:  Is this picture a straight

11    shot from the face, right angle?

12    A    Yes, of the face.

13    Q    It's not a little tilted sideways?

14    A    What happens is that, even if it's tilted, the deviation

15    of the septum can be seen.

16    Q    Doctor, but that's not my question.  My question is if the

17    picture is tilted a little bit sideways.

18    A    I understand that it is in a frontal position.

19              MS. CINTRON-COLON:  May we clear the screen, please?

20    BY MS. CINTRON-COLON:

21    Q    Doctor, can you please mark where you see prominent

22    bleeding allegedly related to a recent deviated septum by

23    trauma?

24    A    In this -- yes.  In this case in particular, you can

25    observe the reddish color.  That would be the residual

1    bleeding.  Otherwise, it would look like the adjacent areas.

2              MS. CINTRON-COLON:  May we have a print screen,

3    please?

4              Thank you.

5              Your Honor, we move to admit this as Defense Exhibit

6    Number E3, please.

7              THE COURT:  This would be the Defendant's Exhibit E,

8    as in "echo," 3.

9        (Exhibit No. E3 admitted into evidence.)

10             MS. CINTRON-COLON:  Can we clear the screen, please?

11             Thank you.

12   BY MS. CINTRON-COLON:

13   Q    Dr. Rodriguez, can you please draw a circle around the

14   nasal bone?  Not the nasal septum, the nasal bone.

15   A    In this area.

16             MS. CINTRON-COLON:  May we also please have a print

17   screen of that?

18             And we request that that be admitted as the

19   Defendant's Exhibit Number E4, please.

20             THE COURT:  This would be the Defendant's Exhibit E,

21   as in "echo," 4.

22       (Exhibit No. E4 admitted into evidence.)

23   BY MS. CINTRON-COLON:

24   Q    Now can you please draw a circle around the nasal septum?

25             MS. CINTRON-COLON:  Can we have a print screen,

1      please?

2              THE WITNESS:  This is the area where the septum is.

3              MS. CINTRON-COLON:  And, Your Honor, we request that

4      that be admitted as Defendant's Exhibit Number E5.

5              THE COURT:  All right.  This would be Defendant's

6      Exhibit E, as in "echo," 5.

7          (Exhibit No. E5 admitted into evidence.)

8              MS. CINTRON-COLON:  May I clear the screen and remove

9      the picture?

10             Thank you.

11     BY MS. CINTRON-COLON:

12     Q    Dr. Rodriguez, if a nasal septum is broken, you would be

13     able to move it; is that correct?

14     A    Yes.  She could walk, unless she has lost consciousness

15     because of the bleeding.

16     Q    Let me --

17     A    She could move.

18     Q    Let me rephrase my question.  My question is:  If a nasal

19     septum is broken, you, as a forensic pathologist, when you're

20     conducting an autopsy, you're able to move the nasal septum,

21     correct?

22     A    Yes.  We evaluate it to see whether or not it has

23     deviation.

24     Q    And, but we did not see any pictures here about, of you

25     moving the nasal septum?

1    A    No.  We do not do that.  It is not documented while we do

2    that.

3    Q    And it is not included in your autopsy report either,

4    correct?

5    A    No.

6    Q    Dr. Rodriguez, you stated that a toxicology test was done

7    on the woman?

8    A    That's correct.  That's part of the protocol.

9    Q    And you testified that that report was made by Dr. Luz

10   Silva-Torres, correct?

11   A    That's correct.

12   Q    And you reviewed that report, correct?

13   A    That is correct, in order to arrive at the conclusion of

14   cause and manner.

15   Q    So you adopted the contents of that report?

16   A    It's part of the evaluation of the case, in order to

17   evaluate the cause.

18           MS. CINTRON-COLON:  Your Honor, may we approach?

19           THE COURT:  Yes.

20           MS. CINTRON-COLON:  Thank you.

21      (Sidebar conference commenced.)

22           MR. GOTTFRIED:  I understand that Sister Counsel

23   wants to cross-examine this witness on the toxicology analysis

24   that was prepared by the witness from yesterday.  She's not a

25   toxicologist.  I think her testimony, if any, would be very

 1    limited as to the contents of the toxicology report.  She

 2    indicated that she reviewed it in preparing her analysis, but

 3    she's not certified as a toxicologist.

 4           MS. CINTRON-COLON:  If I may, Your Honor.  She has

 5    stated that, she declared -- she testified yesterday plenty, a

 6    lot, on the Fentanyl that was found in the victim's body.

 7    Right now she even stated that she adopted its contents because

 8    she used it to base her findings and conclusions as the cause

 9    and manner of death in her report.

10           Now, even if she's not the author of this report,

11    that she's not the chemist that performed this, she has

12    reviewed it.  She adopted it, and she relied on this to make

13    her determinations and findings in her autopsy and autopsy

14    report.  And she testified plenty about the contents of this

15    report, which is the amount of Fentanyl that was found.

16           Let me read the other word.  I forget.

17           The Xylazine?  Is that how it's pronounced?

18           The Xylazine that was found on her body, the amounts.

19    She even testified that she, it's her opinion that the victim

20    was injected with these substances, and the amounts of the

21    substances that were found in her body.

22           So she did testify as to the contents of this report.

23    And she just said that she adopted this to prepare her

24    conclusions and to reach her findings in her autopsy, Your

25    Honor.

1          MS. COLLAZO-ORTIZ:  Your Honor, she didn't say she

2     adopted it.  She said it was made part of the protocol.

3          But the witness to be crossed on the content of this

4     document was yesterday, Ms. Luz Silva, who the defense did not

5     cross.  And so if they are going to attack somehow the contents

6     of the report or the findings of the report, the proper witness

7     was the one that we sat yesterday and was not crossed.

8          This, this witness is not the toxicologist.  So she

9     cannot be crossed on the contents and cannot authenticate a

10    document that was prepared by someone else.

11         MS. CINTRON-COLON:  First of all, it has a certified

12    copy stamp as being a certified copy of the Forensic Science

13    Institute.  First of all.

14         Second, we're not going to impeach the contents or

15    challenge the veracity of what is in here.  But this witness

16    yesterday testified that one of the three causes of death of

17    this woman was because she was injected with Fentanyl,

18    Xylazine; and that caused her to lose consciousness; and then

19    she was thrown into the water because she was injected.

20         So we're going into the effects of Fentanyl, these

21    amounts on the body, and how it was evaluated, but not to

22    contest the contents of the report.  And she literally just

23    said that she adopted it to prepare her findings in her autopsy

24    report.

25         THE COURT:  Yes.  Objection overruled.

1          (Sidebar conference concluded.)

2     BY MS. CINTRON-COLON:

3     Q    Dr. Rodriguez, if -- you stated that you adopted the

4     toxicology report in order to reach your findings and

5     conclusions on the cause of death?

6     A    In this case in particular, yes.

7               MS. CINTRON-COLON:  May I approach the witness, Your

8     Honor?

9               THE COURT:  Yes.

10    BY MS. CINTRON-COLON:

11    Q    Dr. Rodriguez, without going into the contents of what I,

12    the piece of paper that I just handed to you, can you please

13    tell us if you recognize that document?

14    A    Yes.  I attest that I recognize it.

15    Q    How do you recognize it?

16    A    I recognize it because it bears my name, the number of the

17    case that is being evaluated, the signature of the expert, and

18    in this case in particular, the toxicology report.

19              MS. CINTRON-COLON:  May I approach the witness, Your

20    Honor?

21              THE COURT:  Yes.

22              MS. CINTRON-COLON:  Your Honor, at this time, the

23    defense moves to admit what has been marked as ID B.

24              THE COURT:  Let me see it.

25              MS. CINTRON-COLON:  Sure.

```
 1                 THE COURT:  The record should reflect that the
 2      document was shown to me in sidebar.
 3                 So your request is what?
 4                 MS. CINTRON-COLON:  To admit this ID as an exhibit,
 5      Your Honor.  That would be Defense Exhibit B.
 6                 MR. GOTTFRIED:  No objection.
 7                 THE COURT:  Without objection, so ordered.  This
 8      would be the Defendant's Exhibit B, as in "bravo."
 9          (Exhibit No. B admitted into evidence.)
10      BY MS. CINTRON-COLON:
11      Q    Dr. Rodriguez, yesterday you testified that this woman
12      that you made -- you performed the autopsy in was injected with
13      Fentanyl; is that correct?
14      A    That's correct.
15      Q    But to Sister Counsel's questions yesterday you said that
16      you did not find an injection mark in her body?
17      A    Yes.  In this case in particular, it was not identified
18      due to the changes due to decomposition.
19      Q    And, Dr. Rodriguez, there is, based on the autopsy that
20      you conducted, solely and exclusively on the autopsy that you
21      conducted, there is -- you cannot tell us for certain that she
22      was injected with Fentanyl?
23      A    I could not identify the site.
24      Q    And the question is if you cannot conclude for certain
25      that she was injected with Fentanyl.
```

1   A    But she received it.

2   Q    But the question is -- listen carefully please -- that you

3   cannot conclude for certain that she was injected with

4   Fentanyl?

5   A    Because of the non-identification of the site, it cannot

6   be ruled out that she was injected.

7   Q    But, Doctor, the question is that you cannot conclude for

8   certain that she was, in fact, injected?

9   A    I cannot rule it out.

10  Q    But you cannot conclude that she was injected?

11  A    But she received it.

12  Q    But you cannot conclude that she was injected, Doctor?

13  A    I cannot rule it out.

14        THE COURT:  That's your answer, ma'am.

15  BY MS. CINTRON-COLON:

16  Q    Doctor, a person can ingest Fentanyl in other ways that is

17  not an injection, correct?

18  A    Illegally, yes.  It can be administered in other manners.

19  Q    Regardless of the legality, my question is if Fentanyl can

20  be ingested in different manners that is not an injection.

21  A    That's correct.

22  Q    Like snorting?

23  A    That's correct.  In pills, as a powder.

24  Q    And, also, as a topical on the skin?

25  A    That's correct.  In a medical setting or in a hospital

1    setting, it can be used in, transdermally or in the mouth, on

2    the skin.  That would be a setting, a hospital setting or a

3    medical setting, not illegally.

4    Q    Doctor, you stated yesterday that she could not have

5    injected herself because she was restricted with wire.  Is that

6    what you testified yesterday?

7    A    I did not declare, I did not say that, because it was not

8    asked in that manner.

9    Q    Sister Counsel asked you yesterday:  How did you reach the

10   conclusion that her injuries and substances in her body were

11   not product of, of her own actions.

12          Do you remember that?

13   A    Can you please repeat the question?

14   Q    Sure.  Of course.

15          The prosecutor yesterday asked you:  How could you

16   know that this woman did not suffer injuries nor had presence

17   or traces of controlled substances or drugs in her body because

18   of her own actions.

19   A    I do not remember the question as such, but indeed, she

20   could not give herself the hits.  And besides that, the way in

21   which she was tied, she had her physical activity restricted.

22   She could not defend herself.  She could not do anything else.

23   Q    But -- okay, Doctor.  Thank you.

24          But you cannot conclude, you have no way of knowing

25   for certain if the alleged facial trauma occurred before or

```
1    after she was tied with the wire, correct?

2    A    No.  That occurred before, because there was a vital

3    reaction.  It occurred before.

4              And after that, when the person receives the blow,

5    then the person becomes confused and loses consciousness.  And

6    then the drug is administrated, and then the person loses

7    consciousness.  And the physical activity is limited, and the

8    person then, because of the synergetic action of the drugs and

9    the blow, loses consciousness.  And then she was thrown in the

10   water.

11   Q    Doctor, yesterday you specifically told Sister Counsel

12   that if the blow was strong enough, that could cause her to

13   lose consciousness.  Do you remember that?

14   A    That's correct.

15   Q    But you cannot state for certain the strength of any blow

16   that she might have received?

17   A    I cannot determine the strength, but it was strong enough

18   to cause the fracture, the hits, and to cause an

19   unconsciousness.

20   Q    Doctor, so the answer to my question is no, you cannot

21   determine for certain, based on your autopsy, what was the

22   strength of the alleged blow that she received?

23   A    No.  I cannot determine it from the autopsy findings, but

24   I can determine it from the magnitude of the blows.

25   Q    Doctor, you also testified that you think she was
```

1    injected, but you cannot know for certain.  But the truth is

2    also that there is no way of knowing for certain if, in case

3    she was, in fact, injected, if she was injected before or after

4    she was tied, correct?

5              THE INTERPRETER:  The interpreter requests

6    repetition.

7              MS. CINTRON-COLON:  Sure.

8    BY MS. CINTRON-COLON:

9    Q    To my questions, you testified that no, there is no way of

10   knowing for certain, based on your autopsy, even though you

11   can't rule it out, but there is no way of knowing for certain

12   if she was injected with Fentanyl or not?

13   A    No, because we can see that with the results of the

14   toxicology.

15   Q    And you cannot conclude for certain either, if, if she was

16   injected, if it was before or after she was tied with the wire?

17   A    In this case in particular, because of the trauma

18   inflicted, she -- in this case in particular, because of the

19   trauma received, she must have been drugged because of the

20   synergistic action in order for her to be tied up because she

21   did not have physical activity.  So I believe that she was hit;

22   she received the drug; and then she was thrown in the water.

23   Q    And, Doctor, you just said that you believe that that's

24   what happened.  But the truth is that, based on your autopsy

25   report, you cannot tell for certain if that is exactly what

1    happened?

2    A    I only provided the findings of the autopsy, and I

3    conclude the cause and manner.

4    Q    And yesterday, Doctor, you -- well, let's first --

5          Showing defense exhibit, what has been admitted as

6    Defense Exhibit B.

7          Dr. Rodriguez, the result -- this is the

8    toxicological report, correct?

9    A    That's correct.

10   Q    That was done on Ms. Keishla Rodriguez-Ortiz?

11   A    That's correct.

12   Q    Which is the one that you told us previously that you

13   adopted and relied upon in reaching your conclusion for cause

14   of death?

15   A    It's one of the elements used for the cause and the manner

16   of death.

17   Q    Dr. Rodriguez, I'm directing your attention to part 4 that

18   says "Results," and the third paragraph here.  Can you please

19   indicate the results for Fentanyl in the body?

20   A    In this case in particular, the findings of the presence

21   of Fentanyl, I can see 9.9 nanograms per milliliter.

22   Q    And --

23   A    Xylazine?

24   Q    Sure.

25   A    Less than 50 micrograms per milliliter, nanograms per

1      milliliter.

2      Q     And is this amount of Fentanyl a large amount of Fentanyl?

3      A     Yes.  That should not be present.  Beyond three

4      milligrams, it is considered that she is intoxicated with that

5      substance.

6      Q     So this amount of Fentanyl in the body could kill a

7      person?

8      A     It could.  As a solitary speculative element, it could

9      cause death.

10     Q     And directing your attention to Section 1 that says

11     "Samples Received, other, blood 15 and blood 30, pleural

12     cavity."

13            "Pleural cavity" means the chest area, correct?

14     A     That's correct.

15     Q     So this means that the samples that were extracted and

16     analyzed for toxicology report were not from blood?

17     A     What happens is that, this is the element.  In this case,

18     in order to obtain the substance, the sample of the substance

19     is done in this place.  When the person is in a state of

20     decomposition, this is a place where we take the sample, or

21     from the heart.

22            In this case in particular, blood 15 is from the

23     heart, and blood 30 is from the pleural cavity.

24     Q     Thank you.

25            Dr. Rodriguez, yesterday you testified specifically

1    that -- one second -- that there were three causes of death for

2    this person?

3    A    In this case in particular, yes.

4    Q    But here, there is no way of knowing for certain which one

5    was the exact cause and manner of death, correct?

6    A    In this case in particular, all of them contributed to her

7    death.  I cannot separate them.

8    Q    So you cannot say specifically one cause of death?

9    A    No.  The three of them contributed to her death.

10   Q    And you cannot state for certain whether she was still

11   alive when she was in the water, placed in the water?

12   A    She was breathing in the water.

13   Q    I asked you, Doctor, but there was no water in her lungs,

14   correct?

15   A    In this case in particular, she was so decomposed that the

16   lungs were softened.

17   Q    But you were still able to examine the lungs, correct?

18   A    That's correct.

19   Q    And none of the lungs had water in them, correct?

20   A    Well, they presented the postmortem changes.  But if you

21   want a specific edema that was marked, it was not there because

22   of the decomposition changes in the water.

23   Q    But the question is if there was water in her lungs when

24   you evaluated and performed your autopsy.

25   A    They did not look edematous.

1              MS. CINTRON-COLON:  May I have one second, Your

2      Honor?

3              THE COURT:  Yes.

4              MS. CINTRON-COLON:  I have no more questions, Your

5      Honor.

6              MS. COLLAZO-ORTIZ:  Your Honor, may we briefly

7      redirect?

8              THE COURT:  Yes.

9                        REDIRECT EXAMINATION

10     BY MS. COLLAZO-ORTIZ:

11     Q    Good morning again, Dr. Rodriguez.

12     A    Good morning.

13     Q    To clarify, when you were asked about the amendment to

14     your report, that was to correct the typographical mistake,

15     correct?

16     A    That is correct.

17     Q    So there were no changes to your conclusions?

18     A    Yes.  The word "conceptual product" was eliminated.

19     Q    Because it was in the incorrect line?

20     A    That is correct.

21     Q    But the conclusions remain the same?

22     A    It did not change at all the rest of the protocol.

23     Q    And the defense counsel asked you about taking DNA from

24     the wire and the block.  Why didn't you take DNA from the wire

25     and the block?

1    A     It was not taken because it came from water.  It was in

2    water for sometime, and the presence of blood could not be

3    seen.

4    Q     And in your experience, what effect does water have on, on

5    DNA material?

6    A     In the case -- in cases such as these, where the body is

7    in water in a state of decomposition, when doing the tests, the

8    percentage is very minimal, sometimes less than one percent of

9    testing positive.

10   Q     Okay.  I'm going to be showing now what has been marked as

11   Exhibit 99.

12         Can you please describe again to the members of the

13   jury the trauma that was seen to the area of the nose?

14   A     You can see in this area that there is residual

15   hemorrhagic infiltration and a fracture, and here in the medial

16   section at the nasal septum level, you can observe that there

17   was deviation and discoloration.  That means there was recent

18   residual blood.

19         And here, at the maxillary level, you can observe the

20   hemorrhagic infiltration in the cheek or the cheek bone, and

21   here, on the other side, it can also be observed a small

22   hemorrhagic infiltration in the region of the cheek bone or the

23   maxilla on the right side.  And we can see the difference, that

24   in the other area of the bone, that infiltration cannot be

25   seen.

```
 1    Q    Can you explain to the members of the jury, what does that
 2    hemorrhagic infiltrate suggest or tells you?
 3    A    When we have the presence of hemorrhagic infiltration,
 4    it's because we have evidence of trauma that was inflicted.  We
 5    can see it in fluid form, or we can see it in coagulated form.
 6    We can observe it at the level of the area that was affected.
 7    With that reddish color, that means that it had a vital
 8    reaction when it was received.
 9    Q    And how do you know that these injuries were related to an
10    injury and not preexisting?
11    A    Because in the external evaluation of the injuries, it can
12    be observed that they were recent injuries.
13    Q    And how do you know that Ms. Keishla Rodriguez was
14    breathing when she went into the water?
15    A    It is observed because of the presence of that
16    infiltration in the septum area, which should not have that
17    color.
18    Q    But, specifically, in terms of your finding that she was
19    breathing when she went into the water, how do you reach that
20    conclusion?
21    A    In a forensic context, the presence of that water in the
22    sphenoid should not be there.
23              THE INTERPRETER:  Correction.
24              THE WITNESS:  The presence of the water in the
25    sphenoid, no matter the amount, means that the person was
```

1    breathing when the person went into the body of water,

2    regardless of the amount of the water.  This should not be in a

3    normal person.

4    BY MS. COLLAZO-ORTIZ:

5    Q    How many -- I'm sorry.

6    A    So when that person goes into a body of water, the person

7    was breathing.  That water in that location and in the bone

8    structures means that the person inhaled and exhaled, and it

9    went into the sphenoid.

10   Q    And how certain are you that she was breathing when she

11   went into the water?

12   A    Because of the presence of the water in the sphenoid.

13   Q    But how certain are you?

14   A    In my years of experience, that is an element that is

15   positive when a body has been in a body of water.  She was

16   breathing.

17   Q    Are there any other explanation for the presence of that

18   liquid?

19   A    No.

20            MS. COLLAZO-ORTIZ:  No further questions.

21            MS. CINTRON-COLON:  Very briefly, Your Honor.

22                        RECROSS-EXAMINATION

23   BY MS. CINTRON-COLON:

24   Q    Dr. Rodriguez, after a person dies, bodies can make

25   involuntary movements, correct?

```
 1    A    I have yet to have one that has an involuntary movement.
 2    Q    But based on your knowledge and training, you know that
 3    that occurs?
 4    A    Well, I don't know about that, that information.  I do not
 5    have it.  I am not aware of that, but we are those who move and
 6    break the bodies.
 7    Q    Doctor, you stated that you knew that the traumas on the
 8    face were recent because the external evaluation showed that
 9    the trauma was recent, correct?  That's what you stated?
10    A    That is correct.
11    Q    But you had also stated that in a decomposing body such as
12    this one, it's difficult to determine the nature and the damage
13    of certain body parts?
14    A    That is why it is evaluated the next day, because when a
15    body has been in the water, the injuries become more defined.
16    And that's why I evaluated it the next day.
17    Q    But you still have to cut open the body, make incisions,
18    to be more certain of the nature and damage of the injuries?
19    A    Well, in those cases where I have doubts, but if I have no
20    doubts, I do not have to do the incision.
21    Q    And in this case, you did make an incision, correct?  In
22    this case, you did make an incision, correct?
23    A    I did the incision for the facial skin in order to
24    corroborate the fracture that I was seeing upon external
25    examination.
```

```
1    Q    And you just said that you do incisions only when you're
2    not sure?
3    A    Exactly.
4    Q    And, Doctor, you cannot say for certain if a blow or the
5    hit that this person received was not the product of a fall or
6    a hard accident with anything?
7    A    In this case in particular, it cannot be the result of an
8    accident or a fall because of the location, the characteristics
9    and the pattern of the injuries on the face.
10   Q    But you cannot say for a fact and a conclusion that these
11   were hits from a person?
12   A    That is compatible with a blow inflicted on the face with
13   a fist or a hand.
14   Q    And you also answered to Sister Counsel's question that
15   you did not take any sample from the cement block or the wire
16   because you, because, in part, because the body was in the
17   water, correct?
18   A    Yes, that's correct.
19   Q    And that because of that, when doing a test, the
20   percentage of a DNA testing positive is minimal?
21   A    In these types of conditions.
22   Q    But it can be done?
23   A    It can be done.
24        MS. CINTRON-COLON:  No further questions, Your Honor.
25        THE COURT:  Sidebar.
```

```
 1              (Sidebar conference commenced.)

 2              THE COURT:  Who is your next witness?

 3              MS. COLLAZO-ORTIZ:  I was just telling counsel, it's

 4    Dr. Xiomara Rivera.  She's an odontologist.  It should be a

 5    short testimony.  If we can do it before lunch?

 6              THE COURT:  No.  We'll do it after lunch.

 7              MS. COLLAZO-ORTIZ:  The reason is because she has

 8    been here since yesterday.

 9              THE COURT:  Well, from your side, but I do not know

10    what's coming from the other side.  And I'm not going to

11    pressure them into anything.  All right?

12              Okay.  The doctor was qualified as an expert.

13              MS. COLLAZO-ORTIZ:  Right.

14              THE COURT:  And you are bringing in a forensic

15    pathologist.

16              MR. GONZALEZ-DELGADO:  Yes, sir.

17              THE COURT:  Okay.  As an expert, she can be in the

18    courtroom while the pathologist testifies.

19              MS. CINTRON-COLON:  We don't have a problem.

20              MR. GONZALEZ-DELGADO:  Yes, sir.

21              MS. CINTRON-COLON:  We had talked about it with the

22    prosecutor.

23              THE COURT:  Okay.  I just wanted to bring that out to

24    avoid problems down the road.

25              MS. CINTRON-COLON:  We had talked about it.
```

```
 1              MR. GONZALEZ-DELGADO:  It's been discussed.

 2              THE COURT:  Okay.  Perfect.

 3              Anything else?

 4              MR. GOTTFRIED:  Nothing.

 5              MR. GONZALEZ-DELGADO:  No, Your Honor.

 6              MS. CINTRON-COLON:  No, Your Honor.

 7         (Sidebar conference concluded.)

 8              THE COURT:  I do not have questions for the witness.

 9              Doctor, thank you for your testimony.  You are free

10    to go.

11              THE WITNESS:  Thank you.  Have a nice day.

12         (Witness excused.)

13              THE COURT:  Ladies and gentlemen, it's noontime, so

14    we are going to take a lunch break.  We'll be back in the

15    courtroom around 1:15 in the afternoon.

16              Before we go on break, remember, do not talk about or

17    communicate with anybody about your impressions of the case or

18    the evidence in the case.  Do not view, read or hear reports,

19    comments or articles about the case.  Do not conduct any

20    research about the case, the matters in the case or the

21    individuals involved in the case.

22              I look forward to seeing you all in the courtroom at

23    1:15 p.m.

24         (Whereupon the following proceedings were had in open court

25         without the presence of the jury.)
```

```
1              THE COURT:  All right.  We'll be back in the
2    courtroom at 1:15.
3              MR. GONZALEZ-DELGADO:  Thank you.
4        (Whereupon a recess was taken at 12:02 p.m., until 1:20
5        p.m.)
6                            -oOo-
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    UNITED STATES DISTRICT COURT )
                                   )  ss.
 2    DISTRICT OF PUERTO RICO      )

 3

 4                        REPORTER'S CERTIFICATE

 5

 6            I, CINDY LEE BROWN, RPR, Federal Official Court

 7    Reporter for the United States District Court for the District

 8    of Puerto Rico, appointed pursuant to the provisions of Title

 9    28, United States Code, Section 753, do hereby certify that the

10    foregoing is a true and correct computer-aided transcript of

11    proceedings had in the within-entitled and numbered cause on

12    the date herein set forth; and I do further certify that the

13    foregoing transcript has been prepared by me or under my

14    direction.

15

16            Dated this 28th day of June, 2023.

17

18

19                              /s/ Cindy Lee Brown

20                              CINDY LEE BROWN, RPR, Federal
                                Official Court Reporter
21                              150 Carlos Chardon, Room 150
                                San Juan, PR  00918
22                              (787) 772-3478

23

24

25
```