1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF PUERTO RICO

 3                              -oOo-

 4   THE UNITED STATES OF AMERICA,    )
                                      )
 5          Plaintiff,                )  Case No. 3:21-CR-00161-PAD
                                      )
 6   -vs-                             )
                                      )
 7   FELIX VERDEJO-SANCHEZ,           )
                                      )
 8          Defendant.                )
     _____)
 9
          TRANSCRIPT OF JURY TRIAL - DAY SEVEN - P.M. SESSION
10       HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
            UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
11                   WEDNESDAY, JUNE 28, 2023
     _____
12                    A P P E A R A N C E S

13
     FOR THE UNITED STATES OF AMERICA:
14
     AUSA Jonathan L. Gottfried &
15   AUSA Jeanette M. Collazo-Ortiz

16   FOR THE DEFENDANT:

17   Jason Gonzalez-Delgado, Esq. &
     Gabriela Jose Cintron-Colon, Esq.
18
     COURT INTERPRETERS:
19
     Carlos Ravelo &
20   Lynmar Vera

21   GOVERNMENT INTERPRETER:

22   Jose Luis Rosado

23

24

25


                 Cindy Lee Brown, RPR, Official Court Reporter
                  U.S. District Court, District of Puerto Rico
                              (787) 772-3478

1                          I N D E X

2    WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:        PAGE:

3    XIOMARA RIVERA-MORALES

4    Direct Examination by Ms. Collazo-Ortiz:              3

5    JOSEPH SOEKA

6    Direct Examination by Mr. Gottfried:                  9

7    Cross-Examination by Mr. Gonzalez-Delgado:           66

8    Redirect Examination by Mr. Gottfried:               87

9    Recross-Examination by Mr. Gonzalez-Delgado:         91

10   RICARDO GARCIA

11   Direct Examination by Mr. Gottfried:                 94

12   Cross-Examination by Mr. Gonzalez-Delgado:          101

13   EXHIBITS:                                           PAGE:

14   Government Exhibit No. 142                            16
     Government Exhibit No. 138                            33
15   Government Exhibit No. 125                            59
     Government Exhibit No. 143                            64
16   Government Exhibit No. 134                            97
     Government Exhibit No. 135                            99
17

18

19

20

21

22

23

24

25

```
 1          (Proceedings commenced at 1:17 p.m.)
 2                              -oOo-
 3      (Whereupon the following proceedings were had in open
 4          court without the presence of the jury.)
 5              THE COURT:  All set to call the jury in?
 6              MR. GOTTFRIED:  Yes, Your Honor.  And the government
 7      -- the witness is on the stand.
 8              THE COURT:  Okay.
 9      (Whereupon the following proceedings were had in open
10          court in the presence of the jury.)
11              THE COURT:  Good afternoon.  Welcome back to the
12      courtroom.  Please take a seat.
13              MS. COLLAZO-ORTIZ:  Good afternoon.  May it please
14      the Court?
15              THE COURT:  Go ahead.
16              MS. COLLAZO-ORTIZ:  Good afternoon.  Can the witness
17      be sworn in?  Xiomara Rivera.
18              THE COURTROOM DEPUTY CLERK:  The government calls
19      Xiomara Rivera.
20              Ms. Rivera, please raise your right hand.
21          (Witness sworn.)
22              THE COURTROOM DEPUTY CLERK:  So help you God.  You
23      may take a seat.
24                      XIOMARA RIVERA-MORALES,
25          called as a witness on behalf of the Plaintiff,
```

```
 1                    having been previously duly sworn,
 2                 was examined and testified as follows:
 3                          DIRECT EXAMINATION
 4    BY MS. COLLAZO-ORTIZ:
 5    Q    Good afternoon.  Can you please introduce yourself to the
 6    members of the jury?
 7    A    Good afternoon.  My name is Xiomara Rivera.
 8    Q    And what is your occupation?
 9    A    I am a forensic odontologist.
10    Q    What is a forensic odontologist?
11    A    A forensic odontologist is a dentist who analyzes teeth to
12    make, make identifications using the structures found in the
13    oral cavity.
14    Q    And before becoming a forensic odontologist, can you
15    please explain to the members of the jury what is your academic
16    background?
17    A    So I did my Bachelor's in Science at the University of
18    Puerto Rico, Mayaguez.  I did my Doctorates in the University
19    of Puerto Rico, Medical Sciences Campus.  I did a year of
20    general practice residency as well in the University of Puerto
21    Rico, Medical Sciences Campus.  And then I did a Forensic
22    Odontology Fellowship at the University of Texas Health Science
23    Center at San Antonio.
24    Q    And after your training, did you obtain any licenses or
25    certifications?
```

1    A    Yes.  I am licensed to practice dentistry in Puerto Rico.

2    Q    Since when?

3    A    Since 2006.

4    Q    Okay.  And as part of your employment, do you take

5    continuing education?

6    A    I do.

7    Q    How long?

8    A    Probably, every month.

9    Q    And are you a member of any professional organization?

10   A    Yes.  I am a member of [non-English language].

11        THE INTERPRETER:  The College of Dental Surgeons of

12   Puerto Rico.

13        THE WITNESS:  I am also a member of the American

14   Society of Forensic Odontology, and I am a Fellow of the

15   American Academy of Forensic Sciences.

16   BY MS. COLLAZO-ORTIZ:

17   Q    And who is your current employer?

18   A    I'm employed at the University of Puerto Rico, Medical

19   Sciences Campus, where I am a professor.  I teach the forensic

20   odontology course there and supervisor dental students.

21   Q    And how long have you worked there?

22   A    Since 2007.

23   Q    And did, at anytime, you held a private practice?

24   A    Yes, I was -- I practiced privately for 10 years in San

25   Juan.

```
 1    Q    And what kind of practice did you have?
 2    A    Basically, general dentistry practice.
 3    Q    Do you provide services to any other entity beside the
 4    University of Puerto Rico?
 5    A    Yes.  I am a contractor with the Institute of Forensic
 6    Sciences of Puerto Rico.
 7    Q    For how long?
 8    A    I've been working there since 2010.
 9    Q    And what do you do at the Institute of Forensic Sciences?
10    A    I work as a forensic dentist.
11    Q    And what kind of services do you provide?
12    A    We do dental identifications, age estimation, if it is
13    needed, and bite-mark-pattern analysis.
14    Q    And when does a forensic odontologist get involved in an
15    identification?
16    A    I am called when the, the remains, or the body that is
17    being autopsied at the Institute of Forensic Sciences, is not
18    apt to be shown to the family.
19    Q    What is the process that a forensic odontologist as
20    yourself follows in order to determine the identity of a body?
21    A    I get, I get consulted by the Institute of Forensic
22    Sciences.  They are the ones who, who provide the dental
23    record.  They've done the background, and they've talked to the
24    family.  And they've gotten the dental record from the dentist.
25              And what I do is I analyze and compare this dental
```

1    record provided by the dentist with the dental x-rays taken of

2    the remains or the body in question.

3    Q    And what are you looking for?

4    A    We are looking at all dental structures.  We are looking

5    for consistency and inconsistencies that can help us determine

6    whether it is a positive identification or not.

7    Q    And since 2010, approximately, how many identifications do

8    you do in a year?

9    A    Around 60 a year.

10    Q    And have you previously testified before in federal court?

11    A    Yes, I have.

12    Q    How many times in federal court?

13    A    One time.

14    Q    And how many times have you testified before a state or

15    local court?

16    A    Three times.

17    Q    And has, has a Court ever rejected you as an expert?

18    A    No, ma'am.

19         MS. COLLAZO-ORTIZ:  Your Honor, at this time, we move

20    that the witness be admitted and accepted as an expert in

21    forensic odontology.

22         MS. CINTRON-COLON:  No objection, Your Honor.

23         THE COURT:  Without objection, so admitted and

24    considered.

25    BY MS. COLLAZO-ORTIZ:

1    Q    Ms. Rivera, did you participate in the identification of

2    the body assigned PAT 1798-21?

3    A    Yes, I did.

4    Q    And who requested your services?

5    A    Dr. Rosa Rodriguez.

6    Q    And after -- what did you do upon receiving that request?

7    A    The Institute of Forensic Sciences provides the dental

8    record, the antemortem, before the death, and dental record.

9    They also take the x-rays of the body in question.  And what I

10    do is, I analyze all of the information given to me in the

11    dental record and all of the x-rays given to me taken at the

12    Institute of Forensic Sciences, analyze and compare.

13    Q    And after analyzing and comparing the records -- I'm

14    sorry.

15            Who were the records that you received for comparison

16    for?

17    A    Keishla Rodriguez-Ortiz.

18    Q    Okay.  And after examining the records for Keishla

19    Rodriguez-Ortiz against those from the body with PAT 1798-21,

20    what conclusion, if any, did you reach?

21    A    After analyzing all of the information, I reached the

22    conclusion that this was a positive identification.

23    Q    So does that mean that PAT 1798-21 was the body belonging

24    to Keishla Rodriguez-Ortiz?

25    A    That is correct.

1                MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

2                MS. CINTRON-COLON:  We have no questions, Your Honor.

3                THE COURT:  I have no questions for the witness.

4                Doctor, you are free to go.  Thank you for your

5        testimony.

6                THE WITNESS:  Thank you.

7            (Witness excused.)

8                MR. GOTTFRIED:  Your Honor, the government calls Joe

9        Soeka, S-O-E-K-A.

10               THE COURTROOM DEPUTY CLERK:  Mr. Soeka, please raise

11       your right hand.

12           (Witness sworn.)

13               THE COURTROOM DEPUTY CLERK:  So help you God.  You

14       may take a seat.

15               MR. GOTTFRIED:  May it please the Court?

16               THE COURT:  Go ahead.

17                           JOSEPH SOEKA,

18           called as a witness on behalf of the Plaintiff,

19                having been previously duly sworn,

20                was examined and testified as follows:

21                       DIRECT EXAMINATION

22       BY MR. GOTTFRIED:

23       Q    Good afternoon, sir.

24       A    Good afternoon.

25       Q    Can you please tell the members of the jury your name?

1    A    My name is Joseph Soeka, S-O-E-K-A.

2    Q    And where do you work?

3    A    I am a Senior Investigative Analyst for the Department of

4    Justice's Computer Crime and Intellectual Property Section Lab,

5    Cyber Crime Lab, in Washington, D.C.

6    Q    And how long have you been an analyst with the Cyber Crime

7    Lab?

8    A    I started with the lab in January of 2021.

9    Q    What is the Cyber Crime Lab?

10    A    The CCIPS, Computer Crime and Intellectual Property

11    Section's Cyber Crime Lab, is there for the needs of the

12    prosecutor.  We analyze digital media and evidence for purposes

13    of expert witness testimony and additional analysis in civil

14    and criminal proceedings.

15    Q    Okay.  And under what circumstances would the Cyber Crime

16    Lab, the digital crime lab, become involved in a case?

17    A    At the request of a prosecutor, we will receive a

18    generalized request, email or phone call, and we get involved

19    when the original investigating agency may want a deeper

20    analysis of digital media or to have findings validated; or

21    just, if the time parameters for them to accomplish the task

22    aren't there, they'll reach out to us for assistance.

23    Q    As an analyzer with the crime lab, generally speaking,

24    what are your responsibilities?

25    A    My responsibilities are to conduct digital investigative

1    analysis on a multitude of digital media, to include mobile

2    devices, computers, servers, cloud productions, and third-party

3    provider returns, like web-server logs, for example.

4    Q    If I can ask you just to approach the microphone a little

5    bit.

6             Thank you.

7             Prior to working at the Cyber Crime Lab, what did you

8    do professionally?

9    A    I come from a law enforcement background.  I worked five

10   years law enforcement in the State of Alaska, three of which

11   was spent as a Task Force Officer with the Drug Enforcement

12   Administration, and then, approximately, five years for the

13   City and County of Broomfield, in the State of Colorado, as a

14   sworn police officer and detective assigned to the Internet

15   Crimes Against Children Task Force and the Major Crimes Unit.

16   I was also assigned as a digital forensic examiner with the

17   police department there.

18   Q    And what can you tell us about your higher education?

19   A    I have my Bachelor's of Arts from Purdue University in

20   West Lafayette, Indiana, and Law and Society, with minors in

21   Forensic Science and Psychology.  I'm currently getting my

22   Master's Degree in Digital Forensics from the University of

23   Central Florida.

24   Q    What, if any, training have you received in computer

25   forensics investigations?

1    A    Throughout my career, I've received over, approximately,

2    500 hours of training in the field of digital forensics.  I

3    hold a number of certifications from a number of certifying

4    boards, to include IACIS, which is the International

5    Association of Computer Investigative Specialists, and the SANS

6    Institute.

7         My certifications are as a GIAC-Certified Advanced

8    Smart Phone Forensic Examiner, a Computer Forensic Examiner,

9    and a Certified Forensic Analyst.  And these are all through

10   the SANS Institute.

11        I'm also, again, certified as a Computer Forensic

12   Examiner and Mobile Device Examiner through IACIS.  I am also a

13   mentor and coach for IACIS, meaning that new applicants going

14   through the certification process are assigned a peer-review

15   coach to analyze their work as they go through the

16   certification process, which can take up to four months.

17   Q    Can you tell us what IACIS is?

18   A    It's the International Association of Computer

19   Investigative Specialists.  It's a certification nonprofit

20   authority that provides training in a multitude of disciplines

21   within digital forensics, Windows analysis, mobile device

22   forensics and computer forensics.

23   Q    And you've touched upon this, but let me ask you more in

24   depth.  What, if any, training in digital forensics have you

25   provided to others?

1    A    Also part of my current role with the Cyber Crime Lab, we

2    teach the topics of digital forensics nationally and

3    internationally.  I've traveled to many countries to teach

4    mobile device forensics, computer forensics, and basic courses

5    on how the internet works, to judges, prosecutors and

6    investigators.

7    Q    And during, in the course of your career, approximately,

8    how many smart phones have you conducted forensic analyses on?

9    A    I don't have an exact number, but I've conducted forensic

10   analyses on over, approximately, 100 phones throughout my

11   career.

12   Q    And what kinds of smart phones have those been?

13   A    Those have been IOS devices, meaning Apple iPhones, iPads;

14   Android devices, of which there is, approximately, 12,000

15   different manufacturers.  Obviously, I haven't been exposed to

16   all of those, but a numerous amount of those

17   Android-manufactured devices.

18   Q    And have you ever testified as an expert witness in

19   digital forensics in a federal trial?

20   A    I have.

21   Q    Okay.  And was your testimony admitted?

22   A    It was.

23   Q    Okay.  And how long ago was that?

24   A    It was, approximately, three weeks ago.  It was the

25   beginning of June.

1          MR. GOTTFRIED:  Okay.  Your Honor, at this time, the

2    government would move to qualify Mr. Joseph Soeka as an expert

3    witness in digital forensics.

4          MR. GONZALEZ-DELGADO:  No objection, Your Honor.

5          THE COURT:  Without objection, he is accepted as an

6    expert in digital forensics.

7    BY MR. GOTTFRIED:

8    Q    Sir, can you please tell the members of the jury what a

9    hash value is?

10   A    The term "hash value" is the digital DNA of a file, a

11   directory, a number of files, or an entire hard drive.  And

12   what we mean is that it's a mathematical algorithm that looks

13   at every bit of a file or a directory or a hard drive and

14   calculates a value for that that is alphanumeric.

15          If one bit of that file or directory or hard drive is

16   changed, meaning a zero is changed to a one or a one is changed

17   to a zero, it changes that hash value.

18   Q    Okay.  So just to give you an example, if I've got two

19   Word documents which are the same, except in one of the Word

20   documents there is an extra space, would the hash values of

21   those two documents be the same?

22   A    No, they would not.

23   Q    Okay.  And what, if any, evidence did you analyze in this

24   investigation?

25   A    In this investigation, I was provided a working copy of a

1    Graykey extraction of a mobile device, an iPhone 11 Pro.

2    Q    And when you say "Graykey," what's Graykey?

3    A    Graykey is a forensic acquisition tool that is only

4    available to law enforcement agencies for the purposes of data

5    extraction from mobile devices.

6    Q    And who provided this cell phone extraction to you?

7    A    I was provided the working copy of this extraction by

8    Agent Brian Clarity with the FBI.

9    Q    Okay.  Once the FBI -- and based on the information that

10    you obtained regarding this extraction, who had performed the

11    extraction originally?

12    A    The Graykey extraction report said that it was performed

13    by CFA Diaz.

14    Q    Now, did you calculate the hash value of the file that you

15    received from the FBI?

16    A    I did.

17    Q    And what did you do with that hash value?

18    A    I compared that hash value with the hash value that was on

19    the Graykey extraction report, basically to show that the

20    working copy that I was provided had the same hash value as

21    what was reported as being created by Graykey.

22    Q    Sir, I'm going to --

23            MR. GOTTFRIED:  Your Honor, I'm going to mark as

24    Government ID 142 a document that says "Cyo Hash," which I've

25    shown to Brother Counsel.

1              May I approach the witness?

2              THE COURT:  Yes.

3    BY MR. GOTTFRIED:

4    Q    So do you recognize Government ID 142?

5    A    I do.

6    Q    What is it?

7    A    It is the comparative hash that was run on my working copy

8    using a tool called "Cyo Hash," which calculates the SHA256

9    hash value of that file, and it's comparing it with the hash

10   value that was provided on the Graykey report.

11   Q    Okay.  And is Government ID 142 a true and accurate copy

12   of the hash verification that you performed?

13   A    Yes.

14              MR. GOTTFRIED:  Your Honor, at this time, the

15   government would move to admit Government ID 142 into evidence

16   as Government Exhibit 142.

17              MR. GONZALEZ-DELGADO:  No objection, Your Honor.

18              THE COURT:  Without objection, so ordered.  This

19   would be Government Exhibit 142.

20       (Exhibit No. 142 admitted into evidence.)

21              MR. GOTTFRIED:  And permission to retrieve the

22   exhibit.

23              THE COURT:  Yes, granted.

24              MR. GOTTFRIED:  If I can just use the Elmo for a

25   minute?

 1    BY MR. GOTTFRIED:

 2    Q    I'm showing you, sir, Government Exhibit 142.  Can you

 3    just tell the jury what we have here?

 4    A    So, again, we have a screen capture showing Cyo Hash,

 5    which calculated the hash value of the working copy of the data

 6    extraction performed by Graykey, comparing it with the report

 7    that Graykey produced, and just showing that those values do

 8    match.

 9    Q    Okay.  And I'm showing you what was previously introduced

10    as Government Exhibit 52, which was the target device

11    information through Agent Diaz.  How do the hash values of

12    those two compare?

13    A    They match.

14    Q    Okay.  Which means, based on your expertise?

15    A    That the file is unaltered; that every bit is exactly the

16    same as the time the extraction was conducted.

17    Q    Okay.  Now, once you verified that the extraction from

18    Agent Diaz was the same extraction that you had in your hands,

19    what did you do next?

20    A    I took the working copy of the extraction and used a tool

21    called "Magnet Axiom" to process it.

22    Q    What's Magnet Axiom?

23    A    Magnet Axiom is an industry-leading forensic tool that

24    allows the ingestion of extraction files, such as this or other

25    data files and forensic images, for the purpose of parsing out

1    that data to be reviewed by an agent or an analyst or an

2    examiner.

3    Q     Okay.  So is it fair to say that you got the raw data from

4    the extraction?  Is that accurate?

5    A     Yes.  So I was provided the extraction data, and I used

6    the tool to process it.

7    Q     And is Magnet Axiom the only tool that you can use in

8    order to view an extraction?

9    A     No.

10    Q     Okay.  Can you give me some other tools that are out there

11    publicly?

12    A     Cellebrite is another tool that would provide the analysis

13    of a Graykey extraction.  You can also use a tool such as

14    Oxygen, would be another example.

15    Q     Do you know which tool Agent Diaz used to view the

16    extraction?

17    A     My understanding is that he used Cellebrite Physical

18    Analyzer.

19    Q     Okay.  And you used which one again?

20    A     I used Magnet Axiom.

21    Q     Okay.  So once you process the extraction through Magnet

22    Axiom, then what did you do?

23    A     So I was requested to look at the extracted data to see if

24    there was evidence of messages that may have been deleted.  So

25    what I did, following the processing of it, was looked at the

1    communications field.  So the tool will take the data and build

2    it out into different categories so it provides a quicker

3    access for the user.

4            It's like a user interaction -- interactive tool.  So

5    within communications, it separates it out into different

6    fields, such as SMS/MMS messages and various chat applications.

7    So that's where I started my analysis.

8    Q    Okay.  And then what did you do next?

9    A    I focused specifically on messages that were taken from

10   two locations:  One is known as the KnowledgeC database, and

11   one is known as the Biome directory.

12   Q    And can you tell us what kinds of information is stored in

13   Biome and KnowledgeC databases?

14   A    So KnowledgeC and Biome are kind of pattern-of-life

15   artifacts that we use in the field of digital forensics.  So

16   when you send or receive a message or a phone call, there is

17   other services within the Apple Operating System that are using

18   that information to bring other features of the phone available

19   for you as a user, such as Siri.

20           So you can respond to a text message or a phone call

21   through Siri, for example, or Siri makes suggestions about

22   applications that you may want to use if you swipe down on your

23   home screen.

24   Q    Okay.  And when Siri is making those suggestions or if you

25   say "call home," where does Siri pull that information from?

1    A    So KnowledgeC tracks a lot of different things, and

2    KnowledgeC is tracking things such as plug-in state, unlock

3    state, and these app intents, is what it's called.  So

4    basically it's the intent to use application information with

5    other features of the device.

6         Biome and KnowledgeC contain information for this

7    purpose, and as operating systems with Apple are updated, such

8    as IOS 16, which we're currently on, Biome is being used a

9    little more heavily, from what we've seen in our analysis of

10   other devices and through our research.  And KnowledgeC is

11   being used a little less.  But you do see mirrored data in

12   both, in certain versions.

13   Q    So if I have a text message on my iPhone and I swipe and

14   delete it, can you tell me, from your digital forensics

15   perspective, where that message may go?

16   A    So when it's deleted, it's removed from a database called

17   the "sms.db."  This database is where your native text message

18   application stores its messages, and it's kind of like a

19   running spreadsheet with the messages stored in it.

20        When you delete a message, your phone is removing a

21   line from that database because it's not needed anymore.  The

22   same message is shared with KnowledgeC and Biome, for a short

23   period of time, for purposes of integrating the other features

24   from your IOS device.

25        Now, as a user, when you delete your message, the

```
 1    phone's done what it needs to to not show it to you anymore.
 2    But the messages can still be in these other files until they
 3    get cleaned out.  The system doesn't need to go in there and
 4    remove them at that time.  It's not accessible to the user, so
 5    it doesn't get cleared at the same time a message is deleted.
 6    Q    So on an iPhone, for example, how long, generally, is
 7    information, such as messages, kept in that Biome database?
 8    A    It does vary based on the service, but it is,
 9    approximately, four weeks, through our previous analyses and
10    testing.
11    Q    Okay.  And in terms of the kinds of messages that are
12    stored in this Biome database, can you tell us what kinds of
13    messages are stored there?
14    A    So native chat application messages are stored there.
15    Other applications for other -- messages from other
16    applications may be stored there if you've chosen, as a user,
17    to integrate it with Siri.  But native applications and native
18    call logs are stored there.
19    Q    So let me give you some examples:  Text messages sent on
20    an iPhone, would these be stored in Biome?
21    A    They would.
22    Q    Okay.  Snapchat messages, would those be stored in Biome?
23    A    I have not seen them stored in Biome, but, again, there is
24    Siri search features that can be user-activated.
25    Q    Okay.
```

```
 1    A    So I don't know if it would be, if it was.

 2    Q    Okay.  WhatsApp messages automatically stored in Biome?

 3    A    I have seen WhatsApp messages stored within the Biome.

 4    Again, it's by user.

 5    Q    Going back to the analysis of the extraction in this case.

 6    When did you perform your analysis?

 7    A    I received the working copy shortly after it was sent on

 8    October 27th.  I conducted my analyses, and I created my report

 9    on October 31st, 2022.

10    Q    Okay.  October 31st, 2022?

11    A    Yes.

12    Q    Okay.  And what can you tell us about the state of

13    forensic analyses of iPhones between 2021 and 2022?

14    A    So as these locations that store artifacts become more and

15    more known within the forensic community, the tools adapt.

16    These tools do a good job at parsing out information for us,

17    which is why we use them.  But it's only good as the

18    programming and the engineers behind the tools.  These are

19    private companies.

20         So as areas like Biome are further researched and

21    understood, they build parsers into their tools.  Newer

22    versions of Cellebrite, newer versions of Magnet Axiom, have

23    newer capabilities that may not have been available in previous

24    versions.

25         MR. GOTTFRIED:  If I may have just 30 seconds, Your
```

1      Honor?

2              Your Honor, I'm going to mark as Government ID 138 a

3      DVD, which has been shown to defense counsel, and if I may

4      approach the witness?

5              THE COURT:  Yes, you may.

6              MR. GONZALEZ-DELGADO:  But we'd like to approach the

7      bench before, Your Honor.

8          (Sidebar conference commenced.)

9              MR. GONZALEZ-DELGADO:  Your Honor, Exhibit 138, we

10     believe, are text messages that were deleted that were

11     referenced yesterday in our cross-examination and government's

12     direct examination of Agent Diaz.  This morning Brother Counsel

13     asked me if I had received an amended exhibit yesterday, and I

14     had not.

15             At 9:19 this morning, they sent us an amended, an

16     amended exhibit that we had not had the opportunity to examine

17     because we don't know who the witnesses are that the government

18     is going to present.  So at noon we were preparing for

19     something else.

20             But as soon as we heard the name, we looked at the,

21     at the exhibit that Brother Counsel had sent this morning, and

22     there are differences from what they had originally stated that

23     was going to be the exhibit.  Actually, there were 45 pages in

24     the first exhibit, and now there are only 23.

25             I was informed by Brother Counsel that what had

24

1    happened was that the emojis that were not available in the
2    first printing, or printout, that the Court can see here -- let
3    me see if I can -- here, Your Honor.  There is an emoji here
4    that was not printed out in, in what they originally sent us.
5    They fixed it, and the new exhibit contains the actual emoji as
6    it is shown on the phone when it is sent.
7          We would request, Your Honor, that the government
8    introduce the full 45 pages for completeness of the documents,
9    or the text messages that were referenced yesterday, that were
10   included since April 19th, 2021, until May 2nd, I think is the
11   last --
12         May 2nd?
13         MS. CINTRON-COLON:  April 27th.
14         MR. GONZALEZ-DELGADO:  -- April 27th, which is the
15   last message that is included, or was included, in the evidence
16   that was presented to us prior to today.  Like I said, I
17   haven't had an opportunity to examine any other inconsistencies
18   or differences that might have been from the two evidence
19   documents.
20         Oh, there is another, there is another issue, Your
21   Honor.  In the original extraction that was made, the names of
22   the people that appear on the, on the names next to the phone
23   numbers as to who's making the call and to whom they're making
24   the call, it was also edited, and the names were taken out.  An
25   example of this is, on April 19th, 2021, there is a text

1    message sent by -- or an answer by Mr. Verdejo at 7:09:07 a.m.,

2    Atlantic Standard Time, and the response is from Ms. Keishla

3    Rodriguez at 7:10:14, Atlantic Standard Time.

4           If we look at the brand new provided evidence, you

5    can see that Mr. Verdejo's name is still included in his part

6    of the, of the screen, or of the text message, but they have

7    edited Ms. Keishla Rodriguez's name.  Equally, there are other

8    messages in the, in the text messages where they eliminated

9    basically all of the names of the people that were -- or either

10   received or sent the messages.

11          THE COURT:  Mr. Gottfried?

12          MR. GOTTFRIED:  So the streamlined version of this

13   document was produced last week to defense counsel.  So in

14   terms of, the government had produced, with the original

15   exhibit binder that I disclosed to defense counsel voluntarily,

16   pages that exceeded, I believe, 30.

17          Last week, we provided a reduced subset of that.  We

18   did not add any messages.  We took them away.  We said:  This

19   is an amended list.  So that they've had since last week.

20          Last night, as we were reviewing the documents, we

21   noticed that there were certain periods that should be there,

22   based on what was in the original extraction, as well as

23   certain emojis.  When you print them out as a pdf, they don't

24   appear in the pdf format, even though they were in the

25   original.  So we added those back in as well.  But those are

1    all in the original version of the extraction that they

2    themselves have and that was produced in December of 2022 to

3    them.

4            With respect to the names, Keishla Rodriguez and Luis

5    Cadiz, those, looking at the original extraction, were not in

6    the original extraction.  So those were knocked out.  If they

7    want, we can add the names back in, but those were changes last

8    night looking at it.

9            Again, none of the messages were changed.  No

10   messages were added.  No messages were deleted.  What was

11   changed were the, some punctuation, some emojis that appeared

12   in the original extraction, but when printed to pdf, did not

13   appear, they appeared as triangles or some other stuff, and

14   then the names of Keishla Rodriguez next to the phone number,

15   and Luis Cadiz next to the phone number.  So those are the

16   changes.

17           MR. GONZALEZ-DELGADO:  And 20-something pages that

18   we're missing.

19           MR. GOTTFRIED:  That was last week.

20           MS. COLLAZO-ORTIZ:  When we sent on Sunday the

21   revised exhibits, that was one of the ones that was revised

22   previously.

23           MR. GOTTFRIED:  I think the other issue too is, we

24   voluntarily provided exhibits to defense counsel with a

25   certified translation with the interest of streamlining things.

1    But should we decide not to admit part of the exhibits, or even
2    the entirety of exhibits, I'm not sure what the grounds is for
3    requiring us to submit something that we voluntarily provided
4    to them.
5         We are updating.  As we update exhibits, as we see
6    the need, we're providing updates in real-time to them.
7         MR. GONZALEZ-DELGADO:  Your Honor, he's correct.
8    They were provided in the *Jencks* on June 25th, 2023, at night,
9    but that's correct.  He has the -- he represented the 23 pages,
10   but there is a difference from what we were presented with
11   what's being presented today here.
12        There were amendments made.  There were
13   deletions that we believe that -- we'd request the Court to
14   have the government introduce what they, what they provided and
15   for what we prepared.
16        Because the problem is, with this is now the witness
17   can sit down and say that this last-night extraction that was
18   made was taken from the phone.  But it would be inaccurate for
19   the jury because it would not be the actual extraction from the
20   phone because there have been deletions that the government
21   admits that were made.
22        MR. GOTTFRIED:  And I can proffer to the Court that
23   the questions to the witness would be, this document here,
24   which is the copy that they have, is that a true and accurate
25   copy of the extractions from the phone.  And my understanding

1    is that he will say:  Yes, it is.  Because he's reviewed this

2    version.

3              If I present him a prior version, where the emojis

4    appear as triangles and squares and with certain punctuation

5    left out, he will say:  That's not the extraction that I

6    viewed.

7              MR. GONZALEZ-DELGADO:  And then I have no problems

8    with the emojis.  The problem that we have is with the

9    elimination of the names of the persons who are having the

10   conversation.  Because the only names that they left in was Mr.

11   Verdejo's.

12             And, I mean, if we want to be -- if we want to bring

13   the truth to the jury, the truth is these conversations were

14   between him and Ms. Keishla Rodriguez.  It should be between

15   him and Mr. Luis Cadiz, and between him and a person named

16   Mr. Rabbit.

17             And the dates that we received had been from April

18   19th, 2021.  And all of the sudden, we're receiving an amended,

19   and amended exhibit where they eliminated five days from the

20   text messages and the conversations that were, or were had

21   between the individuals texting from Mr. Verdejo's phone, if

22   that is actually Mr. Verdejo's phone, and the people who

23   received those messages.

24             MR. GOTTFRIED:  In terms of the phone numbers, I

25   will, through this witness, based on other evidence, visit who

1    those numbers belong to based on phone records.  But based on

2    Mr. Verdejo's cell phone extraction, I don't believe he's going

3    to be able to say:  I can associate this number with Keishla

4    based on the cell phone extraction.

5              Based on other evidence that I plan on bringing in,

6    to be clear, I do plan on saying that's Keishla's number.  I do

7    plan on saying that's Luis's number.  So that information will

8    come in through this witness.

9              MS. COLLAZO-ORTIZ:  It's not in the phone extraction.

10   The name itself is not in the phone extraction.

11             MR. GONZALEZ-DELGADO:  So, Your Honor, that would

12   mean that Mr. Verdejo's name was included by someone who was

13   not, who was not the phone, and Ms. Keishla Rodriguez and

14   somebody else, Mr. Luis Cadiz's, phone was included.  Because

15   if the extraction is true and correct, all he does is he takes

16   it out.

17             And as it seems on the, on the screen of the phone,

18   where when I'm texting and I text Counsel Cintron, the name

19   that I have for her will show up, and her answers will show up

20   like that.  And that would be accurate.  But the way that

21   they're presenting it today, you can see, Your Honor, that in

22   the original, they have the names for the people who make the

23   phone call and receive the phone call, if in the cell phone

24   Mr. Verdejo had a name attached or a nickname to that phone

25   number.

 1          Here, if you can see, I'm -- I have to assume that it

 2     was the government who removed the names because you can see in

 3     the brand new exhibit that they're trying to introduce, the

 4     names were deleted or -- the only word I can use is "deleted"

 5     because it's just not there.  So somebody eliminated those

 6     names.  And the dates, obviously, do not correspond with what

 7     we had.

 8          MS. CINTRON-COLON:  Dates are missing, which is more

 9     important than the names, for completeness.

10          MR. GOTTFRIED:  And with respect to the name of Mr.

11     Verdejo, there is identifying information on that cell phone

12     extraction that links him to that phone number.  So that's why

13     that name is included.

14          With respect to the others:  Keishla and Luis, based

15     on what I understand he's going to say, he cannot link that

16     phone number to that name based solely on the cell phone

17     extraction.

18          THE COURT:  Go ahead.

19          MS. COLLAZO-ORTIZ:  To be clear, for Counsel's

20     example, if these were regular messages that had not been

21     deleted and they were tied to a contact name, it's different

22     than for messages that are recovered from a different database.

23     So his example is premised on a different scenario; that being,

24     two people who are communicating with the contacts added,

25     without deleting contact information or without deleting text

1     messages.

2               THE COURT:  Okay.

3               MR. GONZALEZ-DELGADO:  Yesterday -- if I may.

4               THE COURT:  Go ahead.

5               MR. GONZALEZ-DELGADO:  Yesterday the government -- I

6     mean, I don't -- I'm not sure if it was yesterday or the day

7     before.  They spent two days reading text messages to the jury

8     where they said who's calling who, who's sending the message,

9     and they gave the name that appeared on top of the message and

10    the phone number.  And they alluded as to that person making

11    the phone call or making the -- or sending the text message.

12              Now, because they have another witness bringing in

13    some text messages that will be read to the jury, and the jury

14    will have them in evidence if they're admitted, they're doing

15    exactly the opposite.  They're deleting the names of the

16    persons that were involved in those, in those text messages.

17              The inference that the government wanted to bring to

18    the jury with the other -- two days ago, with Agent Diaz

19    testifying as to, or reading the text messages, were that this

20    person called or texted that person, and this is a conversation

21    between the two of them.  Now, it's only a conversation between

22    Mr. Verdejo and we don't know who.

23              MS. CINTRON-COLON:  Most importantly, the five days

24    that are missing is, is crucial to this determination because

25    they have eliminated five days of text messages between, for

1    example, Mr. Verdejo and Ms. Rodriguez.  And that would be in

2    Government's ID 138.

3            So for completeness, for context, we understand, and

4    we request, that the entirety of the messages since April 19th

5    of 2021 be included as they were in that first conversations,

6    communications.

7            MR. GOTTFRIED:  Your Honor, the messages are complete

8    in and of themselves.  And that phone has gigabytes of data.  I

9    mean, we're not introducing the whole cell phone into evidence.

10           There are certain messages that we believe to be

11   relevant with respect to the messages that we presented two

12   days ago.  I mean, that was a multiyear relationship, that was

13   the one with Keishla so --

14           THE COURT:  I'm not persuaded I should go along with

15   defense counsels' request.

16       (Sidebar conference concluded.)

17           MR. GOTTFRIED:  Your Honor, permission to approach

18   the witness with Government ID.

19           THE COURT:  Granted.

20   BY MR. GOTTFRIED:

21   Q    Do you recognize Government ID 138?

22   A    I do.

23   Q    Okay.  I'm sorry?

24   A    I do.

25   Q    How do you recognize it?

1    A    I recognize it as a disc containing some pdf reports that
2    were provided to me by Special Agent Clarity.
3    Q    How do you recognize that disc?
4    A    My initials and my date.
5    Q    And are those true and correct copies of certain content
6    that you extracted from the cell phone extraction?
7    A    Of specific messages from my extraction, yes.
8            MR. GOTTFRIED:  At this time, Your Honor, the
9    government would move to admit Government ID 138 as Government
10   Exhibit 138.
11           MR. GONZALEZ-DELGADO:  With our objection, Your
12   Honor.
13           THE COURT:  All right.  Government's ID 138 is now
14   Government Exhibit 138.
15        (Exhibit No. 138 admitted into evidence.)
16           MR. GOTTFRIED:  Permission to recover the exhibit.
17           THE COURT:  Granted.
18           MR. GOTTFRIED:  And permission to publish.
19           THE COURT:  Yes, granted.
20   BY MR. GOTTFRIED:
21   Q    Sir, the messages in Government 138, in what database did
22   you find those?
23   A    These were from the Biome directory.
24   Q    And what conclusions, if any, were you able to draw about
25   the presence of these messages in the Biome database?

1    A    They were present within the Biome directory.  The

2    messages themselves were not present in the SMS database, which

3    is, again, where those native chat application messages are

4    stored.

5    Q    Okay.  And the presence of those messages in the Biome

6    database, but not in the SMS database, leads you to what, if

7    any, conclusion?

8    A    It leads me to the conclusion that they were removed from

9    the SMS database.

10   Q    And why do you say that?

11   A    I say that because the rows associated with the messages

12   were no longer present.

13   Q    Okay.  Were there any retention settings on this phone for

14   messages?

15   A    There was.

16   Q    And what, if any, were those retention messages?

17   A    At the time of acquisition, the retention for messages was

18   set to "forever."  You are able to change the period to which

19   messages are retained.

20   Q    In this case, had this been changed?

21   A    No.  It was set at "forever."

22   Q    Okay.  So to explain, if the user of the phone did not

23   actively delete the messages, would they automatically be

24   deleted after a certain period of time?

25   A    I am unaware of any reason they would be removed from the

1    database without the user of a device choosing to remove them.

2    Q    Okay.  I'm going to briefly show you what has already been

3    admitted into evidence as Exhibit 4.  Sir, what is the phone

4    number associated with this account?

5    A    (787)397-2408.

6    Q    Okay.  And where do you see that?

7    A    I see that in the line that says "MSISDN" under "User

8    Information."

9    Q    Who are the financial and billing parties associated with

10   that phone number?

11   A    The financially-liable party listed is Keishla M.

12   Rodriguez-Ortiz, and the billing party listed is the same.

13   Q    Okay.  Moving back to Exhibit 128 -- I'm sorry, 138.

14        Okay.  Can you please read the first message.  It's

15   in Spanish on the left and the certified English translation on

16   the right.  I'm going to ask you to read the certified English

17   translation beginning on Saturday, April 24th, 2021.

18        And, sir, the name Felix Verdejo associated with that

19   number, what is the basis of that connection?

20   A    From the device, there are a number of account IDs that

21   are present.  There is associated Apple IDs, which were of

22   email addresses, and then application user names that are saved

23   to the device as well, some of which were listed as Felix

24   Verdejo.

25   Q    All right.  The -- on April 24th, 2021, at 8:47 a.m., what

```
1    is the message?

2    A    It says:  "Good morning, precious," with two emojis.

3    Q    And what is the response?

4    A    "Good morning."

5    Q    To which Mr. Verdejo responds what?

6    A    "What are you doing, baby?  Working, my love?"

7    Q    To which the response is?

8    A    "Yes."

9    Q    And what does Mr. Verdejo write on April 24th at 8:52

10   a.m.?

11   A    The device owner says:  "Um, okay.  I hope everything goes

12   well, my love.  And how did you wake up, precious?"

13   Q    And then the response is?

14   A    "Thank you."

15   Q    And then?

16   A    "Good."

17   Q    And then the device owner says what?

18   A    "That's good, my love.  Are you okay?  Nothing's wrong,

19   love?"

20   Q    And then on April 24th, at 8:58 a.m., what is the

21   response?

22   A    "GD."

23   Q    Okay.  And then what does the owner say on April 24th at

24   9:09 a.m.?

25   A    "Are you sure because you never write like that,
```

1    abbreviating, babe.  That's weird, baby."

2    Q    And then he says?

3    A    "I still can't believe what came out of your mouth," with

4    three emojis.

5    Q    And then he writes?

6    A    "Well, you prefer the old man over me.  Whatever.  I'll

7    respect whatever you do.  It's your decision.  I can't do

8    anything or force you," with emojis.

9    Q    And then the next message to which the person with whom

10   he's communicating responds?

11   A    "You're not going to help me though, right?"

12   Q    And then?

13   A    "In all these years."

14   Q    And then what does Mr. Verdejo respond on April 24th at

15   3:30 p.m.?

16   A    "Of course I can help you, dumb bitch, but you don't speak

17   up.  Whatever in your eyes.  An old man can do better than me.

18   That's tough," with emojis.

19   Q    To which the response is?

20   A    "Get me out from where I am.  That's something only a real

21   man has the balls to do."

22   Q    To which the response is?

23   A    "You don't have to have balls to do that, dummy.  It's

24   whatever."

25   Q    Okay.  To which the response at 3:36:03 p.m. is?

1  A    "You do have to have them and have a big fucking heart for

2  you to want to help the person you supposedly love."

3  Q    And then?

4  A    "Because human beings don't help others as a labor of

5  love, but if in reality if you care about that person, you'd do

6  anything to not lose her.  And you're so immature, always

7  giving excuses."

8  Q    To which Mr. Verdejo responds on 3:41:53 p.m., on April

9  24th?

10  A    "Okay.  So let's go.  All hands on deck, baby."

11  Q    To which the response is?

12  A    "It's not a joke."

13  Q    And then?

14  A    "And you're not obligated to do something that you don't

15  want to."

16  Q    And what is the response?

17  A    "I'm not joking.  What's up," with emojis.

18  Q    And then?

19  A    "It's fucked up to lose to an old man, you slut."

20        MR. GONZALEZ-DELGADO:  Your Honor, we have some

21  objections to the translations in what we're seeing.  And if,

22  could Brother Counsel bring back page 6, to give the Court an

23  example?

24        MR. GOTTFRIED:  Your Honor, if we can approach at

25  sidebar?

```
1                THE COURT:  Yes.

2                MR. GONZALEZ-DELGADO:  It's a translation issue.

3                THE COURT:  Sidebar.

4           (Sidebar conference commenced.)

5                MR. GONZALEZ-DELGADO:  Your Honor, at least three

6      translations that are incorrect.  It says -- page 4 -- in page

7      5, in the message, it says, record in 292, 4/24/2021, at

8      3:32:10 p.m., the message in Spanish is:  "[non-English

9      language]."  The translation is:  "You don't have to have balls

10     to do that, dummy.  It's whatever."

11               That's incorrect.  Instead of "it's whatever," it

12     should say "normal."

13               Then in the other translation, it says -- yes, in, in

14     record 295, it says:  "[non-English language]."  The

15     translation is misquoted because it says:  "You do have to have

16     them and have a big fucking heart for you to want to help the

17     person you supposedly love."

18               It doesn't say "supposedly."  It says:  "the person

19     you love," should be the correct translation.

20               THE COURT:  Okay.  Listen, I'm not going to go over

21     all those messages to micromanage a determination on whether

22     translation is accurate or not.  I have one basic option at

23     this point:

24               I can release the jury for the day, and you both,

25     both sides, go over all those messages and agree on a
```

1    translation and bring me any differences.  And then I will

2    check, and I will decide.  But --

3                MR. GONZALEZ-DELGADO:  The reason, Your Honor, is --

4                THE COURT:  No.

5                MR. GONZALEZ-DELGADO:  It's the translation, because

6    of "the person I love."  It's not "supposedly."

7                THE COURT:  Mr. Gonzalez, I heard what you said.  I

8    heard what you read.

9                What I'm saying is, I'm not spending the rest of the

10   afternoon, using the jury's time, in sidebar going over

11   objections to translations.  It's not efficient, and it's not

12   fair to the jury.

13               I can release the jury.  I can remain in the

14   courtroom.  I'm not concerned about my time.  I'm concerned

15   about their time.

16               And you go over all those messages, and if there is

17   any question, after having gone through all messages, as to any

18   translations, you bring them to me, and I'll decide.

19   Otherwise, it doesn't make sense.

20               MR. GOTTFRIED:  Your Honor, if I can be heard.  One

21   is -- these are certified translations that were provided to

22   defense counsel weeks ago.

23               THE COURT:  So he has waived the objection; that's

24   what you are saying?

25               MR. GOTTFRIED:  Well, just as a matter of precedent

```
 1    here, this morning there was a certified translation that was
 2    shown to us, six pages of a technical document.  We asked for
 3    time, you know, to submit objections to the Court, and we
 4    decided to move ahead with the testimony.
 5             What we want to avoid is a situation.  We anticipate
 6    having additional documents that we have provided to them
 7    weeks, if not months, ago with certified translations, and we
 8    want to avoid a situation each time we try to introduce these.
 9             THE COURT:  It's a problem.
10             MS. CINTRON-COLON:  If I may, Your Honor.
11             THE COURT:  No.  Remember what I said --
12             MS. CINTRON-COLON:  Yes, sir.
13             THE COURT:  -- yesterday?  I think one of both speaks
14    to me because otherwise we lose control.
15             MS. CINTRON-COLON:  Yes, sir.
16             THE COURT:  Implicit in what you just said, Mr.
17    Gottfried, is -- this is my understanding -- let's go ahead,
18    and at the end of the day, if there is any need to clarify to
19    the jury, we'll clarify to the jury.  That's what you are
20    saying?
21             MR. GOTTFRIED:  Yes, Your Honor.  And that was my
22    understanding with respect to the translation that defense
23    counsel had this morning.  There was the same understanding
24    that, if we had an issue, we would clarify it at some later
25    point.
```

```
 1                    THE COURT:  Sounds good to me because the difference
 2        between "normal" and "whatever," for me, is --
 3                    MR. GONZALEZ-DELGADO:  Yeah, but this one isn't, Your
 4        Honor.  "For a person you love" --
 5                    THE COURT:  You used the example.
 6                    MR. GONZALEZ-DELGADO:  Yes.
 7                    THE COURT:  I'm using this as an example.
 8                    MR. GONZALEZ-DELGADO:  Okay.
 9                    THE COURT:  Original:  "[non-English language;"
10        translation:  "whatever."  It is insignificant for me.  But I
11        think what Mr. Gottfried suggested is the right thing to do.
12                    MR. GONZALEZ-DELGADO:  But, Your Honor -- let me just
13        put it on the record.
14                    THE COURT:  Go ahead.  You already did.
15                    MR. GONZALEZ-DELGADO:  I know.  But the Court is
16        stating that that translation is insignificant.
17                    THE COURT:  As an example.
18                    MR. GONZALEZ-DELGADO:  As an example, and it might
19        be.  But the problem is that this is not an insignificant
20        translation because the government has been saying from the
21        beginning that the reason why he wanted, Mr. Verdejo wanted to
22        kill her is because he did not want the child, and the
23        relationship with them was toxic.
24                    But if we have a text message from the victim that
25        says "[non-English language]," that, a literal translation, and
```

1    I'm not a certified translator, has -- the translation changes

2    the context of the interpretation because it says:  "the person

3    that you love" is different from "the person that you

4    supposedly love."

5              THE COURT:  Okay.

6              MR. GONZALEZ-DELGADO:  That goes to --

7              THE COURT:  Mr. Gonzalez, I understand.  It's the

8    same point you raised earlier.  We are not going to go over

9    this.  It's an impasse.  Listen, it's an impasse.

10             I suspect that the translations to the autopsy report

11   -- that's what we were dealing this morning?

12             MR. GONZALEZ-DELGADO:  Yes, sir.

13             THE COURT:  -- would be non-eventful in terms of

14   controversy.  This is kind of different.

15             How many messages are we talking about?

16             MR. GOTTFRIED:  Your Honor, we have 23 pages.

17             THE COURT:  23 pages.  Listen, I'm not going to spend

18   the rest of the afternoon with this jury waiting for

19   translations to be sorted out.  It's unfair to them.

20             MR. GOTTFRIED:  So, Your Honor, may we --

21             THE COURT:  So I'm going to recess for the day.

22             MR. GOTTFRIED:  Your Honor --

23             THE COURT:  It's a problem, but there is no way

24   around this.

25             MS. COLLAZO-ORTIZ:  Your Honor, perhaps -- I don't

1    think we need to recess for the day.  Again, Counsel has had

2    these translations for a while.

3              THE COURT:  I know.

4              MS. COLLAZO-ORTIZ:  But if we can then have a break,

5    and then instead of recessing for the day and wasting the rest

6    of the afternoon, perhaps we can take an early break.

7              THE COURT:  How much time?  Listen, I'm not saying

8    any of you folks has not been acting without good faith.  We

9    need to sort this out.  I'm willing to call a recess.  Sounds

10   like a compromise.  So let's do this.

11             MR. GONZALEZ-DELGADO:  Only a half hour?

12             THE COURT:  Well, we'll play it by ear.  Why?

13   Because we attorneys are not good with time estimates.  So

14   we'll play it by ear.

15             I understand your point and your frustration, Mr.

16   Gottfried.

17             I understand Counsel's point.

18             I think we need to sort this out.  The reality is

19   that, going back to the example, "normal" is not "whatever."

20   I'm not a certified translator or a certified interpreter.  I

21   do not know why the interpreter opted to use the word

22   "whatever" rather than "normal," going back to the example

23   again.

24             But this requires exchange and compromise.  So in

25   terms of agreeing to language or identifying language which is

1    not acceptable in the translation, then I will intervene.  But
2    in what block of time?  Not every time there is a message read
3    where that message triggers an objection based on the
4    translation.
5            Okay.  So we'll do this.  I'm going to call for a
6    recess, and let's see what happens.  We'll play it by ear.
7            MR. GONZALEZ-DELGADO:  Okay, Your Honor.
8            THE COURT:  Anything else?
9            MR. GONZALEZ-DELGADO:  No, Your Honor.
10    (Sidebar conference concluded.)
11            THE COURT:  Ladies and gentlemen, the attorneys and I
12    have to spend some time dealing with an issue.  Rather than
13    having you here in the courtroom, I'm going to call a recess.
14    And once we sort this out, we'll return to the courtroom.
15            Remember, do not talk about or communicate with
16    anybody about your impressions of the case or the evidence in
17    the case.  Do not conduct any research about the case, the
18    matters in the case or the individuals involved in the case.
19    Do not view, read or hear reports, comments or articles about
20    the case.
21            As soon as I'm able to, to resolve what we need to
22    deal with at this point, I'll call you back into the courtroom.
23    Thank you for your patience.
24    (Whereupon the following proceedings were had in open
25        court without the presence of the jury.)

 1              THE COURT:  We are going to be in recess, so you do

 2     not have to be there all this time.  You can walk around.  You

 3     can interact with members of the prosecution.  No problem.

 4              Now, do not discuss your testimony with anybody.  Do

 5     not review materials related to this case.  Do not send out

 6     messages on social media about this case.  All right?

 7              We'll return as soon as we can.  Thank you.

 8              Adjourned until further notice.

 9        (Whereupon a recess was taken at 2:28 p.m., until 3:37

10        p.m.)

11        (Whereupon the following proceedings were had in open court

12        without the presence of the jury.)

13              THE COURT:  Was the problem fixed?

14              MR. GOTTFRIED:  Yes.  The parties managed to resolve

15     the differences.

16              THE COURT:  So we're ready to call the jury in?

17              MR. GOTTFRIED:  We're ready to proceed.

18              THE COURT:  Let's call the jury in.

19        (Whereupon the following proceedings were had in open court

20        in the presence of the jury.)

21              THE COURT:  Welcome back to the courtroom.  Please

22     take a seat.

23              MR. GOTTFRIED:  Your Honor, may I continue?

24              THE COURT:  Go ahead.

25              MR. GOTTFRIED:  Your Honor, with your permission, I'd

1     like to approach the witness with the modified translations

2     that have been agreed upon by the parties so that the witness

3     is reading those into the record.

4              THE COURT:  Granted.

5              MR. GOTTFRIED:  To clarify, Your Honor, the witness

6     will be reading the agreed-upon translations.  We will be

7     showing on the screen what we have, which is the older version,

8     and we will substitute out -- today or tomorrow, will provide

9     the amended copy to the Court so that's what's officially in

10    the record.

11             THE COURT:  Okay.

12             MR. GONZALEZ-DELGADO:  That's what was agreed on,

13    Your Honor.

14             THE COURT:  Okay.  I'll go along.

15    BY MR. GOTTFRIED:

16    Q   So if we can continue, sir, going back to page 4.  And,

17    sir, reading from the document in front of you, at the top,

18    what is the message at 4:24?

19             MS. CINTRON-COLON:  Your Honor, excuse me.  Mr.

20    Verdejo cannot hear.  I don't know if we need to change the

21    device.

22             MR. GONZALEZ-DELGADO:  We're ready.

23    BY MR. GOTTFRIED:

24    Q   Sir, on April 24 at 3:30:05 p.m., what is the message?

25    A   "You are not going to help me, right?"

1    Q    And then?

2    A    "In all these years."

3    Q    And then Mr. Verdejo responds on April 24th, at 3:30?

4    A    "Of course I can help you, dumb ass, but you don't speak.

5    But fine, in your eyes an old man can do better than me.

6    That's tough," with emojis.

7    Q    And then the response to which is?

8    A    "Get me out from where I am.  That's something only a man

9    who has the balls to do."

10    Q    And then what does Mr. Verdejo write on April 24th, at

11    3:32 p.m.?

12    A    "You don't have to have balls to do that, dummy.  It's

13    whatever."

14    Q    The response to which is?

15    A    "You do have to have them and have a big fucking heart for

16    you to want to help the person who, according to you, you

17    love."

18    Q    And then?

19    A    "Because human beings don't help others as a labor of

20    love, but if in reality you care about that person, you do

21    anything to not lose her.  And you're so immature.  Always

22    giving excuses."

23    Q    And then Mr. Verdejo writes at 3:41 p.m.?

24    A    "Okay.  Let's go all hands on deck, baby."

25    Q    Okay.  Turning to page 6.  The response is?

```
 1    A    "It's not a joke."

 2    Q    And then?

 3    A    "And you're not obligated to do something that you don't

 4    want to do."

 5    Q    Okay.  Then Mr. Verdejo writes?

 6    A    "I'm not joking.  What's up," with emojis.

 7    Q    And then?

 8    A    "It's fucked up to lose to an old man, you sellout."

 9    Q    And then the next page?

10    A    "It's not about losing."

11    Q    To which Mr. Verdejo responds?

12    A    "Yes, baby, and about going off with an old man, you

13    sellout."

14    Q    To which the response is?

15    A    "Are you going to help me?"

16    Q    Okay.  And?

17    A    "And without sleeping with that old man."

18    Q    And then?

19    A    "Because he doesn't see me as a whore that has to sleep

20    with him for him to help me."

21    Q    And then?

22    A    "And you're the sellout, you miserable man."

23    Q    To which Mr. Verdejo writes at 4:44 p.m., on April 24th,

24    what?

25    A    "Yeah.  Okay.  Believe whatever you want.  He's not a dumb
```

```
 1    ass, babe.  I'm not saying this is the case, but I'd rather be

 2    a miserable man than a slut, you sellout."

 3    Q    And then?

 4    A    "It's good to hear you say that."

 5    Q    And then?

 6    A    "Don't hang onto that because I told you that's not the

 7    case."

 8    Q    To which the response is?

 9    A    "Okay."

10    Q    And then Mr. Verdejo writes?

11    A    "Okay what," with an emoji.

12    Q    And then?

13    A    "What are you up to?  Thinking about your old man?"

14    Q    And what's the timestamp on that?

15    A    April 25th, 2021, at 4:11:29 p.m., local time.

16    Q    Okay.  And so, and then what happens after Mr. Verdejo

17    makes that comment?

18    A    "No."

19    Q    And then Mr. Verdejo writes?

20    A    "And what are you doing?"

21    Q    To which the response is?

22    A    "Eating a limber."

23    Q    And then Mr. Verdejo writes?

24    A    "Where?"

25    Q    To which the response is?
```

```
1    A    "Catano."

2    Q    And then on April 25th, at 4:15 p.m., the message is?

3    A    "Um, okay, with your Mr. Grandpa?"

4    Q    Okay.  And then?

5    A    "How fun."

6    Q    And then?

7    A    "Dumb ass."

8    Q    The response to which is?

9    A    "You're a dumb ass, and you have to delete everything."

10   Q    And the next message?

11   A    "Before mommy checks your cell phone."

12   Q    To Mr. Verdejo writes on April 25th, at 6:36 p.m.?

13   A    "Dumb ass."

14   Q    And then he writes?

15   A    "I love you, mother-fucking bitch.  Go fuck yourself, you

16   cock-sucker," with emojis.

17   Q    And then?

18   A    "No.  Actually, it's your actions.  How is it possible

19   that a young woman like you, much younger than the other woman,

20   would want to be with that person?  For just one reason, money.

21   Only in your mind, and very few others, does that make sense,"

22   with an emoji.

23   Q    And then the response to which is?

24   A    "Keep going."

25   Q    And then?
```

1    A    "I don't want to keep talking about the subject with you

2    since you have gnats in your brain."

3    Q    To which the response of Mr. Verdejo on April 25th, at

4    8:32 p.m., is?

5    A    "That's what you think.  I'm very clear on what I say and

6    think too, babe.  If you don't like it, that's a whole other

7    story, baby."

8    Q    To which the response is?

9    A    "I respect your opinion, and since you think that the only

10    thing I like -- the only thing I think of is money, then forget

11    about me.  I don't like that that's what you think of me."

12    Q    To which Mr. Verdejo writes?

13    A    "Well, I say it in the sense that the only reason you want

14    to be with that old man is only because of that.  It came out

15    of your mouth, woman.  I'm not making it up, babe," with an

16    emoji.

17    Q    To which the response is?

18    A    "Only because he can always help me with anything.  He

19    doesn't give excuses.  And without me having to ask or say

20    anything, he pays attention to see if I need something or if

21    I'm okay, because he knows I don't count on anybody."

22    Q    To which Mr. Verdejo responds?

23    A    "I understand that part, baby.  You've always told me, and

24    I'm clear on that."

25    Q    And then he states?

```
 1    A    "But that doesn't mean that you can't be with anyone, like

 2    he says.  You're the idiot if you do that.  And apparently it's

 3    what you want to do, and that's why you're tossing me to the

 4    side, asshole.  I feel the same way I did when we were kids,

 5    and you rejected me to be with Ochar.  That's why I'm bitter.

 6    I've always been a loser to you always, but that's how life

 7    is."

 8    Q    To which the response is?

 9    A    "I don't toss you to the side."

10    Q    And then the message on April 25th, at 8:41:13 p.m., is?

11    A    "You choose your woman over me, and I don't say anything."

12    Q    And then?

13    A    "You're impossible for me."

14    Q    To which Mr. Verdejo responds?

15    A    "In a nutshell, you're telling me to leave, baby.  Don't

16    pretend now."

17    Q    And then?

18    A    "Look, dumb ass, you always know why, but apparently

19    you've never wanted to understand because you're not a dumb

20    baby."

21    Q    To which the response is?

22    A    "A lot of summers will go by.  And what do you want, to

23    keep seeing you with her, and me on my own?"

24    Q    To which Mr. Verdejo writes?

25    A    "Um, okay.  And do you still have the medication you were
```

1    taking and whatever it is that you are doing?"

2    Q    To which the response is?

3    A    "I finished taking it."

4    Q    And then?

5    A    "It's best not to have sex."

6    Q    And then?

7    A    "But I'm better."

8    Q    And Mr. Verdejo writes on April 25th, at 8:54 p.m.?

9    A    "Um, okay.  That means that you took all the medicine.

10   Was it like that until it's finished?"

11   Q    To which the response is?

12   A    "What?"

13   Q    And then?

14   A    "It was more an anti-inflammatory."

15   Q    And then?

16   A    "Because I was hurt."

17   Q    To which Mr. Verdejo writes?

18   A    "Um, okay.  And when is your next appointment?"

19   Q    To which the response is?

20   A    "I don't have an appointment."

21   Q    To which the response is?

22   A    "You just had to take that and nothing more?"

23   Q    And then on April 25th, at 8:58:48?

24   A    "Yes.  And I still haven't gotten my period."

25   Q    Okay.  And now -- I'm sorry, if you can move to the

1    preceding message.  What was the timestamp on the preceding

2    message?

3    A    The one that I just read?

4    Q    Yes.

5    A    April 25th, 2021, 8:58:48 p.m., local time.

6    Q    Okay.  And the next message, the timestamp is what?

7    A    April 26th, 2021, 4:49:31 p.m., local time.

8    Q    Okay.  And what is the message?

9    A    "Can I call you?"

10   Q    To which Mr. Verdejo responds?

11   A    "Yes."

12   Q    And then?

13   A    "When I finish."

14   Q    And then?

15   A    "You're almost finished, right?"

16   Q    And then?

17   A    "Yes."

18   Q    And what does Mr. Verdejo write on April 26th, at 4:49

19   p.m.?

20   A    "Okay."

21   Q    And then?

22   A    "You destroy my soul.  My heart hurts.  I'll try to

23   understand."

24   Q    And then what does Mr. Verdejo write at 5:38 p.m., on

25   April 26th?

1    A    "Okay.  Forgive me, truly."

2    Q    To which the response is?

3    A    "You're aiming to kill me with your attitude and the

4    things you say to me."

5    Q    Okay.  And if we can go to the preceding message, that was

6    -- what was the timestamp on that?

7    A    April 27th, 2021, 5:39:55 p.m., local time.

8    Q    Okay.  And the timestamp on the next message?

9    A    April 27th, 2021, 6:11:55 p.m., local time.

10   Q    And what does Mr. Verdejo write at that time?

11   A    "Open.  I'm here."

12   Q    To which the response is?

13   A    "Don't come here to fight."

14   Q    And?

15   A    "Nor to argue."

16   Q    To which Mr. Verdejo responds on April 27th, at 6:12 p.m.?

17   A    "No."

18   Q    Okay.  And what is -- the timestamp on that was 6:12 p.m.;

19   is that correct?

20   A    6:12:31 p.m., local time.

21   Q    And the timestamp on the next one is?

22   A    April 27th, 2021, 7:50:26 p.m., local time.

23   Q    Okay.  So, approximately, how much time has passed between

24   those two messages?

25   A    Approximately, one hour and 38 minutes.

1   Q    And that message at 7:50 is what?

2   A    "You didn't eat."

3   Q    To which Mr. Verdejo responds?

4   A    "I forgot to, but don't worry."

5   Q    And then?

6   A    "I'll get something to eat from around here.  Don't

7   worry."

8   Q    Okay.  And then the response?

9   A    "But come here and eat."

10  Q    To which Mr. Verdejo responds?

11  A    "Damn, it's just that I'm at DACO."

12  Q    And the answer is?

13  A    "Stupid."

14  Q    Now, sir, in your analysis of these records, did you find

15  any additional text messages between this phone extraction and

16  that number:  (787)397-2408?

17  A    Did I find any other messages?

18  Q    After April 27th, 2021?

19  A    No.

20  Q    Okay.  Now, sir, I'm going to show you what has been

21  admitted into evidence as Exhibit Number 1.  Sir, what is the

22  phone number associated with this account?

23  A    (787)485-6855.

24  Q    Okay.  And what is the billing address on that account?

25  A    The address is P.O. Box 15955, Lenexa, Kansas.

```
 1   Q    I'm sorry.  Who is the person associated with the billing?

 2   A    Luis Cadiz.

 3   Q    Okay.  And have you had a chance to look at that P.O. Box

 4   in Lenexa address?

 5   A    I was informed that it was a customer service address

 6   associated with the provider.

 7   Q    Okay.  That would be with Sprint or T-Mobile; is that

 8   accurate?

 9   A    It's not in the current screen capture.

10   Q    Okay.

11   A    Yes.  It says "Sprint/T-Mobile" at the top.

12   Q    Okay.  So the billing party for this phone number is who?

13   A    The billing party is Luis Cadiz.

14            MR. GOTTFRIED:  Okay.  Your Honor, may I, at this

15   time, mark as Government ID 125 and request permission to

16   approach the witness, after having shared this with defense

17   counsel?

18            THE COURT:  Yes.

19   BY MR. GOTTFRIED:

20   Q    Sir, after you've had a chance to review that, can you

21   please look up so I know you're finished?

22            Sir, have you had a chance to review that document?

23   A    I have.

24   Q    Do you recognize that document?

25   A    I do.
```

1   Q    How do you recognize that document?

2   A    I recognize it as a printed version of a pdf that was

3   provided on the disc that I initialed.

4   Q    And is that document a true and correct copy of certain

5   messages from the Magnet Axiom report that you generated from

6   the extraction?

7   A    Yes.  This is a representation of specific messages from

8   that extraction report.

9            MR. GOTTFRIED:  At this time, Your Honor, I would

10   move into evidence Government ID 125 as Government Exhibit 125.

11            MR. GONZALEZ-DELGADO:  No objection, Your Honor.

12            THE COURT:  Without objection, so ordered.  This

13   would be Government Exhibit 125.

14   (Exhibit No. 125 admitted into evidence.)

15            MR. GOTTFRIED:  Your Honor, permission to recover the

16   exhibit and publish.

17            THE COURT:  Granted.

18   BY MR. GOTTFRIED:

19   Q    Sir, in which database did you find the messages in

20   Government Exhibit 125?

21   A    These were also from the Biome directory.

22   Q    Did you find them in any other directory in the cell phone

23   extraction?

24   A    I did not find them in the sms.db database.

25   Q    Okay.  And can you explain, the fact that you found them

1       in the Biome database and not in the SMS database, what does

2       that tell you?

3       A    It tells me again, much like the last chain of messages,

4       that they had been removed from the SMS database.

5       Q    And they had been removed how?

6       A    The only way I'm aware of for them to be removed in the

7       way that they were is for the user to delete them.

8       Q    I'm sorry?  You said "for the user to delete them?"

9       A    For the user to delete them.

10      Q    Okay.  All right.  Sir, looking at Government Exhibit 125,

11      on April 27th, 2021, at 11:39 p.m.  What is the message from

12      Mr. Felix Verdejo?

13      A    "Hey, are you awake?"

14      Q    To which the response is?

15      A    Yes.

16      Q    Okay.  And then Mr. Verdejo responds at 11:40 p.m. that

17      night?

18      A    "I'm heading over to you in a few minutes."

19      Q    To which the response is?

20      A    "Okay."

21      Q    And, again, the timestamp on the prior message was?

22      A    April 27th, 2021, 11:40:31 p.m., local time.

23      Q    And then the timestamp on the following message?

24      A    April 28th, 2021, at 12:02:08 a.m., local time.

25      Q    So, approximately, how much time has passed between those

1    two messages?

2    A    May I see the previous again?

3              So, approximately, 22 minutes.

4    Q    Okay.  And Mr. Verdejo's statement at that time?

5    A    "I'm here."

6    Q    And then -- I'm sorry.  The following timestamp is what?

7    A    April 28th, 2021, 7:01:16 a.m., local time.

8    Q    Okay.  And, at that time, the SMS message from Mr. Verdejo

9    is what?

10   A    "Okay.  Let's go.  I'm finishing, then go get you."

11   Q    To which the response is?

12   A    "I'm making coffee."

13   Q    And then Mr. Verdejo writes?

14   A    "It's done."

15   Q    And then Mr. Verdejo writes?

16   A    "I'm close."

17   Q    Okay.  The response to which is?

18   A    "I'm on the toilet."

19   Q    And then the response from Mr. Verdejo at 7:32 a.m., on

20   April 29th?

21   A    "Hahahaha.  Okay.  It's done.  I'm already here.  Let me

22   know."

23   Q    The response to which is?

24   A    "It's done."

25   Q    And the response to that is?

1    A    "I'll try to be ready in five to 10."

2    Q    The response to that from Mr. Verdejo is?

3    A    "Okay.  No worries."

4    Q    The response to that?

5    A    "I'll put on my sneakers and go down."

6    Q    And the response from Mr. Verdejo?

7    A    "That's it."

8    Q    Okay.  And the timestamp to that last one is when?

9    A    April 28th, 2021, 7:43:48 a.m., local time.

10   Q    The timestamp on the next message is when?

11   A    April 29th, 2021, 6:45:15 a.m., local time.

12   Q    And what does Mr. Verdejo text?

13   A    "On my way to where you are, Titan."

14   Q    Okay.  The timestamp on the next message is what time?

15   A    April 29th, 2021, 4:37:58 p.m., local time.

16   Q    Okay.  So, approximately, how much time has passed between

17   that first message on the page and that second message?  Quick

18   math.

19   A    It appears to be, approximately, 10 hours.

20   Q    And, at that time, April 29th, at 4:37 p.m., what is the

21   text message that is sent to Mr. Verdejo?

22   A    It's three emojis.

23   Q    And can you describe those?

24   A    It appears to be a black heart, a drop of blood, and

25   praying hands.

1    Q    To which Mr. Verdejo responds what?

2    A    With two emojis that appear to be a kiss face and a red

3    heart.

4    Q    Sir, other than analyzing certain deletes messages in the

5    Biome database, what additional analysis, if any, did you

6    conduct?

7    A    In addition to examining the Biome directory for evidence

8    of messages that may no longer be within the sms.db, I was also

9    asked to analyze the KnowledgeC database for artifacts related

10   to a specific date and timeframe.

11   Q    Okay.  And what specific artifacts were you looking for in

12   the KnowledgeC database?

13   A    The KnowledgeC database, as I described earlier, has

14   pattern-of-life artifacts.  So it tracks things like appetence

15   as well, power logs, whether a screen is lit up or not lit up

16   and whether a phone is in a locked or unlocked state, along

17   with other artifacts.

18          MR. GOTTFRIED:  Okay.  Your Honor, I'm going to mark,

19   at this time, Government ID 143 and request permission to

20   approach the witness.

21          THE COURT:  Approach.

22   BY MR. GOTTFRIED:

23   Q    Sir, do you recognize this document?

24   A    I do.

25   Q    Okay.  And is that a true and correct copy of a portion of

1    the analysis that you performed?

2    A    It appears to be a pdf version of a spreadsheet that I

3    created from my analysis.

4            MR. GOTTFRIED:  Okay, Your Honor, at this time, the

5    government would move into evidence Government ID 143 as

6    Government Exhibit 143.

7            MR. GONZALEZ-DELGADO:  No objection, Your Honor.

8            THE COURT:  Without objection, so ordered.  This

9    would be Government Exhibit 143.

10       (Exhibit No. 143 admitted into evidence.)

11           MR. GOTTFRIED:  Permission to recover the exhibit and

12   publish it.

13           THE COURT:  Granted.

14   BY MR. GOTTFRIED:

15   Q    Sir, can you tell us what we see here in Government

16   Exhibit Number 43?

17   A    So these are the locked/unlocked states of the device that

18   was from the KnowledgeC database.  So what you see here are

19   three columns.  That's what's been zoomed-in on.

20           The first column is the state of the device, whether

21   it was in a locked or a unlocked state.  Then you have the

22   start date and time, which is converted into local time, and

23   the end date and time for that state, also in local time.

24   Q    Okay.  So can you explain to me for the first row that

25   says:  State, locked, 4/28/2021 at 10:12 p.m., to 4/29/2021, at

1    5:40 a.m.?  What is this telling me?

2    A    It shows that the phone was in a locked state during that

3    time period.

4    Q    And then on April 29th, 2021, at 5:40 a.m., to 5:41:07

5    a.m., on April 29th, unlocked, what is that telling me?

6    A    That during that time, the phone was in an unlocked state.

7    Q    Okay.  And when you say "in an unlocked state," what are

8    the means by which a phone would move from locked to unlocked?

9    A    An operator of the phone either entered an associated

10   password, used biometrics to unlock it, or if a devise had no

11   password associated with it, it's just a matter of unlocking

12   the device by swiping up.

13   Q    Okay.  If you can turn your attention to the column that

14   starts 4/29, 8:49 a.m., locked, it's about midway down?

15   A    Yes.

16   Q    Okay.  And so between -- on April 29th, 8:49 a.m. and 9:52

17   a.m., on April 29th, what was the state of the phone?

18   A    The phone was in a locked state.

19   Q    And, lastly, sir, as part of your analysis of the phone,

20   how many Apple IDs were associated with this Apple device?

21   A    There was one associated Apple ID.

22   Q    Okay.  And what was that?

23   A    It was an email address.  I don't have it in front of me,

24   but it is verdejofelix, with a numeric, at yahoo.com.

25        MR. GOTTFRIED:  Okay.  No further questions, Your

1    Honor.

2                    MR. GONZALEZ-DELGADO:  May it please the Court?

3                    THE COURT:  Go ahead.

4                    MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

5                              CROSS-EXAMINATION

6    BY MR. GONZALEZ-DELGADO:

7    Q    Good afternoon, Mr. Soeka.

8    A    Good afternoon.

9    Q    Mr. Soeka, you helped to prepare for today's testimony

10   here; is that correct?

11   A    That is correct.

12   Q    And the truth is that when you received the cell phone

13   that has been analyzed, it was because Agent Diaz had already

14   done the Cellebrite extraction?

15   A    I didn't receive the phone.

16   Q    No.  What did you receive?

17   A    I received a working copy of the extraction done by CFA

18   Diaz.

19   Q    Okay.  But you received everything that Agent Diaz

20   extracted from the phone; is that correct?

21   A    That is correct, a working copy of it.

22   Q    A working copy.

23                    And in that working copy, you reviewed it, and you

24   found out that there were missing messages, or deleted

25   messages, on that phone; is that correct?

1    A    I found evidence of messages within KnowledgeC and Biome

2    that were not present within the SMS database.

3    Q    And because of that, you searched for those messages,

4    correct?

5    A    Correct.

6    Q    And you found the messages in the program?

7    A    I found the messages in those two locations, yes.

8    Q    Okay.  And the truth is that today you just said, a few

9    minutes ago, that you received or that you worked on certain

10   messages that the government wanted you to present; is that

11   correct?

12   A    I validated certain messages that were prepared in that

13   pdf document.

14   Q    But the truth is that you had prepared -- referring to

15   Exhibit 138, this is a 23-page printout of messages; is that

16   correct?

17   A    It is.

18   Q    Okay.  But prior to this 23-page printout, you had

19   prepared a, an exhibit, or you had prepared a report for the

20   government that had 45 pages in it; is that correct?

21   A    I don't know the number of pages, but my initial report

22   contained more messages than what was present in that pdf.

23   Q    Right?

24   A    Yes.

25   Q    And in those messages, there were multiple messages that

1    have been edited from the ones that have been presented to the

2    jury; is that correct?

3    A    There are messages that are not included within this

4    pdf --

5    Q    That follow --

6    A    -- that has been presented to the jury.

7    Q    That has been presented.

8            But the truth is, this Exhibit 138 is only referring

9    to April 24th, 2021, until April 27th, 2021; is that correct?

10   A    I believe so.  It's no longer on my screen, but I recall

11   that as being the date range.

12   Q    But the 45 -- or the multiple-page report that you

13   initially prepared, had messages since April 19th, 2021; is

14   that correct?

15   A    Again, I don't have the report in front of me, but that

16   would make sense.  There were days prior to the date from that

17   pdf.

18   Q    And those messages were from -- or in between the same two

19   people?

20   A    Correct.

21   Q    And actually --

22           MR. GONZALEZ-DELGADO:  May I have the Elmo?

23   BY MR. GONZALEZ-DELGADO:

24   Q    This report that we have before us has the name of the

25   person who belongs to the number (787)397-2408 removed; is that

```
 1    correct?
 2    A     There is no name.
 3    Q     No name, right?
 4    A     Yes.
 5    Q     Because last night, you removed those names from this
 6    presentation; is that correct?
 7    A     I did not remove them.
 8    Q     But in the initial report that you had, there was a name
 9    associated to that phone number; is that correct?
10    A     I would have to reference that report.  This pdf was not
11    something that I created.  These specific messages were checked
12    for content of the message to make sure it referenced what was
13    in the initial report.
14    Q     But you did see the prior presentation; is that correct?
15    A     The prior pdf presentation with the name that was attached
16    to it?  Correct.
17    Q     Okay.  So it's correct to say that in this image that's
18    been presented to the jury, the name was eliminated?
19    A     Correct.
20    Q     Okay.  And if it would be an accurate screen-shot, it
21    would have that name?
22    A     I would, again, have to reference the axiom report that I
23    originally provided.
24    Q     Okay.  But let's say you have a cell phone on you.  And I
25    want to text my daughter, for example.  If I text my daughter
```

```
 1      -- let's say this is WhatsApp; is that correct?

 2      A    This is not WhatsApp.

 3      Q    This is a regular --

 4      A    Native text-messaging.

 5      Q    Text-messaging, SMS?

 6      A    Correct.

 7      Q    Okay.  If I text my daughter and I send her a message, it

 8      will show up her name and whatever message I'm sending her?

 9      A    If you have your daughter saved as a contact, yes.

10      Q    Correct, right?

11      A    Yes.

12      Q    Because all names that are saved for a number, if I text

13      them or I message them, the program automatically shows the

14      name instead of the number; is that correct?

15      A    There is a table within the SMS database called "Handles"

16      that has the associated contact information.  So it joins those

17      together to be displayed, yes.

18      Q    Okay.  And that goes also for Exhibit 125?

19      A    If this number was saved as a contact, yes.

20      Q    It was eliminated, to the best of your knowledge?

21      A    To the best of my knowledge, yes.  There was a version

22      that once had a name, and there is no name listed on the

23      recipient number.

24      Q    And looking at this screen-shot, or at the screen, Exhibit

25      125, from your knowledge and from what you did in this case,
```

1    you can see that on, let's say the first message on the top,

2    where it says "4/27/2021, 11:39:15 p.m., AST," on top of that

3    there is missing information; is that correct?

4    A    What do you mean?

5    Q    The original message has a record number that enumerates

6    the number of that message between the parties; is that

7    correct?

8    A    Those record IDs were created by the forensic tool.

9    Q    Okay.  And those record IDs say the amount of messages

10   that are, that are sent between the two phones; is that

11   correct?

12   A    No, it is not.

13   Q    No?

14        If it says, let's say, an example, record one, let's

15   say this first message says:  Hey, are you awake?  Would it say

16   record one, and then the answer would be record two, or not?

17   A    Those record numbers are created by the Magnet Axiom tool

18   for reference purposes.  They're independent of the database.

19        There are row IDs for individual messages that states

20   order within the sms.db, but those record numbers are reference

21   points created by the forensic tool.

22   Q    But does the forensic tool enumerate the amount of

23   messages that are in a specific conversation?

24   A    Not by individual conversation.

25   Q    Okay.  But for this screen-shot, it wouldn't do that

1    either?

2    A    Can you rephrase the question?

3    Q    Okay.  Let's say that you put the phone in the program,

4    and you say:  I want the messages for Tuesday, April 27th,

5    2021.  The program downloads, let's say, 15 messages.

6         Would the program give each message a specific

7    sequential number?

8    A    It would give it a record number, but that was not the way

9    that this data was processed.  The entire Graykey extraction

10   was processed, and individual records from the total processing

11   of the information were built out into a filtered report.

12   Q    Okay.  But my question is, would the program give it a

13   sequential number to the messages sent on Tuesday, April 27th,

14   2021, from your -- from this extraction?

15   A    It's not the way the forensic tool works, so I can't pick

16   and choose from the zip file created by Graykey 15 messages.  I

17   have to process the entirety of the data and then choose

18   individual record numbers.

19        So it's -- I would have to reference my report on how

20   the tool had determined to number those artifacts.  If it's

21   referencing the running tally of the sms.db, for example, it

22   would be inclusive of all conversations within that specific

23   database.  So, again, since the tool is creating those numbers,

24   I wouldn't be able to speak to how they're assigned.

25   Q    Okay.  And did you review these messages that are in

1    Exhibit 125 and 138 to make sure that what was eliminated from

2    the original, or initial report, are not included here?

3    A    I did point out that there were messages from the original

4    report that were missing from this timeline.

5    Q    But you don't know which ones they were?

6    A    I don't.

7    Q    Somebody else did that job?

8    A    Correct.

9    Q    Okay.  You didn't have to do a -- you didn't have to

10   validate the elimination; is that correct?

11   A    Correct.

12          MR. GONZALEZ-DELGADO:  May I have a second, Your

13   Honor?

14          THE WITNESS:  And, if possible, I would like to

15   elaborate on that.

16   BY MR. GONZALEZ-DELGADO:

17   Q    Now --

18   A    May I, just before moving on, elaborate on that?

19   Q    You answered my question.  Thank you very much.

20          My question is, if these messages have been altered,

21   and messages eliminated, context can be eliminated from the

22   conversation; is that correct?

23   A    If messages are not included from a conversation, could it

24   change its meaning?  Yes.

25   Q    Okay.  And the only messages that we have here are the

1    ones that were specifically selected by the prosecution; is

2    that correct?

3    A    That's correct.

4    Q    And the other messages that have been deleted, you have

5    access to these messages?

6    A    The other messages that were removed --

7    Q    Yes, sir.

8    A    -- from this pdf?

9    Q    Yes, sir.

10   A    Yes.  That first extraction report I created included the

11   messages from those locations.

12   Q    And if you saw those messages in a document, you would be

13   able to recognize them?

14   A    If it was my report, yes.

15   Q    If it was the report that, more or less, we're seeing

16   here, you could say that they were from your extraction; is

17   that correct?

18   A    If I was to compare them to my report, I would be able to

19   say if the associated timestamps, offsets, and message content,

20   was from my report.

21            MR. GONZALEZ-DELGADO:  May I have one second, Your

22   Honor?

23   BY MR. GONZALEZ-DELGADO:

24   Q    Is it fair to say that we have not seen the report that

25   you made of this cell phone?

1    A    It has not been presented.

2    Q    And, actually, the only things that we have seen are a

3    Verdejo extraction hash value, which was Exhibit, I believe,

4    Number 1; is that correct?

5    A    I would have to see it for the exhibit number.

6    Q    I'm sorry.  It would be Exhibit 52.

7    A    This is the extraction report created by Graykey that

8    included the original hash value.

9    Q    And then number, Exhibit Number 142 would be the hash,

10   system hash of Mr. Verdejo's phone, correct?

11   A    This is a screen capture of me validating the hash using

12   the tool Cyo Hash.

13   Q    Okay.  That is all that we have seen, besides the selected

14   text messages provided by the government as exhibits; is that

15   correct?

16   A    You have seen these and the pdfs provided.  I don't

17   believe there is anything else, but if I'm forgetting an

18   exhibit number, it's just from lack of memory.

19   Q    If I showed you a document, would you be able to determine

20   if this document was prepared by you?

21   A    Yes, if I could see it.

22            MR. GONZALEZ-DELGADO:  May I approach the witness,

23   Your Honor?

24            MR. GOTTFRIED:  Your Honor, may we approach?

25            THE COURT:  Did you show the document to your

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

1      opponent?

2             THE WITNESS:  I will, before approach, say that I

3      created an axiom portable case.

4             MR. GONZALEZ-DELGADO:  Your Honor, I don't think

5      there is a question proposed at this time.

6             THE COURT:  It doesn't matter.  I'm not going to

7      strike what he said.

8             MR. GOTTFRIED:  Your Honor, may we approach?

9             THE COURT:  Yes.

10     (Sidebar conference commenced.)

11            MR. GOTTFRIED:  Your Honor, the, Brother Counsel has

12     elicited from the witness that there are messages that were not

13     included.  I think that point has been made clear.

14            Brother Counsel showed me what he intends to show the

15     witness, which are messages, text messages, from Mr. Verdejo

16     that we did not introduce.  And this goes back to the same

17     issue of trying to introduce self-serving statements from the

18     defendant, the same issue we dealt with yesterday, the same

19     issue we dealt with on the recorded statements, the same issue

20     that was the subject of the motion in limine.

21            Again, if the point is that certain messages were not

22     included, we did not object.  That point has been made.  But

23     trying to show the witness self-serving statements by Mr.

24     Verdejo that we did not -- that are not introduced by the

25     government as opposing party statements, that crosses the line

1    to inadmissible hearsay.

2         MS. CINTRON-COLON:  Your Honor, the problem is that,

3    again, rule of completeness, and under 403, it needs context,

4    because it is misleading for the jury to not have the complete

5    picture.  I have a bunch of examples here in this exhibit of

6    messages that literally just jump from one thing to another,

7    and they start with no context whatsoever.

8         In fact, there is one of the messages that's from,

9    allegedly, from Keishla to Mr. Verdejo that she's talking about

10   the medication that she's taking for an infection or whatever,

11   and she says it's best not to have sex.  And here's the thing,

12   it misleads the jury to believe that this is something that

13   she's telling him you need to stay away from him.  And it --

14   from me.  I'm sorry.

15        It gives the wrong impression and confusions the

16   issues because this also provides background on their

17   relationship.  Most of the messages that are in the rest of

18   this report, and the extraction that this witness made,

19   provides background on their relationship, which is exactly

20   what the government wants to establish, by the way, that they,

21   in fact, had a relationship.

22        These are not self-serving statements because the

23   statements merely state the nature of the relationship, gives

24   context as to the conversations that have been presented here

25   by this witness that have been read by him.  And it is not

1      self-serving statements because he's not talking about

2      absolutely anything that would exculpate him from anything

3      related to this case.

4              It's giving context to the relationship, to the

5      statements, to the messages.  And, otherwise, would be

6      misleading and confusing to the issues to the jury, and

7      completeness requires the introduction of the entirety of the

8      conversations, at the very least, since April 19th, 2021, up

9      until --

10              MR. GONZALEZ-DELGADO:  27.

11              MS. CINTRON-COLON:  -- to 27th, April 27th.

12              MR. GONZALEZ-DELGADO:  That's been admitted.  The

13      messages are admitted until April 27th, 2021.

14              MR. GOTTFRIED:  It's the same issue.  It's just

15      they're trying to introduce Mr. Verdejo's self-serving

16      statements, as well as Keishla's hearsay.  And we've introduced

17      20-plus pages of conversations.  The idea that they have to

18      introduce 20 more pages of inadmissible hearsay just isn't

19      provided for under the rules.

20              And, again, this is something that, I think this is

21      the fourth or fifth time it's come up.  The rulings have been

22      consistent that they cannot admit self-serving statements.

23              MR. GONZALEZ-DELGADO:  Your Honor, how can they be

24      hearsay if we introduce them, but the government can introduce

25      the same statements, and it's not hearsay for the government?

1    This isn't, like Sister Counsel has stated, this isn't
2    self-serving statements.
3            This is to bring into context the reason why Ms.
4    Keishla is telling Mr. Verdejo:  We can't have sex; I'm taking
5    a medication.  It opens itself up, if we leave it like this,
6    for the jury to make multiple interpretations that are not what
7    really happened.
8            This is a conversation between two individuals that
9    had a relation, that if the full conversation is left out,
10   would make it seem like Mr. Verdejo is forcing Keishla
11   Hernandez to have sex with him.
12           THE COURT:  Rodriguez.
13           MR. GONZALEZ-DELGADO:  Excuse me?
14           THE COURT:  Rodriguez.
15           MR. GONZALEZ-DELGADO:  Rodriguez.  I'm sorry.
16   Keishla Rodriguez to have sex with him.  And that is not what
17   happened in these conversations.
18           It also goes to show that there is a witness that
19   already testified that the conversations between Mr. Verdejo
20   and Keishla Rodriguez were always toxic; that they were always
21   screaming; that they were always insulting each other.  And
22   these text messages that the government presented to the jury
23   already, and now they're hearsay, those messages prove the
24   contrary, where they're talking about themselves in a loving
25   manner, in a loving way.

1         The Court can see that, even in the redacted portion

2    that the jury has heard, we hear Ms. Keishla Rodriguez saying:

3    Did you eat; why didn't you eat?  And he says:  Well, I forgot;

4    it's okay.  That goes against the testimony presented by Ms.

5    Bereliz Rodriguez stating that this was a toxic relation.

6         And the person that the government brought in to

7    bring in all this hearsay and all these text messages was this

8    -- was Agent Diaz yesterday, and Mr. Soeka, to prove that there

9    was a relationship between the, between the accused and between

10   the victim.  All we're asking for is to allow us to bring the

11   full context of the messages so that the jury has context,

12   understands the nature of the conversation, and to prove that,

13   besides the statements made by Ms. Bereliz Rodriguez that this

14   was a toxic relationship in which both parties were always

15   demeaning each other with their vocabulary, the government has

16   proof that this is not the case.

17        THE COURT:  Let me see what you want me to admit.

18        MR. GONZALEZ-DELGADO:  Excuse me?

19        THE COURT:  Let me see what you want me to admit.

20   Mark it with a Post-it.

21        MR. GONZALEZ-DELGADO:  Yes.

22        MR. GOTTFRIED:  Can I be heard, Your Honor?

23        THE COURT:  Yes, go ahead.

24        MR. GOTTFRIED:  Your Honor, again, this is basically

25   a motion for reconsideration of the Court's ruling on the

1    motion in limine, which was precisely on this point, allowing

2    the government to introduce, under the opposing party exception

3    to hearsay, Mr. Verdejo's statements, as well as Keishla's

4    statements, insofar as they provided context, not for the truth

5    of the matter asserted.

6         What defense counsel is attempting to do, without

7    invoking any exception, any evidentiary rule that would allow

8    it, is to introduce their own client's out-of-court statements

9    for the truth of the matter asserted, as well as the victim's

10   statements for the truth of the matter asserted.

11        MR. GONZALEZ-DELGADO:  It's not for the truth of the

12   matter.  Those are some of the messages that were deleted.

13        THE COURT:  What are the messages?

14        MR. GONZALEZ-DELGADO:  The ones in yellow, the

15   messages here.  May I have --

16        THE COURT:  You marked the page -- it's all the

17   messages in the page?

18        MR. GONZALEZ-DELGADO:  Yes, Your Honor, because it's

19   the context.  It starts how the conversation starts, but

20   they're just one line, one-liners.  This one starts on

21   [non-English language], this page.  You just -- Your Honor,

22   there is an exhibit --

23        THE COURT:  It goes on.

24        MR. GONZALEZ-DELGADO:  Yeah, but it's just that

25   Exhibit 138, at page 19, there is a message from April 25th,

1    2021, at 8:58:48 p.m., that says:  "Yes, and I still haven't

2    gotten my period."  For context, this is the rest of the

3    conversation.

4              MR. GOTTFRIED:  Your Honor, if I could just --

5              THE COURT:  Go ahead.

6              MR. GOTTFRIED:  A couple of points:  One is that

7    they, at the time that we presented this evidence to the

8    witness, they did not make any objection based on the rule of

9    completeness.  They made an objection to the translations, but

10   they had no objection otherwise to the admission of the

11   evidence. In admitting what we did with this witness, we were

12   relying, not only by the lack of objection, but also upon the

13   Court's ruling regarding the opponent's self-serving statements

14   to be excluded.

15             To the extent the Court were now to allow the defense

16   to enter this evidence, it would be prejudice to us.  We had

17   relied upon the Court's rulings and the lack of objection on

18   the evidence presented.  And now it makes it appear as if there

19   is relevant evidence that we deliberately decided not to

20   include, and that was based upon our understanding that we were

21   allowed -- we are allowed to introduce the defendant's, the

22   opposing party's statements, and we have presented days of

23   that.

24             In addition to that, I believe what defense is

25   presenting is a subset of the entirety of the messages.

1              THE COURT:  A what?

2          MR. GOTTFRIED:  A subset of the entirety of the

3    messages.  So what they're asking is:  Let us introduce

4    cherry-picked messages that are favorable to our client, our

5    defendant's statements, and introduce them into evidence.

6              Again, there is no reference to any rule of evidence

7    that would make that admissible.  And so we would ask the

8    Court, consistent with the Court's prior rulings, with respect

9    to the other witness yesterday, with Eliz's text messages, with

10   respect to the video introduced by the Witness Bereliz, that

11   the government be allowed to introduce the defendant's opposing

12   party statements, but the defense be precluded from introducing

13   that hearsay because there isn't an exception that applies.

14         MR. GONZALEZ-DELGADO:  Your Honor, the witness

15   testified that he prepared two reports, and that he reviewed

16   the report that was presented as Exhibit 138.  And that report

17   has been amended, and messages have been removed from it.  I

18   can go in, and I can probe into that.

19             And what I'm asking for, to be introduced, is not the

20   full conversation.  We have many other text messages that we

21   believe are much more favorable, but what we're trying to prove

22   is the rule of completeness so that the jury can have context

23   as to why Mr. Verdejo or Ms. Keishla Rodriguez stated that:  I

24   haven't had my period yet.  That's the context.

25             In addition, we're trying to prove that there was a

1  relationship, and that the relationship was not like Bereliz

2  Rodriguez stated in her testimony three or four days ago.  I'm

3  repeating myself.  But like she said:  This was a toxic

4  relationship where there was only demeaning words between them,

5  and for many years, that's how it was.

6          These are text messages that were found on the phone

7  of Mr. Verdejo between the victim and Mr. Verdejo that

8  contradict directly the statements made by Ms. Bereliz that

9  they always spoke in a demeaning manner.  The words that are

10  used here in this conversation are "my love," "precious,"

11  "mommy," "baby."  And she responds to that.

12          That's why we need the text messages to be

13  introduced, to be able to produce -- to introduce context for

14  half of the messages and to prove that they had a relationship,

15  and it wasn't as the, one of the government witnesses stated.

16  And this is the only witness that we can bring this information

17  with because he's the one who actually found the messages using

18  the system that the Department of Justice used.

19          We have not had any type of intervention with these

20  documents.  They were provided by the government, and they just

21  -- they don't like the, the, the statements that are made

22  there, but there is nothing self-serving in those statements.

23          He is not, in any of those text messages that we have

24  provided to the Court to read right now, a statement in which

25  Mr. Verdejo says:  I did not commit this crime; I will not

1    commit this crime; I have done nothing related to this crime.

2    It's actually nine days, or ten, prior to the alleged facts of

3    this case, Your Honor.

4            MR. GOTTFRIED:  Two brief responses:  One is, this is

5    not the only witness that defense can use to introduce these

6    statements.  Their client can introduce these statements,

7    should he choose to take the stand.  He doesn't have to, but

8    defense always has that option.

9            Secondly, Brother Counsel is saying that he wants to

10   introduce these statements to basically create a rosy picture

11   of the relationship between Keishla and Verdejo to undermine

12   the government witnesses who have characterized it as a toxic

13   relationship, and that's clearly self-serving.  That's in the

14   defendant's interest in doing so.

15           So I think by defense counsel's own argument, these

16   are self-serving statements that they want to introduce.  And

17   there is nothing under the rules of evidence that allows them

18   to do that.

19           MR. GONZALEZ-DELGADO:  Mr. Gottfried just stated that

20   if we want to bring these, in my client has to sit down and

21   testify regarding that.  That would be shifting the burden of

22   the case upon Mr. Verdejo.  So I think that is not a correct

23   way of arguing this issue.

24           And the -- we're not giving a rosy picture of the --

25   we're giving a full picture of what happened between the

1    parties.  And we're the defense.  We can bring evidence that is

2    favorable to our client with the evidence provided by the

3    government.

4          And that's what we're trying to do with this, with

5    these, with these text messages that the witness admits that

6    when he started this case, the selected messages that were

7    provided were -- I said 45 pages.  He said:  I don't remember

8    the exact number, but there were many more.

9          And we proffer to the Court that that's what the

10   government gave us.  There were 45 pages.  And he admits there

11   were many more messages, and last night there was a difference

12   -- last night, when he reviewed it, there were messages that

13   were altered.  And there are 20 -- there are missing pages in

14   this document that has been presented to the jury.

15         I'm not making evidence up.  I'm just using what the

16   government has provided in a favorable way, the way that the

17   rules of evidence allow me to use.

18         MR. GOTTFRIED:  By the same juncture, we've provided

19   evidence, recordings, and other evidence, regarding the

20   defendant's statements.

21         THE COURT:  Okay.

22         MR. GOTTFRIED:  And we provide that in discovery, but

23   it doesn't give defendant free rein to introduce it.

24         THE COURT:  Okay.  I'm not persuaded that the

25   defendant is entitled to what he requests.

1            Your point is preserved.

2        (Sidebar conference concluded.)

3            MR. GONZALEZ-DELGADO:  May I, Your Honor?

4            THE COURT:  Go ahead.

5    BY MR. GONZALEZ-DELGADO:

6    Q    Mr. Soeka?

7    A    Yes.

8    Q    We can be clear that there are many more text messages in

9    Mr. Verdejo's phone between Mr. Verdejo and Ms. Keishla

10   Rodriguez; is that correct?

11   A    That's correct, than what was presented in that exhibit.

12   Q    Or at least you can tell the jury that these messages are

13   contained in a phone that is associated to two persons with

14   those names?

15   A    That's correct.

16   Q    Because you don't know if they actually wrote them?

17   A    No.  I can't put anyone behind the phone at the time it's

18   being used.

19            MR. GONZALEZ-DELGADO:  No further questions, Your

20   Honor.

21            MR. GOTTFRIED:  Just brief redirect.

22            THE COURT:  Go ahead.

23            MR. GOTTFRIED:  If I can please see Exhibit 138?

24                        REDIRECT EXAMINATION

25   BY MR. GOTTFRIED:

1    Q    Okay.  Sir, with respect to the message on April 24th, at

2    8:47 a.m., do you see where it says:  [non-English language]?

3    "Good morning, precious."  Do you see that?

4    A    I do.

5    Q    Okay.  And the extraction was in which language?  English

6    or Spanish?

7    A    The extraction was in Spanish.

8    Q    Do you speak Spanish fluently?

9    A    I do not.

10   Q    Did you change a letter, a space, in the [non-English

11   language], on the left-hand side?  Did you change anything

12   there?

13   A    I did not create this pdf report.  It is a representation

14   character-for-character of what was from the extraction.

15   Q    Okay.  The next line:  [non-English language], "Good

16   morning," is that an accurate representation

17   character-by-character of what was in the extraction?

18   A    Yes.

19   Q    Next line:  [non-English language], "What are you doing,

20   baby; working, my love," is that an extract, a true and correct

21   representation letter-by-letter of what was in the extraction?

22   A    Yes.

23   Q    And, sir, if I asked you the same question with respect to

24   every single message on pages 1 through 23 of this, Exhibit

25   138, would your answer be the same?

1    A    It would.

2    Q    Okay.  Turning to the last page of Exhibit 138.  That

3    would be page 23.

4         Okay.  Defense counsel had asked you about messages

5    excluded or not excluded.  After April 27th, 2021, are there

6    any messages between Felix Verdejo on this phone, 963-3693, and

7    Keishla Rodriguez (787)397-2408, after April 27?  Any text

8    messages?

9    A    There was nothing between these two numbers past that

10   date.

11   Q    Okay.  So to the best of your knowledge, there was nothing

12   excluded from this after April 27th, 2021, in terms of text

13   messages between Verdejo, on this phone, and Keishla; is that

14   correct?

15   A    There is nothing date-time-stamped past this date and time

16   between these two numbers.

17   Q    Thank you.

18        And all of the messages in Exhibit 128 -- all of

19   these messages are one -- 138, excuse me -- all of these

20   messages in 138 are between (787)963-3693 and (787)397-2408; is

21   that correct?

22   A    Yes, it's between these two numbers.

23   Q    Okay.  And based on the phone records that we saw earlier,

24   (787)397-2408 is associated with Keishla Rodriguez; is that

25   correct?

 1    A    For the billing information, yes.

 2    Q    Based on the billing information.

 3         Okay.  Sir, looking at Exhibit 125, 125, all of these

 4    messages are between (787)963-3693 and what number?

 5    A    (787)485-6855.

 6    Q    Okay.  And so every single page of Exhibit 125 concerns

 7    messages between these two numbers?

 8    A    That's correct.

 9    Q    Okay.  And the billing individual associated with 485-6855

10    is Luis Cadiz; is that correct?

11    A    That is what was listed on the document that was provided.

12         MR. GOTTFRIED:  Okay.  If I may just have one second,

13    Your Honor?

14         And if I can just, lastly, go to the last page of

15    Government ID 125?

16         THE COURT:  ID?

17         MR. GOTTFRIED:  I'm sorry, Government Exhibit, excuse

18    me, 125.

19    BY MR. GOTTFRIED:

20    Q    Okay.  And so this message, "On my way to where you are,

21    Titan," on April 29, 6:45 a.m., based on what we have

22    discussed, that is a message from Felix Verdejo to Luis Cadiz;

23    is that correct?  Based on what we've discussed?

24    A    Based on the billing information, if we're associating it

25    to the numbers, yes.

```
 1              MR. GOTTFRIED:  Okay.  I have no further questions,
 2     Your Honor.
 3              THE COURT:  Mr. Gonzalez?
 4              MR. GONZALEZ-DELGADO:  Yes, Your Honor.
 5                        RECROSS-EXAMINATION
 6     BY MR. GONZALEZ-DELGADO:
 7     Q    Agent Soeka, Brother Counsel just said that, referring to
 8     Exhibits 125 and 138 --
 9              MR. GONZALEZ-DELGADO:  May I have the Elmo?
10     BY MR. GONZALEZ-DELGADO:
11     Q    -- 125, 138, he said that everything that is shown here is
12     accurate; is that correct?
13     A    He did.
14     Q    But you answered a question that I made a couple of
15     minutes ago that the name of the person that is in the blue,
16     blue cloud or blue box, was removed; was that correct?
17     A    Yes.  I was speaking in regards to the body of the
18     messages.
19     Q    Okay.  But the truth is, he said that it was completely,
20     it was accurate completely, and I'm asking you, that the truth
21     is, that the names of the persons who received these messages
22     were edited?
23     A    I'm saying that he read me a message from the chat, and I
24     said, based off of the message that he read me, that it was
25     accurate.
```

1   Q    But we can agree that the, like you said a little while

2   ago, the names were edited?

3   A    Compared to a previous version of this I saw, yes, they've

4   been removed.

5   Q    Okay.  And the truth is, Brother Counsel said that there

6   are no more messages after April 27th, 2021, in Exhibit 138,

7   and that is correct, there are no more messages, right?

8   A    Correct.

9   Q    But before April 27th, and in between, there are multiple

10  messages that we have not seen?

11  A    In this exhibit, that is correct.

12  Q    That you did see when you did your examination?

13  A    That is correct.

14          MR. GONZALEZ-DELGADO:  I have no further questions,

15  Your Honor.

16          THE COURT:  I do not have questions for the witness.

17          Mr. Soeka, thank you for your testimony.  You are

18  free to go.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Sidebar.

21      (Sidebar conference commenced.)

22          THE COURT:  Your next witness?

23          MR. GOTTFRIED:  We do have a next witness, Ricardo

24  Garcia.

25          THE COURT:  What is he going to testify about?

```
 1              MR. GOTTFRIED:  What is he going to testify about?

 2              THE COURT:  More or less.

 3              MR. GOTTFRIED:  Yeah.  His company had an agreement

 4    to move -- his company had an agreement to give Mr. Verdejo the

 5    Dodge Durango.  He should be brief.

 6              THE COURT:  Well --

 7              MR. GOTTFRIED:  I know.  I know the caveat.  But I

 8    don't think there is much of a dispute that there was a

 9    contract to give Mr. Verdejo the Dodge Durango, which is

10    basically what he's testifying about.

11              MR. GONZALEZ-DELGADO:  We know who the witness is,

12    and it's related to the vehicle.

13              MS. CINTRON-COLON:  But we don't know what he's going

14    to say in direct examination that might give us the desire to

15    do cross.  So we don't know.

16              THE COURT:  Let's leave him for tomorrow.

17              MR. GOTTFRIED:  Okay.  Your Honor, he's not available

18    tomorrow.  Well, we'll find another witness for tomorrow to go

19    first.  He leaves for vacation tomorrow.

20              THE COURT:  Okay.  Remember, we are not working -- I

21    mean, we are not doing trial work on Monday and on Tuesday.

22              MR. GOTTFRIED:  Right.

23              THE COURT:  We'll return on Wednesday.

24              MR. GOTTFRIED:  Right.

25              THE COURT:  Okay?
```

1             MR. GONZALEZ-DELGADO:  Yes, sir.

2             THE COURT:  All right.

3        (Sidebar conference concluded.)

4             THE COURT:  Bring the witness.

5             MR. GOTTFRIED:  Yes, Your Honor.  Your Honor, the

6    government calls Ricardo Garcia.

7             THE COURTROOM DEPUTY CLERK:  Mr. Garcia, please raise

8    your right hand.

9        (Witness sworn.)

10            THE COURTROOM DEPUTY CLERK:  So help you God.  You

11   may take a seat.

12            MR. GOTTFRIED:  May it please the Court?

13            THE COURT:  Go ahead.

14                        RICARDO GARCIA,

15        called as a witness on behalf of the Plaintiff,

16             having been previously duly sworn,

17            was examined and testified as follows:

18                     DIRECT EXAMINATION

19   BY MR. GOTTFRIED:

20   Q    Good afternoon, sir.

21   A    Good afternoon.

22   Q    And in a nice, loud voice, speaking into the microphone,

23   can you please tell the jury your name?

24   A    Ricardo Garcia.

25   Q    Where do you work?

```
 1    A    At FCA Caribbean.

 2    Q    And what is that?

 3    A    FCA Caribbean is in charge of distributing the brands

 4    Chrysler, Dodge, Jeep, Dodge, Ram, Fiat, Alfa Romero and Mopar,

 5    in Puerto Rico.

 6    Q    And, sir, what is your position with FCA Caribbean?

 7    A    General manager.

 8    Q    As a general manager, what are some of the things that you

 9    do?

10    A    We are in charge of service, marketing and sales of our

11    products.

12    Q    And how long have you worked in the auto industry?

13    A    24 years.

14    Q    Okay.  And in all that time, have you known any car brand

15    manufactured here in Puerto Rico?

16              THE INTERPRETER:  I'm sorry, Counsel.  Can you please

17    repeat?

18    BY MR. GOTTFRIED:

19    Q    In all of that time, do you know of any car brand that is

20    manufactured here in Puerto Rico?

21    A    No.

22    Q    In 2017, did you sign a vehicle usage agreement?

23    A    Yes.

24    Q    With whom?

25    A    With Felix Verdejo.
```

1    Q    For what kind of car?

2    A    A Dodge Durango GT.

3    Q    Okay.  And was that Dodge imported here, into Puerto Rico?

4    A    Yes.

5    Q    And why, why did FCA Caribbean enter into a car agreement

6    with Verdejo?

7    A    Because we had him as our spokesperson, and we also

8    sponsored him because we believed that, since the Dodge brand

9    is characterized for being really fast and having strong

10    engines, we believed that it made sense to have Felix Verdejo,

11    just the same as we had other athletes, such as Monica Puig and

12    Carlos Correa, that we also sponsored.

13    Q    And what kinds of characteristics were you looking for in

14    choosing someone to sponsor a product in 2017?

15    A    Somebody that had a good image; that was loved by the

16    people and had the same values that we represented as a brand.

17    Q    And who signed the car agreement with Mr. Verdejo on

18    behalf of FCA Caribbean?

19    A    I did.

20         MR. GOTTFRIED:  Okay.  At this time, Your Honor, I'd

21    like to mark Government ID 134, and permission to approach the

22    witness.

23         THE COURT:  Yes, permission granted.

24    BY MR. GOTTFRIED:

25    Q    Sir, do you recognize the document that I've just placed

1    in front of you?

2    A    Yes.

3    Q    How do you recognize it?

4    A    Because it is a document that we created and signed.

5    Q    Okay.  And is that a true and correct copy of a document

6    that you created and signed?

7    A    Yes.

8         MR. GOTTFRIED:  Your Honor, the government would move

9    to admit Government ID 134 into evidence as Government Exhibit

10   134.

11        MR. GONZALEZ-DELGADO:  No objection, Your Honor.

12        THE COURT:  Without objection, so ordered.  ID 134

13   becomes Government Exhibit 134.

14   (Exhibit No. 134 admitted into evidence.)

15        MR. GOTTFRIED:  Permission to recover the exhibit and

16   publish.

17        THE COURT:  Granted.

18   BY MR. GOTTFRIED:

19   Q    Sir, turning to page 7 of this document, which is Schedule

20   I.  According to the Schedule I of the document that you

21   signed, this is for what kind of car?

22   A    It's a 2017 Dodge Durango RT.

23   Q    Okay.  And what is the license plate?

24   A    IVG 226.

25   Q    Turning to page 9 of the agreement.  Looking at paragraph

1    8, do you see where it states:

2              "I/we will not allow the vehicle to be driven by any

3    individual other than a vehicle driver."

4              Do you see that?

5    A    Yes.

6    Q    Okay.  So in terms of trying to find out who the vehicle

7    driver is, can we please go to page 10?  And, sir, who is the

8    only vehicle driver listed on this agreement?

9    A    Felix Verdejo.

10   Q    Okay.  Did you ever learn that someone other than Mr.

11   Verdejo was driving the Dodge Durango?

12   A    No.

13             MR. GOTTFRIED:  Okay.  Your Honor, I'm going to mark

14   Government ID 135, 135, which has been shown to Brother

15   Counsel, and request permission to approach the witness.

16             THE COURT:  Granted.

17   BY MR. GOTTFRIED:

18   Q    Sir, do you recognize the items that have been provided to

19   you in Government ID 135?

20   A    Yes.

21   Q    Okay.  How do you recognize them?

22   A    Because I am depicted there handing the document over, the

23   vehicle over to Felix.

24   Q    And are those true and correct copies of photos that were

25   taken of you and of Felix Verdejo?

1    A    Yes.

2         MR. GOTTFRIED:  At this time, Your Honor, the

3    government would move to admit into evidence Government ID 135

4    as Government Exhibit 135.

5         MR. GONZALEZ-DELGADO:  No objection, Your Honor.

6         THE COURT:  Without objection, so ordered.  ID 135 is

7    now Government Exhibit 135.

8    (Exhibit No. 135 admitted into evidence.)

9         MR. GOTTFRIED:  Request permission to recover the

10   exhibit and to publish.

11        THE COURT:  Granted.

12   BY MR. GOTTFRIED:

13   Q    Sir, showing you page 1 of Exhibit 135.  What do we see

14   here?

15   A    Me handing the key of the vehicle to Felix.

16   Q    Around what year was this?

17   A    January of 2017.

18   Q    Sir, moving on to page 2 of Exhibit 135.  What do we see

19   here?

20   A    Felix seated at the driver's seat.

21   Q    Moving on to page 3 of Exhibit 135.  What do we see here?

22   A    Felix posing in front, to the side of the vehicle.

23   Q    Okay.  And, lastly, page 4 of Exhibit 135.  What do we see

24   here?

25   A    Felix standing to the lateral side of the vehicle, looking

1    through the back seats.

2    Q    Sir, when was the last time that you communicated with Mr.

3    Felix Verdejo?

4    A    On April 24th, we were chatting through WhatsApp.  We were

5    talking about some boxers that we know, and that was the last

6    time, on April 24th.

7              THE COURT:  Of what year?

8              THE WITNESS:  2021.

9    BY MR. GOTTFRIED:

10   Q    And what, if anything, did Mr. Verdejo tell you during

11   that call on April 24th, 2021?

12             MR. GONZALEZ-DELGADO:  Objection, Your Honor, 401.

13             THE COURT:  Overruled.

14   BY MR. GOTTFRIED:

15   Q    Yes, sir.  What did Mr. Verdejo tell you on April 24th,

16   2021, during that phone call?

17   A    It wasn't a phone call.  It was through WhatsApp.  And

18   what he said was that he was going to Las Vegas to train the

19   next Friday, and I wished him a lot of success.

20   Q    And, lastly, sir, do you see Mr. Felix Verdejo here in

21   court today?

22             THE COURT:  What was the answer?

23             THE INTERPRETER:  The interpreter did not hear an

24   answer.  The interpreter saw the witness nod.

25             THE COURT:  Ask again.

1    BY MR. GOTTFRIED:

2    Q    I'm sorry.  Sir, do you see Mr. Felix Verdejo here in

3    court today?

4    A    Yes, yes.

5    Q    Can you please indicate where he is located and what he is

6    wearing?

7    A    He is located there, and he's wearing a shirt, I believe

8    black or dark-blue.

9            MR. GOTTFRIED:  May the record reflect, Your Honor --

10           THE COURT:  Wait.  Where is "there?"

11           THE WITNESS:  Where Felix is, there.

12           MR. GOTTFRIED:  May the record reflect that he is

13   pointing in the direction of the defendant?

14           THE COURT:  The record will so reflect.

15           You were going to ask the Court to do something?

16           MR. GOTTFRIED:  Yes, Your Honor.  May the record

17   reflect that the witness has identified Mr. Felix Verdejo?

18           THE COURT:  The record will so reflect.

19           MR. GOTTFRIED:  Your Honor, no further questions at

20   this time.

21           MR. GONZALEZ-DELGADO:  May I, Your Honor?

22           THE COURT:  Go ahead.

23           MR. GONZALEZ-DELGADO:  Thank you.

24                        CROSS-EXAMINATION

25   BY MR. GONZALEZ-DELGADO:

1    Q    Good afternoon, Mr. Garcia.

2    A    Good afternoon.

3    Q    Brother Counsel just asked you that, if you knew of

4    anybody driving this Dodge Durango, other than Mr. Verdejo; is

5    that correct?

6    A    He asked me, yes.

7    Q    The truth is, you have no control over who drives his car;

8    is that correct?

9    A    That's correct.

10   Q    And the vehicle doesn't have a system that, if Mr. Verdejo

11   isn't the one driving the car, it just shuts down and doesn't

12   move; is that correct?

13   A    That's correct.

14            MR. GONZALEZ-DELGADO:  I have no further questions,

15   Your Honor.

16            MR. GOTTFRIED:  No redirect, Your Honor.

17            THE COURT:  I do not have questions for the witness.

18            Mr. Garcia, thank you for your testimony.  You are

19   free to go.

20       (Witness excused.)

21            THE COURT:  Ladies and gentlemen, it's some minutes

22   after 5:00.  I think it's a good point to stop.  We will resume

23   trial work tomorrow at 9:00 a.m.  Remember, we are not doing

24   trial work next Monday or next Tuesday.  After tomorrow, we

25   will return on Wednesday.

1          The Court stands corrected.  Today is Wednesday.

2          Thank you.  Let me thank my courtroom deputy clerk

3    for pointing that out.

4          So we will return tomorrow at 9:00 a.m., Friday, at

5    9:00 a.m.  We won't be doing trial work on Monday or on

6    Tuesday, and we'll return on Wednesday.

7          Before you go today, remember, do not talk about or

8    communicate with anybody about your impressions of the case or

9    the evidence in the case.  Do not view, read or hear reports,

10   comments or articles about the case.  Do not conduct any

11   research about the case, the matters in the case or the

12   individuals involved in the case.

13         Keep an open mind until after you've heard and seen

14   all evidence and heard my instructions, and you've gone to the

15   jury room to deliberate and all of you have discussed all

16   evidence amongst yourselves.  That's how a verdict is reached.

17         Thank you for being here early, for your diligence,

18   for your patience, for paying close attention to what we are

19   doing in the courtroom.  Stay safe.  I look forward to seeing

20   you all tomorrow at 9:00 a.m.

21      (Whereupon the following proceedings were had in open court

22         without the presence of the jury.)

23         THE COURT:  We'll adjourn until tomorrow at 9:00 a.m.

24         MR. GOTTFRIED:  Yes, Your Honor.

25         MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

1          MS. CINTRON-COLON:  Thank you, Your Honor.

2          THE COURT:  You are free to go.

3     (Whereupon the Court adjourned at 5:12 p.m.)

4                         -oOo-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

```
 1    UNITED STATES DISTRICT COURT )
                                   )  ss.
 2    DISTRICT OF PUERTO RICO      )

 3

 4                        REPORTER'S CERTIFICATE

 5

 6             I, CINDY LEE BROWN, RPR, Federal Official Court

 7    Reporter for the United States District Court for the District

 8    of Puerto Rico, appointed pursuant to the provisions of Title

 9    28, United States Code, Section 753, do hereby certify that the

10    foregoing is a true and correct computer-aided transcript of

11    proceedings had in the within-entitled and numbered cause on

12    the date herein set forth; and I do further certify that the

13    foregoing transcript has been prepared by me or under my

14    direction.

15

16             Dated this 1st day of July, 2023.

17

18

19                            /s/ Cindy Lee Brown

20                            _____
                              CINDY LEE BROWN, RPR, Federal
                              Official Court Reporter
21                            150 Carlos Chardon, Room 150
                              San Juan, PR  00918
22                            (787) 772-3478

23

24

25
```

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478