1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF PUERTO RICO

3                            -oOo-

4    THE UNITED STATES OF AMERICA,    )
                                      )
5            Plaintiff,               )   Case No. 3:21-CR-00161-PAD
                                      )
6    -vs-                             )
                                      )
7    FELIX VERDEJO-SANCHEZ,           )
                                      )
8            Defendant.               )
     _____ )
9
            TRANSCRIPT OF JURY TRIAL - DAY NINE - A.M. SESSION
10       HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
            UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
11                     FRIDAY, JUNE 30, 2023
     _____
12                      A P P E A R A N C E S
13
     FOR THE UNITED STATES OF AMERICA:
14
     AUSA Jonathan L. Gottfried &
15   AUSA Jeanette M. Collazo-Ortiz

16   FOR THE DEFENDANT:

17   Jason Gonzalez-Delgado, Esq. &
     Gabriela Jose Cintron-Colon, Esq.
18
     COURT INTERPRETERS:
19
     Carlos Ravelo &
20   Edna Brayfield

21   GOVERNMENT INTERPRETER:

22   Jose Luis Rosado

23

24

25

```
1                            I N D E X

2   WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:        PAGE:

3   ELIZ MARIE SANTIAGO-SIERRA

4   Direct Examination (Continued) by Ms. Collazo-Ortiz:   14

5   Cross-Examination by Ms. Cintron-Colon:                32

6   Redirect Examination by Ms. Collazo-Ortiz:             65

7   CARLOS COLON-VILCHES

8   Direct Examination by Mr. Gottfried:                   71

9   EXHIBITS:                                           PAGE:

10  Government Exhibit No. 154                              77

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Proceedings commenced at 8:54 a.m.)
 2                          -oOo-
 3          (Whereupon the following proceedings were had in open court
 4          without the presence of the jury.)
 5                  THE COURT:  How many cases do we have on calendar
 6    today?
 7                  THE COURTROOM DEPUTY CLERK:  We have one case.
 8                  THE COURT:  Call the case.
 9                  THE COURTROOM DEPUTY CLERK:  Criminal Case Number
10    21-161, the United States of America against Felix
11    Verdejo-Sanchez, for ninth day of jury trial.  On behalf of the
12    government are Assistant U.S. Attorneys Jeanette Collazo and
13    Jonathan Gottfried, and on behalf of the defendant are
14    Attorneys Gabriela Cintron and Jason Gonzalez.
15                  The defendant is present in the courtroom, and he's
16    being assisted by certified court interpreter.
17                  THE COURT:  Thank you.
18                  Would counsel identify themselves?
19          MR. GONZALEZ-DELGADO:  Good morning, Your Honor.
20    Jason Gonzalez on behalf of Mr. Felix Verdejo.
21                  THE COURT:  Good morning, sir.
22          MS. CINTRON-COLON:  Good morning, Your Honor.
23    Gabriela Cintron-Colon on behalf of Felix Verdejo-Sanchez.
24                  THE COURT:  Good morning, ma'am.
25          MS. COLLAZO-ORTIZ:  Good morning, Your Honor.  AUSA
```

1    Jeanette Collazo for the United States.

2            THE COURT:  Good morning, ma'am.

3            MR. GOTTFRIED:  Good morning, Your Honor.  AUSA

4    Jonathan Gottfried.

5            THE COURT:  Good morning, sir.

6            Would the interpreters introduce themselves?

7            THE INTERPRETER:  Jose Luis Rosado-Santiago,

8    interpreter for the government.

9            THE COURT:  Good morning, sir.

10           THE INTERPRETER:  Edna Brayfield.  Good morning.

11           THE COURT:  Good morning, ma'am.

12           THE INTERPRETER:  Carlos Ravelo, staff interpreter,

13    at the services of your court.

14           THE COURT:  Good morning, sir.

15           The courtroom is open to the public.

16           All set to call the jury in?

17           MR. GOTTFRIED:  The government is.

18           MR. GONZALEZ-DELGADO:  No, Your Honor.  We have a

19    housekeeping matter.

20           THE COURT:  All right.  Approach the bench.

21       (Sidebar conference commenced.)

22           MS. CINTRON-COLON:  Good morning, Judge.

23           So, Your Honor, it has come to our attention that

24    yesterday, in the afternoon and at night, Ms. Bereliz

25    Rodriguez-Ortiz was posting on social media regarding the case.

1    For example -- I'm translating because it is in Spanish.  This

2    is a post that she did not delete.  This is in the social media

3    platform Facebook.

4            She posted:  Amanda --

5            Who is the witness that testified yesterday.

6            Amanda, you're so --

7            MR. GONZALEZ-DELGADO:  You're so brave.

8            MS. CINTRON-COLON:  You're so brave, girl.  I love

9    you, hearts and butterflies, which have been used to identify

10   Ms. Keishla.

11           The post has over 500 shares, 300 comments.  It's a

12   little concerning, because even though it's not specifically

13   stating what she has testified in this case, everybody knew

14   Amanda was a girl who has been identified by the press as an

15   ex-girlfriend.

16           She testified here about having an abortion from who

17   she believed was Felix's child and that he forced her, et

18   cetera.  So, for us, it's concerning that she would be posting:

19   You're so brave, Amanda.

20           She also posted other -- the same thing in the social

21   media platform Instagram, which has since been deleted.  We do

22   have the screen-shots about the same message.

23           A couple of days ago she had also shared a picture of

24   her family crying and stating:  This is all because of you, and

25   a picture of her sister, which we didn't mind.  We didn't mind

1    at all about that one.

2              But after last night's posting, after the trial

3    testimony of Ms. Amanda, it was a little concerning to us that

4    -- and, yeah, and that is specifically addressed to the matters

5    in this case.

6              Furthermore, a couple of news broadcasts did a whole

7    article and a whole TV news report on the statuses that she

8    said, and they even titled it:  Keishla's sister explodes in

9    social media in backlash of the comments and testimonies.  And

10   that was over two-minutes long on different TV broadcasts.

11             The TV announcers even say:  Bereliz has since

12   deleted the messages, but we have them here; we're showing

13   them.  And I also have them because I had seen them previously,

14   Your Honor.

15             So that's one of the two concerns that we have today,

16   that we believe that is strictly against the Court's orders of

17   her not posting about this case on social media, Your Honor.

18             THE COURT:  Okay.  As to what the media does or does

19   not do, I have no control over that.  You all should understand

20   that.

21             MS. CINTRON-COLON:  Of course, Your Honor.

22             THE COURT:  They have a First Amendment Right to do

23   what they do.

24             MS. CINTRON-COLON:  Yes, Judge.

25             THE COURT:  As for this witness, and potential

```
1    witness, I do have concerns.  I do not see her in the courtroom
2    this morning.
3              Mr. Gottfried?
4              MR. GOTTFRIED:  Your Honor, we understand that the
5    Court issued -- the Court instructed her not to post.  We
6    really don't have anything to add.
7              THE COURT:  Okay.  I'll deal with that in due course.
8              MS. COLLAZO-ORTIZ:  To clarify, she didn't go into
9    the contents of anything related to the case, Your Honor.
10             MR. GONZALEZ-DELGADO:  Well, actually, the message
11   that she was saying --
12             MS. CINTRON-COLON:  I just read it.
13             MR. GONZALEZ-DELGADO:  The message that the -- the
14   audio message that she put or --
15             MS. CINTRON-COLON:  I have it right here:  Amanda
16   you're so brave, girl.  I love you.
17             MR. GONZALEZ-DELGADO:  I'm not talking about that
18   part.  I'm talking about the one that --
19             MS. CINTRON-COLON:  Oh, she was fighting with some
20   other person --
21             MR. GONZALEZ-DELGADO:  There is another post that she
22   made inviting an individual called "Elias Barral," who,
23   allegedly, is Ms. Eliz's best friend, to a fight because he --
24   he posted that, something regarding the pregnancy and that Mr.
25   Verdejo was not -- oh, this is the post that he made:  The baby
```

1    that the --

2                THE COURT:  Who is that?

3                MR. GONZALEZ-DELGADO:  This is Elias Barral.  This is

4    what caused one of the responses from Ms. Ortiz,

5    Santiago-Ortiz.

6                MS. CINTRON-COLON:  Bereliz.

7                MR. GONZALEZ-DELGADO:  Oh, Bereliz.  I'm sorry.

8                The baby that the deceased was waiting for was not

9    Verdejo's.  Christ come now.

10               And she made almost a two-minute rant saying that she

11   was not going to allow this; that he was the killer; that she,

12   for two years she was waiting for somebody to pick a fight with

13   her.  She was ready to fight.

14               And she also, she also responded in a text message or

15   a post, Instagram story:  Keishla physically isn't here, God

16   damn it, but I remember -- but let's remember that I am.

17               And that is concerning because it is provoking the

18   emotions of the people.  And we don't know if one of these

19   jurors might have a family member that might read something

20   like this and maybe ask questions or inform them of what is

21   being posted in social media, which the Court prohibited them

22   from.

23               And I know that the jury has been very attentive as

24   to the Court's orders that they should not read social media.

25   But they cannot, they cannot predict what's going to happen

1    once they get home.  Somebody might come up and make a comment

2    that we believe might influence their decision because of the

3    media frenzy that Ms. Bereliz is actually provoking, Your

4    Honor.

5           THE COURT:  Okay.  It's hard to gauge causes and

6    consequences.  I am concerned because I instructed her not to

7    do something, and it seems that she violated my order.  I will

8    deal with that in due course.

9           MS. CINTRON-COLON:  Yes, Your Honor.

10          The second issue that we have that is a little bit

11   more pressing is that it has come to our attention, and we have

12   very good-faith basis to believe that this is true, that the

13   government also interviewed Mr. Miguel Santiago-Laiz, who, as

14   Your Honor knows, has been mentioned on numerous occasions

15   throughout this entire trial, both by the prosecution and the

16   defense, as one of the different names that have been

17   mentioned.  We do not have any report about that interview.

18          And our issue is that, precisely because of what has

19   been observed to be part of our theory of defense that we've

20   mentioned different names, including Mr. Miguel Santiago-Laiz,

21   that we do not have any report as to that; that we don't know

22   if it contains *Brady* material, especially.  And the thing is

23   that he was interviewed way before the deadline that the Court

24   had imposed for the government to produce *Jencks*.

25          Whether or not they are going to use him as a witness

 1    is irrelevant, Your Honor.  And this is the third person that

 2    we have made the Court aware that had been interviewed, and we

 3    had not been produced with any of the materials.

 4              And our concern specifically with Mr. Miguel

 5    Santiago-Laiz is more of *Brady* than in any of the other

 6    witnesses, even though the other two persons, I mean

 7    interviewed persons, are concerning.  But Mr. Miguel

 8    Santiago-Laiz's interview is really concerning, that the

 9    government has not produced any material, report, notes, about

10    this interview.

11              And, again, we have a really good-faith basis to

12    believe he was interviewed a long time before the deadline to

13    produce *Jencks* materials, Your Honor.  So our request would be

14    that we would be provided with those materials.

15              And we do not think that it would be proper to again

16    instruct the government to just review the reports that you

17    have and then you determine if it's *Brady* or not.  Because,

18    Your Honor, this is the third person that we've become aware

19    there is an interview, and we have not been produced any

20    material, reports, notes, as to that interview, Your Honor.

21              MR. GOTTFRIED:  Noticeably absent in Sister Counsel's

22    request was any cite, any Federal Rule of Evidence, or any case

23    law.  There is none that holds that, if we interview someone we

24    are not going to call and who we determine that there is no

25    *Brady* material, that we're required to provide that over.

1          To the contrary, there is ample case law saying that

2     we are not required to do the defense investigation for them.

3     And there is no policy of open file discovery in this district.

4          If we interview someone, do not call them, and there

5     is no *Brady* in that document, as determined by our office after

6     a careful analysis, there is no obligation for us to turn over

7     that stuff.  What Sister Counsel is positing is that whenever

8     the government interviews someone in an investigation, we must

9     automatically turn over those notes to defense counsel, and

10    that's simply not the case.

11         Miguelito, whom they're referencing, Mr. Verdejo's

12    father-in-law, to call him that, was never notified by the

13    government as a witness.  He was not on the witness list.  He

14    has not been subpoenaed.  And based on our determination, there

15    is no *Brady* in that material.

16         To the extent that defense wants to interview him, of

17    course, that's their right.  But there is no obligation, either

18    under the Federal Rules of Evidence or case law, that would

19    require us to turn over any interview notes we have of him.

20         THE COURT:  That's my understanding of the law as

21    well.

22         MR. GONZALEZ-DELGADO:  But our request, Your Honor,

23    is that the Court review the document and make an independent

24    assessment if this is -- if there is no *Brady* material in those

25    documents.  Because this is a witness that has been mentioned

1    by multiple witnesses --

2                    THE COURT:  A person.

3                    MR. GONZALEZ-DELGADO:  A person, I'm sorry, that has

4    been mentioned by multiple persons who was a person of interest

5    in the investigation at the beginning.  The witnesses that have

6    testified, including Miguelito -- Machito yesterday, Mr.

7    Zabala, Sister Counsel asked him if one of the first persons

8    that he mentioned as a witness -- or he asked Mr. Verdejo in

9    one of the recordings, was Miguelito.

10                   And this is a person that the government knew that

11   was a potential witness, or was a potential defendant, in this

12   case.  They did their due diligence.  They made him go to the

13   FBI offices.  An interview was made.  And we believe that we

14   can't let, literal translation is:  We can't let the goats

15   watch over the lettuce.

16                   I mean, they can say that it isn't *Brady*, but we

17   believe that, from the information that we have, that we have

18   investigated, that it's not like the government says, that they

19   don't have to do our job.  We have done our independent

20   investigation, and we have information that Mr. Miguel

21   Santiago-Laiz was directly involved in this issue.

22                   And all we're asking is for the Court to

23   independently examine and make an assessment if there is or

24   isn't --

25                   THE COURT:  *Brady*.

 1                MR. GONZALEZ-DELGADO:  -- *Brady* material in those

 2      documents.

 3                THE COURT:  Okay.  We'll do it at some point.

 4                MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

 5                THE COURT:  Not now.

 6                MR. GONZALEZ-DELGADO:  No, no.  I know.  It's just

 7      that we're requesting it because yesterday we found out new

 8      information, last night after we left.  And that's why we're

 9      bringing it up today.

10                THE COURT:  Okay.

11                MR. GOTTFRIED:  And just to be clear, I understand

12      the Court's ruling in this matter.  This is the third time that

13      they have claimed that there is *Brady* material that we are

14      withholding based on interview notes that they have not seen.

15      And this is the third time that they've requested that we

16      submit our notes for ex-parte or in-camera review.

17                And we are just opposed to that general idea that

18      whenever we introduce someone, it has to be submitted to the

19      Court for a second layer of *Brady* review.  To the extent that

20      the Court wants to see that with the Miguelito notes, if the

21      Court so decides, of course, we will comply but --

22                THE COURT:  I understand your point.  The reason I'm

23      going along, because, otherwise, it would be kind of harassing,

24      is because I understand they have a good-faith belief to make

25      that determination based on the information they may have

```
 1    obtained.  And I may go into that in greater detail ex-parte.
 2              MR. GOTTFRIED:  Yes, Your Honor.
 3              THE COURT:  But let's see where this goes, and at
 4    some point today, I'll deal with that.
 5              MR. GONZALEZ-DELGADO:  Thank you, Your Honor.
 6              MS. CINTRON-COLON:  Thank you, Your Honor.
 7         (Sidebar conference concluded.)
 8              THE COURT:  Ready to call the jury in?
 9              MR. GONZALEZ-DELGADO:  Yes, Your Honor.
10              MR. GOTTFRIED:  Yes, Your Honor.
11              THE COURT:  Let's call the jury in.
12         (Whereupon the following proceedings were had in open court
13         in the presence of the jury.)
14              THE COURT:  Good morning.  Welcome back to the
15    courtroom.  Please take a seat.
16              Ms. Santiago, good morning.  I remind you you are
17    under oath.  All right?
18              THE WITNESS:  Yes.
19              MS. COLLAZO-ORTIZ:  May it please the Court?
20              THE COURT:  Go ahead.
21                   ELIZ MARIE SANTIAGO-SIERRA,
22         called as a witness on behalf of the Plaintiff,
23              having been previously duly sworn,
24         resumed the stand, and testified further as follows:
25                        DIRECT EXAMINATION
```

```
 1                        (Continued)

 2   BY MS. COLLAZO-ORTIZ:

 3   Q    Good morning, Ms. Santiago.  I'm going to start by

 4   clarifying some things that you testified to yesterday.  To

 5   start, can you please tell the members of the jury where you

 6   were living in April of 2021?

 7   A    At the San Jose Plaza Condominium.

 8   Q    And who owned that residence?

 9   A    I was.

10   Q    And yesterday you spoke about messages that you saw in

11   Felix's phone from Keishla.  My question is:  How many times or

12   different days did you see messages from Keishla in Felix's

13   phone?

14   A    Three or four different times.

15   Q    Okay.  And when was the most recent time?

16   A    On Monday, the 26th.

17   Q    So that would be April 26th of 2021, correct?

18   A    Yes.

19   Q    And what was the nature of the messages that you saw that

20   day?

21   A    They were intimate messages.

22   Q    And how many different senders, or interlocutors, did you

23   see messages from on April 26th?

24   A    Besides Keishla, two more.

25   Q    Okay.  I'm now going to turn your attention to April 29th,
```

```
 1    2021.  Where did Felix sleep the night from April 28th until

 2    April 29th?

 3    A     At my house.  At the condominium.

 4    Q     Okay.  And that morning of Thursday, April 29th, 2021,

 5    what time did he leave your house?

 6              MS. COLLAZO-ORTIZ:  Correction to the interpretation.

 7    BY MS. COLLAZO-ORTIZ:

 8    Q     What time did he leave your house?

 9    A     As usual.  I don't know whether it was 5:00 or 5:30.

10    Q     And what did he normally do on Thursdays around that time?

11    A     He went to train.

12    Q     Who did he train with?

13    A     With Pensa.

14    Q     Okay.  And after he left that morning, between 5:00 and

15    5:30, what do you do?

16    A     I got up as usual, at around 7:00, 7:30.  I took Miranda

17    to the school, and I went to work.

18    Q     And when do you next hear or see Mr. Felix Verdejo?

19    A     I heard him when he called me at around 11:00 or 12:00

20    noon.

21    Q     And what did he tell you in the call?

22    A     He called me.  He asked me if I could talk, and I said

23    yes.  And when I said yes, that I could talk, he told me that

24    Keila and Tita, that is Bereliz, had called him to tell him

25    that Marlen was missing and that, supposedly, she was pregnant.
```

1    Q    And before that call, were you aware of Keishla's

2    pregnancy?

3    A    No.

4    Q    And what did you do after that call?

5    A    When I hung up with him, I continued working, and after

6    that, I called him again.

7    Q    Okay.  Why did you call him again?

8    A    I called him then because it was when I was by myself, and

9    the client was not there, and I could talk to him.  And I asked

10   him again what was happening, and he said again that Keila and

11   Bereliz were saying that Marlen was missing and that,

12   supposedly, she was pregnant.

13   Q    Okay.  And what do you do next?

14   A    I told him that I did not believe anything that he said;

15   that I was going to call Bereliz so that she could explain

16   anything that was happening, and that I was lost.

17   Q    Okay.  And what happened next?

18   A    I called Bereliz, and she explained that she was going to

19   meet with Felix early to show him a blood test.  And she told

20   me that she was not like that, to go disappearing and, or not

21   communicate with her, her sister, and that she also had not

22   turned up at her work.

23   Q    Okay.  And after you spoke to Felix and Bereliz, what

24   happened next?

25   A    After that, I believe that I picked up Miranda, or I ate,

1    and then after that, I went to the home.

2    Q    And when do you next see Felix?

3    A    When I arrived at my house in the afternoon.

4    Q    Approximately, what time?

5    A    It could have been 3:00 or 4:00 in the afternoon.

6    Q    Okay.  And what happened at that time?

7    A    When I arrived at home, he was already there, and I

8    confronted him.  I asked him what was happening, whether he had

9    seen her.  And he said that he hadn't; that he never got to see

10   her, and he continued pleading with me to forgive him and said

11   that he was never going again to do that; that he was never

12   again going to be with another woman.  The same.

13   Q    And what did he say about what he had done that morning?

14   A    He told me that he had left the house late, and that's why

15   he had gone to training late.  And that was the reason why he

16   couldn't see her so that she would show him the test; and that

17   he didn't talk to her; that he didn't see her.  And that's the

18   only thing he told me.

19   Q    And what did you say to that?

20   A    I asked him if he was sure if he had seen her, if he had

21   said something to her that had made her feel bad, and if she

22   could have done something; if she was with a friend; if he knew

23   of a friend; if she had called; what did she do.  And he said

24   nothing.

25   Q    And what time had he left that morning?

```
 1   A    The same time as usual:  5:00 or 5:30.

 2   Q    And on Thursday night, where did -- I mean, Thursday to

 3   Friday, where did Mr. Verdejo sleep?

 4   A    I do not know.

 5   Q    Okay.  At what time did he leave your house?

 6   A    At around 7:00 or 8:00 in the evening.

 7   Q    And why did he leave?

 8   A    Because he received a call from the officers from the

 9   police headquarters telling him that he had to go the next day

10   early for an interview, and he went to talk to his lawyers.

11   Q    And after he left to meet with his lawyer, what happened

12   in terms of your house and your person?

13   A    When he left, I stayed at home with Miranda, and we were

14   just there waiting to see what was happening.

15   Q    And what happened on Friday, April 30th, 2021?

16   A    On Friday, 30th of April, he came to my house early, at

17   around 7:00 or 8:00, to pick up some clothes to go to his

18   interview at the police headquarters.

19   Q    And what do you do on April 30th?

20   A    I didn't do anything.  Just stayed home.

21   Q    Why didn't you go to work?

22   A    Because the scandal had broken out the day before in

23   social media, and since the morning, it was in the news and all

24   that.

25   Q    Did you have any conversations with Mr. Verdejo on April
```

1    30th?

2    A    Yes.

3    Q    What did he tell you?  What did he tell you?

4    A    Nothing.  He continued pleading.  He said that he wasn't

5    going to do it again.  He asked me to believe him, to forgive

6    him.  He kept trying to approach me to speak to me closely.

7    And I told him not to get close to me, to leave, and he did.

8    He left.

9    Q    And what happened on May 1st, 2021?  That was a Saturday.

10   A    With me?

11   Q    Yes.

12   A    I continued at home.

13   Q    Okay.  Did you receive a visit from the police the night

14   of May 1st to May 2nd?

15             MR. GONZALEZ-DELGADO:  Objection, leading, Your

16   Honor.

17             THE COURT:  Overruled.

18             MS. COLLAZO-ORTIZ:  Police.  I said police.

19             THE WITNESS:  No.

20   BY MS. COLLAZO-ORTIZ:

21   Q    And did Mr. Verdejo have any firearms?

22             THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat

23   that?

24   BY MS. COLLAZO-ORTIZ:

25   Q    Did Mr. Verdejo own any firearms?

```
 1    A    Yes.

 2    Q    What happened to those firearms?

 3    A    The police took them away.

 4    Q    What happened on Sunday, May 2nd, 2021?

 5    A    I stayed at home.  Are you asking about me?

 6    Q    Yes.

 7    A    I stayed at my house.

 8    Q    And did you speak to Mr. Verdejo on Sunday, May 2nd, 2021?

 9    A    Yes.

10    Q    How did you speak to him?

11    A    Through his mother.

12    Q    Okay.  Can you explain that?

13    A    His mother called me in a three-line call, and he asked me

14    to forgive him and to forgive him for leaving me alone with

15    Miranda, and that I didn't deserve that.  And he said that he

16    was going to hand himself in.

17              And I said, Why are you handing yourself in, if he

18    said that he hadn't done anything.  And he was crying, and he

19    was asking me to forgive him and to forgive him for leaving me

20    by myself with Miranda.

21    Q    What did he tell you about the charges against him?

22    A    He told me that they had charged him with

23    drug-trafficking.

24    Q    Have you spoken to Mr. Verdejo since May 2nd of 2021?

25    A    Yes.
```

1    Q    Can you describe your communications with him back in May

2    of 2021?

3    A    He was calling all the time from the wall to talk to his

4    daughter.

5    Q    And what did he say about your relationship?

6    A    He continued asking me to forgive him; that I did not

7    deserve that, the same as always.

8    Q    Okay.  I'm going to turn your attention now -- to clarify,

9    what do you mean that he was calling you from the wall?

10    A    From the jail phone.

11    Q    Okay.  And turning your attention now to April 2nd of

12    2021.  Do you remember what you did on Holy Week 2021?

13              MR. GONZALEZ-DELGADO:  Objection, Your Honor, 401.

14              THE COURT:  Sidebar.

15        (Sidebar conference commenced.)

16              THE COURT:  Ms. Collazo, Holy Week?

17              MS. COLLAZO-ORTIZ:  Counsel Gottfried can explain

18    further, Your Honor, but as the Court knows, in this case, we

19    are submitting location data information for a phone that is

20    not registered to -- in this case, we're submitting location

21    data evidence for a phone that is not Mr. Verdejo's.  As part

22    of that analysis, the location of his registered phone and this

23    prepaid phone were compared over the course of all of the month

24    of April.

25              And one of those points of comparisons include April

1    2nd, Holy Week of 2021.  And so this question goes to where he

2    was on April 2nd, 2021, which then matches to the locations of

3    both his prepaid phone and his registered cell phone.  That's

4    the good-faith basis of the question.

5              MR. GONZALEZ-DELGADO:  Your Honor, that would be

6    404(b), and I don't remember receiving --

7              THE COURT:  That would be what?

8              MR. GONZALEZ-DELGADO:  404(b), and I don't remember

9    receiving that.

10             MS. COLLAZO-ORTIZ:  It doesn't go anything to

11   character.  It's nothing about 404(b).  It's just where he was

12   on a particular day and how that relates to the location data

13   we can introduce.

14             THE COURT:  That's not 404(b).

15             MR. GONZALEZ-DELGADO:  It could also be 403 because

16   it's confusing to the jury.

17             THE COURT:  No.

18             MR. GONZALEZ-DELGADO:  Your Honor, the phone that

19   they're trying to present as belonging to Mr. Verdejo, with all

20   of the witnesses that have already testified about that, none

21   of those witnesses can say that it belongs to Mr. Verdejo.  All

22   they have said is that there is a phone with -- that they have

23   given the number.

24             And they continue to say that the messages were

25   presented by Mr. Verdejo, without any reliability as to how

1    they got that information or who provided, because nobody has

2    said that that phone is actually Mr. Verdejo's.  Unless this

3    witness has that information, there is no way, there is no way

4    that that phone can be linked to this case, other than it was

5    in the same area.

6            And in the CAST report that they provide, in the CAST

7    report that they provide, there is issues regarding the way

8    that these triangulations of the phones are being met or how

9    they receive or how they obtain this information.  Because all

10   that the CAST, which I believe is coming soon, all that the

11   CAST cell phone location does is say that, in an area, which

12   can be from three miles to 20 miles wide, there was a cellular

13   phone that pinged to a tower, and that's not even a guarantee

14   that it's that tower because --

15           THE COURT:  I know.

16           MR. GONZALEZ-DELGADO:  You've heard this before, the

17   arguments before.  So unless they have evidence that this is

18   actually Mr. Verdejo's phone, this is completely irrelevant,

19   Your Honor.

20           MS. COLLAZO-ORTIZ:  Your Honor, we are setting the

21   foundation to present that evidence, and this is one of the

22   facts that we are using to set the foundation to later

23   introduce that evidence.  We're not going to go into what they

24   were doing, just where they were on that day.

25           THE COURT:  And what happened to that phone after

1    Holy Week?

2           MS. COLLAZO-ORTIZ:  He continued using it until the

3    day of the murder, when he disposed of it.  And that will be

4    introduced through the testimony of the CAST expert, Your

5    Honor.

6           MR. GONZALEZ-DELGADO:  But, Your Honor, the problem

7    is the link.  How do they link that phone to Mr. Verdejo, other

8    than it was in the same cellular phone area?

9           THE COURT:  I've heard that argument before.  I think

10   that's grind for cross-examination.  I understand the argument,

11   but I think the government has laid out sufficient basis to ask

12   what it is asking this witness to respond.

13          MR. GONZALEZ-DELGADO:  Okay, Your Honor.

14          THE COURT:  So objection overruled.

15      (Sidebar conference concluded.)

16          MS. COLLAZO-ORTIZ:  Your Honor, we checked with the

17   court reporter, and there was no answer provided.

18   BY MS. COLLAZO-ORTIZ:

19   Q    So I will ask again, Ms. Santiago:  Turning your attention

20   to Holy Week of 2021, specifically April 2nd, what did you do

21   in April 2nd of 2021?

22   A    What day was that?

23   Q    That was Good Friday 2021.

24   A    Usually, we always go to Cabo Rojo, so we're with family

25   -- or not with family, with my father's family in Cabo Rojo.

```
 1   And there is a house that we stay at, a house that we usually
 2   rent, that has a pool and stuff like that.
 3   Q    And you said "usually."  Is that what you did on Good
 4   Friday of 2021?  Specifically, April 2nd?
 5   A    Yes.
 6            MS. COLLAZO-ORTIZ:  If I may publish Exhibit 59 for a
 7   second, Your Honor?
 8            THE COURT:  Yes.
 9            MR. COLLAZO-ORTIZ:  If we can zoom-in at the phones
10   on top.
11   BY MS. COLLAZO-ORTIZ:
12   Q    Ms. Santiago, do you recognize the phone numbers at the
13   top of Exhibit 59?
14   A    Yes.
15   Q    Who do those phone numbers belong to?
16   A    The one at the top is my father's, and the one below is
17   Felix's.
18   Q    Can you please read your father's phone from Exhibit 59?
19   A    (787)529-5491.
20   Q    And Felix's phone?
21   A    (787)963-3693.
22   Q    Ms. Santiago, how would you describe your father's
23   relationship with Felix?
24   A    The relationship was cordial.  Whenever they saw each
25   other was when the whole family met.  That's it.
```

```
1    Q    And how would you describe your father's relationship to
2    Keishla and her family?
3    A    It was also cordial because we all knew each other from
4    back at the Manuel A. Perez Housing Project.  And I practically
5    stayed at Keila's house, and we had a relationship that was,
6    literally, when we were girls.  And that's the relationship
7    that we had.
8    Q    And prior to April 29th, 2021, had you had any
9    conversations with your father about your relationship?
10   A    No.
11   Q    How involved was your father in your relationship with
12   Felix?
13            MR. GONZALEZ-DELGADO:  Objection, Your Honor, 401,
14   and it would be hearsay, if he says anything.
15            THE COURT:  Overruled.
16            THE WITNESS:  Could you please repeat the question?
17   BY MS. COLLAZO-ORTIZ:
18   Q    How involved was your father in your relationship with
19   Felix?
20   A    My father was not -- he had no, no say in my relationship
21   with Felix because he always allowed me to make my own
22   decisions.
23   Q    Ms. Santiago, how many people do you know from Llorens
24   Torres Public Housing Project?
25            MR. GONZALEZ-DELGADO:  Objection, Your Honor, 401.
```

```
 1                    THE COURT:  Sidebar.

 2          (Sidebar conference commenced.)

 3                    THE COURT:  Okay.  Why is this relevant?

 4          MS. COLLAZO-ORTIZ:  Your Honor, this is our last line

 5   of questioning.  We're only going into the connection between

 6   Felix and Luis Llorens Torres, which I proffer to the Court is

 7   where he would see the codefendant, Mr. Luis Cadiz, and his

 8   brother, Mr. Ricardo Cadiz.

 9                    THE COURT:  Okay.  But the question had to do with

10   the witness's knowledge of people from the public housing

11   project.

12          MS. COLLAZO-ORTIZ:  I was laying the foundation, Your

13   Honor, but I can be more specific.

14                    THE COURT:  Please do.

15          MS. COLLAZO-ORTIZ:  Okay.  I will, Your Honor.

16                    THE COURT:  To me.

17          MS. COLLAZO-ORTIZ:  I'm going to next ask her how

18   many of Verdejo's friends from Llorens Torres did she know.

19                    THE COURT:  And how would she know that?

20          MS. COLLAZO-ORTIZ:  Well, if she doesn't know, she

21   could say:  I don't know any.  But we have a good-faith basis

22   that she had met at least one of his friends from Llorens

23   Torres, which is Mr. Ricardo Cadiz.  I mean, I can ask being

24   leading --

25                    THE COURT:  No, no leading questions.
```

1          MS. COLLAZO-ORTIZ:  That's what I'm trying to avoid,

2     being leading.  That's why I'm asking:  How many of Verdejo's

3     friends from Llorens Torres did you know.

4          MR. GOTTFRIED:  Your Honor, if I can add?  Defense

5     counsel, during a sidebar, initially, asked us to disclose

6     Miguel's conversations to the Court, our interview.  Then when

7     Ms. Collazo asked this witness about Miguel, they objected

8     under 401, claiming that was irrelevant.

9          There have been rumors and aspersions cast upon

10    Miguel, her father, as well upon her, at various points,

11    claiming they were somehow involved with the murder of Keishla.

12    And I think that we have -- we would respectfully request some

13    liberty in order to debunk what we see as those conspiracy

14    theories, claiming that Miguel or his daughter were somehow

15    involved in it.

16          To the extent that they're going to argue that

17    Miguel, her own father, was involved with it, presume the

18    information would have come through her.  And so her knowledge

19    of Llorens Torres, where the codefendant is from and where the

20    evidence will indicate a good part of this plan was hatched,

21    would be relevant to the case and to our ability to counter

22    their argument that either Eliz's father, Eliz, or someone

23    else, was the real culprit in this case.

24          THE COURT:  Okay.  The 401 threshold has been

25    satisfied, so objection overruled.

```
1              MS. CINTRON-COLON:  Your Honor, if I may just add
2      something really quick.  If Sister Counsel is going to go into
3      the question of how many Felix's friends you know from Llorens,
4      there is no foundation as to Llorens or Felix's friends at this
5      point.  So that, again, would still be an objection that there
6      has been no foundation laid as to the friends or Llorens or
7      Felix's connection with the housing project.
8              THE COURT:  Well, she will have to establish that.
9              MS. COLLAZO-ORTIZ:  That's why I was asking how many
10     people she knew, to kind of set the foundation to get to how
11     many of those were Mr. Felix Verdejo's friends.  So, at some
12     point, I have to direct her to Llorens somehow.  That's why I
13     was being broad in my questions --
14             MR. GONZALEZ-DELGADO:  Lay the foundation.
15             MS. COLLAZO-ORTIZ:  -- as to not to be leading.
16             THE COURT:  Okay.  I want to avoid another sidebar
17     with the issue of foundation.  How would you establish that she
18     knows that?
19             MS. COLLAZO-ORTIZ:  Because she has, in her prior
20     interviews, indicated that she was aware of one of Mr.
21     Verdejo's friends, Mr. Ricardo Cadiz, and Mr. --
22             THE COURT:  How does she know that?
23             MS. COLLAZO-ORTIZ:  Because she met them.  She was
24     with them.
25             THE COURT:  That would be sufficient foundation.
```

1          (Sidebar conference concluded.)

2     BY MS. COLLAZO-ORTIZ:

3     Q    Ms. Santiago, have you met any of Mr. Felix Verdejo's

4     friends from Llorens Torres Public Housing?

5     A    Yes.

6     Q    How many of them?

7     A    One.

8     Q    And what is his name?

9     A    Rabbit.

10    Q    Is that a nickname?

11    A    I believe so.

12    Q    And is that Mr. Ricardo Cadiz?

13         MR. GONZALEZ-DELGADO:  Objection, Your Honor,

14    leading.

15         THE COURT:  I will allow it.

16         THE WITNESS:  Yes.

17    BY MS. COLLAZO-ORTIZ:

18    Q    How did you meet him?

19    A    Through Felix.

20    Q    Where did you meet him?

21    A    Every time there was an event where Felix lived or if we

22    were going to do something, he was there as part of Felix's

23    friends.

24    Q    And how long ago would you say you met him?

25    A    I don't know exactly how long ago.

1    Q    Okay.  And how many of Mr. Ricardo Cadiz's family members

2    did you meet?

3                MR. GONZALEZ-DELGADO:  Objection, leading, Your

4    Honor.

5                THE COURT:  Overruled.

6                THE WITNESS:  I only know him.

7                MS. COLLAZO-ORTIZ:  We have no further questions,

8    Your Honor.

9                THE COURT:  Okay.

10                MS. CINTRON-COLON:  May I have just one minute, Your

11    Honor?

12                THE COURT:  Yes.

13                MS. CINTRON-COLON:  Thank you.

14                May it please the Court, Your Honor?

15                THE COURT:  Go ahead.

16                MS. CINTRON-COLON:  Thank you.

17                          CROSS-EXAMINATION

18    BY MS. CINTRON-COLON:

19    Q    Ms. Santiago, I'm going to ask you a couple of questions.

20    Most of them are simple and can be answered with a yes or no.

21                Okay?  Do you understand?

22    A    I do.

23    Q    Ms. Santiago, you were raised in Manuel A. Perez Public

24    Housing Project, correct?

25    A    Yes.

```
1    Q    And this is where you met Mr. Felix Verdejo, correct?
2    A    Yes.
3    Q    And he was raised in Las Gladiolas Public Housing Project,
4    right?
5    A    Yes.
6    Q    Ms. Santiago, your father is also from Manuel A. Perez
7    Housing Project, correct?
8    A    Yes.
9    Q    And, Ms. Santiago, you previously testified that during
10   April of 2021, you were residing in an apartment building or a
11   complex called "San Jose," correct?
12   A    Yes.
13   Q    And this condominium is right next to the Manuel A. Perez
14   Housing Project, right?
15   A    Yes.
16   Q    And this is the San Jose Condominium, and the Manuel A.
17   Perez Housing Project is about five minutes away from the
18   Teodoro Moscoso Bridge, correct?
19   A    Yes.
20   Q    And you previously had stated that you own an eyelash
21   studio, and that is in Carolina, correct?
22   A    Yes.
23   Q    So you would routinely take the Teodoro Moscoso Bridge to
24   reach your business; is that right?
25   A    Not routinely, but if I'm late, yes, I can take it.
```

```
1    Q    And are you late frequently?

2              THE INTERPRETER:  Can you please repeat?

3    BY MS. CINTRON-COLON:

4    Q    Are you late frequently?

5    A    No.

6    Q    Ms. Santiago, you also stated previously that on April

7    29th of 2021, you were at work, right?

8              Do you remember that?

9    A    Yes.

10   Q    That you were attending to a client, correct?

11   A    Yes.

12   Q    But on April 28th, the day before, you had cancelled all

13   of your appointments for April 29th; is that correct?

14   A    No.

15   Q    Ms. Santiago, on April 28th of 2021, did you publish in

16   social media that all of your appointments for April 29th were

17   cancelled?

18   A    No.  I posted that on the 29th, in the afternoon, or early

19   on the 30th.

20   Q    Ms. Santiago, and did you have a phone number or a

21   telephone in your business by April of 2021?

22   A    My phone?

23   Q    A business number.

24   A    Yes.

25   Q    And did you --
```

```
 1              THE COURT:  What's the question?  What's the answer?
 2              MS. CINTRON-COLON:  The question was if she has a
 3    business number, and she said -- she asked me if it was hers.
 4    I asked if it was a business, and she said yes.
 5              THE COURT:  Please go through that sequence again for
 6    clarity.
 7              MS. CINTRON-COLON:  Yes, Your Honor.  Of course.
 8    BY MS. CINTRON-COLON:
 9    Q    Ms. Santiago, do you have a phone number exclusively for
10    your business?
11    A    Yes.
12    Q    And this was -- this is also true for April of 2021?
13    A    Yes.
14    Q    And during the week of April -- beginning on April 26th of
15    2021, at some point, you changed that phone number, right?
16    A    No.
17    Q    Have you ever changed your business's phone number?
18    A    Yes.
19    Q    When was that?
20    A    I changed it maybe two or three months after what
21    happened.
22    Q    And we're talking about 2021?
23    A    Yes.
24    Q    Ms. Santiago, let's go back a little bit and ask you --
25    what is the name of the client that you were attending on April
```

 1    29th of 2021?

 2    A    I can only tend to one at a time, so at that time, I was

 3    tending to Tanya.

 4    Q    Do you know Tanya's last name?

 5    A    No.

 6    Q    Is she a frequent client?

 7    A    Yes.

 8    Q    Ms. Santiago, going a little bit forward to May of -- I

 9    mean backwards, to May of 2021, you went to Attorney Edwin

10    Prado's office, did you not?

11            THE INTERPRETER:  Will you repeat the question?

12            MS. CINTRON-COLON:  Yes, sir.

13    BY MS. CINTRON-COLON:

14    Q    During the beginning of May 2021, did you go to Attorney

15    Edwin Prado's office?

16    A    Yes.

17    Q    And you went with your father, correct?

18    A    Yes.

19    Q    And your father's name is Miguel Santiago-Laiz, correct?

20    A    Yes.

21    Q    And, Ms. Santiago, when you were leaving the office, you

22    ran into Ricardo Cadiz at Attorney Prado's office that day,

23    correct?

24    A    I believe so.

25    Q    Was Ricardo Cadiz in the same meeting with you and your

```
 1    father, along with Attorney Prado?

 2    A    No.

 3    Q    Ms. Santiago, was Ricardo Cadiz accompanied by his

 4    brother?

 5    A    No.

 6    Q    He was by himself?

 7    A    Yes.

 8    Q    Ms. Santiago, you said that you've been -- that you were

 9    in a relationship with Felix since 2012, correct?

10              THE INTERPRETER:  '12 you said?

11              MS. CINTRON-COLON:  (Nods head.)

12              THE WITNESS:  Yes.

13    BY MS. CINTRON-COLON:

14    Q    So that was a relationship for about 11 years?

15    A    Close to 10.

16    Q    And during that period, aside from his infidelities, you

17    knew him pretty well?

18    A    Yes.

19    Q    And you know that he's scared of needles, correct?

20              THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat

21    that?

22    BY MS. CINTRON-COLON:

23    Q    You know that he's scared of needles, correct?

24    A    Yes.

25    Q    In fact, he can't even see needles because he's scared of
```

1    them?

2    A    Yes.

3    Q    And were you aware of his professional career

4    circumstances?

5    A    Yes.

6    Q    So did you know that he fired his physical trainer because

7    he wanted Felix to take numerous injections prior to his

8    fights?

9    A    I don't know.

10    Q    But the truth is that, and please correct me, let me

11    clarify, that Felix had some sort of phobia with needles,

12    right?  That's what you said?

13    A    Yes.

14    Q    And, in fact, with his team and some of his friends, they

15    made fun of him for this, right?

16    A    Yes.

17    Q    And they even recorded him anytime that he was supposed to

18    take -- to go to a laboratory and get some blood drawn for

19    testing, right?

20    A    Yes.

21    Q    And have you seen any of those videos?

22    A    No.

23    Q    Do you know if these videos are posted on social media?

24    A    No.

25    Q    But you knew that they made fun of him, and they recorded

```
1    him because he was scared of the needles and he made a whole
2    spectacle, correct?
3    A    Yes.
4    Q    Now, Ms. Santiago, earlier, going back a little in time,
5    earlier you stated that on April 30th of 2021, you talked to
6    Mr. Verdejo; is that right?
7    A    Yes.
8    Q    Did you text with Mr. Verdejo on that day?
9    A    No.
10   Q    And did you send any WhatsApp messages with him that day?
11   A    No.
12   Q    Ms. Santiago, you had also testified earlier that you had
13   caught some text messages in Mr. Verdejo's phone with other
14   women, correct?
15   A    Yes.
16   Q    And these messages that you found were not only on April
17   of 2021, correct?
18   A    I do not understand the question.
19   Q    You found text messages between Mr. Verdejo and other
20   women in other dates that were not only April of 2021, right?
21   A    Yes.
22   Q    In fact, since 2013, you caught Mr. Verdejo being
23   unfaithful to you?
24   A    I believe so.
25   Q    So since almost the beginning of your relationship, you've
```

1    known that Mr. Verdejo has been unfaithful to you?

2    A    Yes.

3    Q    And, in fact, when you were interviewed by the Puerto Rico

4    Police in April 30th of 2021, you even stated to the police

5    that you were just tired of his infidelities, correct?

6    A    Yes.

7    Q    And you also told the police that these infidelities were

8    with different women, not just Keishla, right?

9    A    Yes.

10   Q    But that he always ended up with Keishla somehow?

11   A    Yes.

12   Q    So you knew that they were in a relationship on and off

13   for many years before April of 2021?

14   A    Yes.

15   Q    And were you mad about that?

16   A    I was tired.

17   Q    And before you were tired, you were mad about this?

18   A    Yes.

19   Q    And in that same interview with police, you also told them

20   that he, that Mr. Verdejo, has never been violent with you,

21   right?

22   A    Yes.

23   Q    In the 10 years of your relationship, he had never been

24   violent with you?

25   A    No.

```
 1    Q    And he has not been controlling in precluding you from
 2    doing things?
 3    A    No.
 4    Q    He was just, for lack of a better word in translation, a
 5    man-whore?
 6    A    Yes.
 7              MS. CINTRON-COLON:  The correct translation for that
 8    would be "womanizer?"
 9              THE INTERPRETER:  "Womanizer."
10              MS. CINTRON-COLON:  Apologies.
11    BY MS. CINTRON-COLON:
12    Q    So you told authorities that he was not aggressive.  He
13    was just a womanizer?
14              THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat
15    the question?
16    BY MS. CINTRON-COLON:
17    Q    So you told police that he was not aggressive.  He was
18    just a womanizer?
19    A    Yes.
20    Q    And you also told police that he was incapable of doing
21    anything bad to Keishla?
22    A    Yes.
23    Q    Now, Ms. Santiago, regarding all these text messages that
24    you caught between Mr. Verdejo and other women, we can also
25    point to dates specifically, for example, with a woman named
```

1    Sokia, in 2016, correct?

2    A    Yes.

3    Q    And this woman named Sokia, she's also from Manuel A.

4    Perez, right?

5    A    Yes.

6    Q    And that's how you know her?

7    A    Yes.

8    Q    So when you saw text messages between Mr. Verdejo and her,

9    you knew who this woman was?

10   A    Yes.

11   Q    And you confronted her?

12   A    I did not confront her.

13   Q    Did you call her?

14   A    Yes.

15   Q    From Felix's phone?

16   A    Yes.

17   Q    And you asked her what was going on with her and Felix?

18   A    Yes.

19   Q    And this wasn't a calm discussion.  This was an agitated

20   discussion between you two?

21   A    You could say so.

22   Q    And fast-forward one year.  You also caught Mr. Felix

23   Verdejo with a woman named Nelka in 2017, correct?

24   A    Yes.

25   Q    And the truth is that you even saw them together having

1    lunch on one occasion, correct?

2    A    It was in the evening, yes.

3    Q    And you saw them because you were calling Felix on the

4    phone; he didn't pick up, so you went to where you thought he

5    was?

6    A    Yes.

7    Q    And you saw the two leaving the parking lot in their own

8    cars, and you followed them?

9        THE INTERPRETER:  I'm sorry, Counsel?

10   BY MS. CINTRON-COLON:

11   Q    And you saw the two leaving in their cars from the parking

12   lot, and you followed them?

13   A    Yes.

14   Q    And, at one point, this woman stops her car, and you

15   stopped right behind her, correct?

16   A    Yes.

17   Q    And she got out of the car, and you got out of your car,

18   right?

19   A    Yes.

20   Q    And the two of you engaged in a physical fight?

21   A    You could say so.

22   Q    In fact, she grabbed you by the hair and put you to the

23   floor, right?

24   A    Yes.

25   Q    And that even left a scar on your left knee, right?

 1    A    Yes.

 2    Q    And after that happened -- I'm sorry.  Let me rephrase.

 3         While this was happening, Mr. Verdejo came back and

 4    separated the two of you?

 5    A    No.

 6    Q    Was he there when this fight was going on?

 7    A    No.

 8    Q    After your fight ended, did you tell Mr. Verdejo what had

 9    happened?

10    A    Yes.

11    Q    Did he seem upset?

12    A    No.

13    Q    Did you ever see this woman again?

14    A    No.

15    Q    Did you tell Mr. Verdejo that if you saw him with her

16    again, that you were definitely going to leave him?

17    A    Yes.

18    Q    Did you see any other text messages between him and this

19    woman after that fight?

20    A    Yes.

21    Q    And did you leave Mr. Verdejo after seeing those messages

22    again?

23    A    No.

24    Q    Now, Ms. Santiago, you also testified a little bit earlier

25    that on --

```
 1                    MS. CINTRON-COLON:  Excuse me for a second, Your
 2      Honor.
 3      BY MS. CINTRON-COLON:
 4      Q     -- that on April of 2021, you asked Mr. Verdejo to leave
 5      your house, correct?
 6      A     Yes.
 7      Q     But that you allowed him to stay at your house?
 8      A     Yes.
 9      Q     And you said yesterday that it was because he had nowhere
10      else to go.
11                    Do you remember that?
12      A     Yes.
13      Q     But Mr. Verdejo's mother lives in Puerto Rico, correct?
14      A     Yes.
15      Q     And his grandfather as well?
16      A     Yes.
17      Q     And he has a close relationship with his mother?
18      A     Yes.
19      Q     And with his grandfather as well?
20      A     Yes.
21      Q     So do you think he could have stayed with them after you
22      kicked him out of your house?
23      A     Yes.
24      Q     And, Ms. Santiago, you said that later on that same week,
25      you again asked him to leave your house, right?
```

```
 1    A    Yes.

 2    Q    And you said:  "And he left."

 3    A    He left on Thursday.

 4    Q    So after you asked him to, Thursday, to leave your house,

 5   he left your house?

 6    A    Yes.

 7    Q    He did not pose any physical resistance or restraint from

 8   leaving?

 9    A    No.

10    Q    And he was not violent nor aggressive towards you before

11   leaving?

12    A    No.

13    Q    And you were still living in that house with your

14   daughter, Miranda, that you share with Mr. Verdejo, right?

15    A    After he left or now?

16    Q    At that date, on April of 2021, when he left, Miranda was

17   living with you in that house?

18    A    Yes.

19    Q    So when he left, he left you and Miranda in that house?

20    A    Yes.

21    Q    And he's a very present father for Miranda, right?

22    A    Yes.

23    Q    And, in fact, you recognize that the two of you are good

24   parents to Miranda, right?

25    A    Yes.
```

```
 1    Q    Ms. Santiago, during the early months of 2021, how many
 2    car seats were in the house in total for Miranda?
 3    A    I believe, two.
 4    Q    Was there, at some point, just one car seat for Miranda?
 5    A    Yes.
 6    Q    And on many occasions, that car seat was in Mr. Verdejo's
 7    Durango, right?
 8    A    Yes.
 9    Q    And by April of 2021, you already had the two car seats,
10    right?
11    A    I believe so.
12    Q    And one of them was in your car, and the other in Mr.
13    Verdejo's Durango, right?
14    A    Yes.
15    Q    And the car seat in Mr. "Durango's" car was placed on the
16    backseat, on the back part of the car, to the right, behind the
17    passenger seat, right?
18    A    Yes.
19    Q    Ms. Santiago, you testified earlier today that on May 2nd
20    of 2021, you talked to Mr. Verdejo through his mom, right?
21    A    Felix's mom, yes.
22    Q    And she said that he was going to turn himself in to the
23    police in that conversation, right?
24    A    Yes.
25    Q    To which you responded:  Why, if he hadn't done anything.
```

1    Correct?

2    A    Yes.

3    Q    But she also told you that it was because he had found out

4    that he had an arrest warrant issued?

5           THE INTERPRETER:  Counsel, can you repeat that?

6           MS. CINTRON-COLON:  Yes.

7    BY MS. CINTRON-COLON:

8    Q    But she had also told you that it was because there was an

9    arrest warrant issued against him?

10   A    I do not recall.  I don't know.

11   Q    To Counsel's questions earlier, you testified that there

12   were drug charges, allegedly, on that date, right?

13   A    Yes.

14   Q    But to the best of your knowledge, Mr. Verdejo is not

15   charged with any drug charges, correct?

16   A    No.

17   Q    You also testified that, usually, for Holy Week, you went

18   with your family to Cabo Rojo, right?

19   A    Yes.

20   Q    And part of your family members who usually go with you to

21   Cabo Rojo include your father, right?

22   A    Yes.

23   Q    And you have a really close relationship with your father,

24   right?

25   A    Yes.

1    Q    You're his only child?

2    A    No.

3    Q    You have siblings -- you have half-siblings, right?

4    A    Yes.

5    Q    You said you were really close with your father.  Would

6    you say you trust him fully?

7    A    Yes.

8    Q    And you also said that he would not be involved in your

9    and Felix's relationship, right?

10   A    Yes.

11   Q    But when you need advice on something, you ask your father

12   for advice, right?

13   A    Yes.

14   Q    You said that, answering to Counsel's questions, that the

15   friend, Felix's friend that you know from Llorens Torres, is

16   nicknamed Rabbit, right?

17   A    Yes.

18   Q    And you know that this person also knows your father,

19   right?

20   A    No.

21   Q    Do you not know, or they don't know each other?

22   A    They did not know each other before what happened.

23            MS. CINTRON-COLON:  Just a second, Your Honor,

24   please.

25   BY MS. CINTRON-COLON:

1    Q    Ms. Santiago, you also had stated that around January of

2    2021, Ms. Bereliz and Ms. Keishla went over to your apartment,

3    right?

4    A    Yes.

5    Q    And was Mr. Verdejo there on that moment?

6    A    Yes.

7    Q    And this was a discussion, a verbal discussion, between

8    the four of you, right?

9    A    Yes.

10   Q    And during this discussion, Mr. Verdejo was relatively

11   calm, right?

12   A    Yes.

13   Q    And the three of you were questioning him and arguing with

14   him about his infidelities and his multiple relationships with

15   the two of you, right?

16   A    Yes.

17   Q    Would you say that this was an agitated discussion?

18   A    No.

19   Q    Was everyone really calm during this discussion?

20   A    At times, you could say so.

21   Q    And in the other times, there was a lot of yelling during

22   the discussion?

23   A    Yes.

24   Q    But none of the yelling came from Mr. Verdejo, correct?

25   A    No.

1    Q    And I ask you, Ms. Santiago, is there a video-recording of

2    this discussion?

3    A    Yes.

4    Q    Have you seen this video?

5    A    Yes.

6    Q    Who are depicted in this video?

7    A    They depict Keishla, Bereliz, me, and maybe my cousins.  I

8    don't know if they appear on the video or they can be seen on

9    the video.

10   Q    What is your cousins' name?

11   A    Lonette and Joanette.

12   Q    And these cousins, they don't live with you, right?

13   A    No.

14   Q    Ms. Santiago, you said that Mr. Verdejo had a Dodge

15   Durango, a black Dodge Durango, right?

16   A    Yes.

17   Q    You also drove that Durango sometimes, right?

18   A    Yes.

19   Q    And that Durango has red interior, right, as you said

20   yesterday?

21          THE INTERPRETER:  I'm sorry, Counsel?

22   BY MS. CINTRON-COLON:

23   Q    The Durango has red interior, as you said yesterday?

24   A    Yes.

25   Q    And your car also has red interiors, correct?

1   A    Not back then.

2   Q    Ms. Santiago, you have been testifying that you have seen

3   numerous text messages between Mr. Verdejo and other women.  I

4   ask you if you ever used the phone application called

5   "WhatsWeb?"

6   A    No.

7   Q    Have you ever used any application to clone Mr. Verdejo's

8   phone?

9   A    Yes.

10  Q    What is the name of that app?

11  A    Maybe "ScanApp," "ScanApp," something like that.

12  Q    And the purpose of this app -- I'm sorry.  One of the

13  functions of this app is that you can have the -- multiple

14  WhatsApp accounts on one device at the same time, correct?

15  A    No.

16  Q    So this ScanApp that you used to clone Mr. Verdejo's phone

17  would allow you to read all of the WhatsApp conversations that

18  he had on his phone, correct?

19  A    Yes.

20  Q    And this app also lets you write messages as if it were

21  from Mr. Verdejo's WhatsApp?

22  A    I don't know.

23  Q    And I ask you, Ms. Santiago, you earlier said that you,

24  obviously, know Mr. Verdejo's family, right?

25  A    Yes.

1    Q    You know his sister, Yashira?

2    A    Yes.

3    Q    And, in fact, you told Yashira how to use this

4    application, the ScanApp?

5    A    Yes.

6    Q    And you told her that the purpose is to clone someone's

7    WhatsApp?

8    A    Yes.

9    Q    You also told her that you could use this to send messages

10   to other people as if it were the cloned person themselves?

11   A    No.

12   Q    Ms. Santiago, in order for you to use this app and to

13   clone the other person's phone, you need to unlock the other

14   person's phone first, correct?

15   A    Yes.

16   Q    So -- and you had Mr. Verdejo's password to his phone,

17   correct?

18   A    At times, yes.

19   Q    And that is why you were able to use the ScanApp to clone

20   his WhatsApp?

21   A    Yes.

22   Q    And I ask you, how many times did you clone his phone?

23   A    Two or three times.

24            MS. CINTRON-COLON:  May I have one second, Your

25   Honor?

```
 1    BY MS. CINTRON-COLON:
 2    Q    Ms. Santiago, yesterday you testified while you were
 3    reading text messages in Government's Exhibit Number 55, that
 4    you forwarded to Mr. Verdejo a phone registry with Keishla's
 5    name, under Keishla's name?  I'm sorry.
 6    A    Yes.
 7    Q    And you said that you did not know -- when you found the
 8    messages, you did not know who Felix was exchanging messages
 9    with because the name of the contact was not stored in his
10    phone, right?
11    A    Yes.
12    Q    And you also testified that you obtained that number, and
13    you sent it to a friend who works at a telephone company, who
14    provided you with the subscriber information for that phone
15    number, correct?
16    A    Yes.
17    Q    What is the name of that friend?
18    A    Katia.
19    Q    Do you know Katia's last name?
20    A    No.
21    Q    Do you know what company she works for, or worked for?
22    A    Yes.
23    Q    What company did she work for?
24    A    T-Mobile.
25    Q    And, Ms. Santiago, you really wanted to know who that
```

1    phone number belonged to because you were really mad about the

2    contents of the conversation, right?

3    A    Yes.

4    Q    And you wanted to know who it was to confront this person

5    about it?

6    A    You could say so.

7    Q    And, Ms. Santiago, I ask you:  Do you know that obtaining

8    subscriber information on a phone number that is not yours, or

9    you're not authorized for, is illegal?

10         MR. GOTTFRIED:  May we just approach briefly at

11   sidebar?

12         THE COURT:  Yes.

13    (Sidebar conference commenced.)

14         MR. GOTTFRIED:  Your Honor, that's an improper

15   question because it calls for a legal conclusion.  I would also

16   question the relevance and why she's asking the defendant --

17   asking the witness this question.

18         THE COURT:  "It is illegal."

19         MR. GONZALEZ-DELGADO:  Yes, it's illegal.  In the --

20         THE COURT:  Why is that relevant?

21         MR. GONZALEZ-DELGADO:  Because it's, it shows her

22   motive, her intent, how mad she was that she was willing to

23   break the law to find out information about Mr. Verdejo.  When

24   you sign a service contract with any company, telephone

25   company, like she did, she has a --

1              THE COURT:  Like everybody here does.

2              MR. GONZALEZ-DELGADO:  Everybody here had done.  It

3     says that it is illegal to search for information for an

4     account that is not yours.  That is, that is basic knowledge.

5              We're not asking her for a conclusion or a specific

6     law that she might have broken.  It's just that if she knows

7     that it is illegal to request information from an account that

8     is not hers.

9              MR. GOTTFRIED:  Your Honor, I actually don't know

10    that it's illegal.  She asked a friend at a phone company to

11    provide the user identification for a number.  Probably be --

12             MR. GONZALEZ-DELGADO:  And that's --

13             MR. GOTTFRIED:  No, because the assumption behind the

14    question that it's illegal, I don't think it's correct.  Maybe

15    that person at the phone company shouldn't have done that,

16    based on her contractual agreement with the company.  But that

17    she's violating some federal law for providing that

18    information, there is no basis for that.

19             MR. GONZALEZ-DELGADO:  We haven't asked that.

20             MR. GOTTFRIED:  You said:  It's illegal.  Do you know

21    that it's illegal to do that.

22             MS. CINTRON-COLON:  I understand I said:  If you know

23    if it is illegal -- I can check the transcript -- or not.  That

24    was my question, you know, if it was.

25             THE COURT:  You already have had her admit that she

1    was mad, and she wanted that information.  And she went to this

2    friend of hers.  I think you've made your point.  I'm going to

3    sustain the objection.  Stay away from:  You knew it was

4    illegal.

5            MR. GONZALEZ-DELGADO:  But, Your Honor, this is the

6    same thing that the government is doing.

7            THE COURT:  What?

8            MR. GONZALEZ-DELGADO:  They're saying that Mr.

9    Verdejo was so mad at the pregnancy of Ms. Keishla Rodriguez

10   that he was willing to do anything to get rid of that baby,

11   enough to kill her.  Here, we're asking the same question:

12           What was the limit of her anger of Mr. Verdejo's

13   infidelities that she was willing to go to ask a friend of hers

14   from a phone company to do something that might be illegal.

15   And I'm saying now "might," because we don't know if she knows,

16   or what her answer will be.

17           All we're asking her is, is does she know that this

18   is, if it is illegal to request information from a phone,

19   information from a phone and its user, that is not the person

20   who actually signed the contract.

21           THE COURT:  But that was not the question.

22           MS. CINTRON-COLON:  I believe I said "if it was."  If

23   it's not, I can check the transcript and rephrase it, because I

24   was going for "if it is."

25           THE COURT:  Do you know if it is illegal.  That's not

1    the same thing that you --

2             MS. CINTRON-COLON:  I apologize.  I thought that's

3    what I said, because that's my intention with my question, not:

4    Do you know it is.  Because I'm asking her if it is.

5             MR. GOTTFRIED:  Your Honor, we would ask for a

6    proffer as to what statute, why it's illegal.  I'm standing

7    here, and I do not know why it's illegal.  So what is the

8    statute?

9             MR. GONZALEZ-DELGADO:  If we might have five minutes,

10   I'll look it up.

11            THE COURT:  Go ahead.

12            MR. GONZALEZ-DELGADO:  Thank you.

13       (Sidebar conference concluded.)

14            THE COURT:  Ladies and gentlemen, let's take a 10,

15   15-minute break at this point.  Remember, do not talk about or

16   communicate with anybody about your impressions of the case or

17   the evidence in the case.  Do not view, read or hear reports,

18   comments or articles about the case.  Do not conduct any

19   research about the case, the matters in the case or the

20   individuals involved in the case.

21            I look forward to seeing you all in about 10 or 15

22   minutes.

23       (Whereupon the following proceedings were had in open court

24       without the presence of the jury.)

25            THE COURT:  Ma'am, we are going to be on a 10 or

```
 1    15-minute break.  You do not have to stay there.  You can walk

 2    around and so forth.

 3          But you should not talk about your testimony with

 4    anybody.  You should not review material related to this case,

 5    and you should not send out messages on social media about this

 6    case.

 7          Do you understand?

 8          THE WITNESS:  I do.

 9          THE COURT:  Okay.  We'll be back in the courtroom in

10    about 10 or 15 minutes.

11    (Whereupon a recess was taken at 10:49 a.m., until 11:09

12     a.m.)

13    (Whereupon the following proceedings were had in open court

14     without the presence of the jury.)

15    (Sidebar conference commenced.)

16          THE COURT:  So is it illegal, what the witness did?

17          MS. CINTRON-COLON:  Who do you want to hear from

18    first?

19          THE COURT:  You're the proponent.

20          MS. CINTRON-COLON:  Yes, sir.

21          So the FCC, the Consumer Guides, and the official

22    government page, in the Protecting Your Privacy Phone/Cable

23    Records states that -- hold on.  I had it right here.

24          The telephone company must maintain accurate records

25    regarding disclosure of customer information to third parties
```

1    with your approval.  That the companies need an online account

2    or an address of record, must keep those records; that they ask

3    for your permission, and to protect your confidentiality of the

4    customer information to third parties.

5            THE COURT:  That's the phone company.

6            MS. CINTRON-COLON:  Well, yes, Your Honor, but the

7    part of what had happened.  So I'm not saying what she did.  I

8    didn't ask her:  What you did was illegal.  I asked her if she

9    knew that obtaining phone records from a company, for a phone

10   number that you are not the owner or subscriber, if she knows

11   if that is illegal.  I did not ask:  Did you do something

12   illegal.

13           THE COURT:  I think that's the question you need to

14   ask.  Go ahead, ma'am.  I'm sorry.

15           MS. CINTRON-COLON:  I'm sorry.  I can keep reading

16   the next chapter.

17           THE COURT:  Okay.

18           MR. GOTTFRIED:  Your Honor, I think this is highly

19   misleading.  I can go into T-Mobile store today, and tell me:

20   Can you read me the number of Brother Counsel.  They shouldn't

21   do that under FCC regs, or whatever else.  I don't know if it's

22   criminal or administrative violation.  They shouldn't.

23           But if they do, or if they don't, FBI's not going to

24   swoop in and arrest me for asking that question.  That was kind

25   of the implication of it.  Simply by requesting that

1    information, or by obtaining that information from the phone

2    company, that the person is doing something wrong.

3           The privacy protections that we have in place that

4    apply to the phone companies, presumably, also to their

5    employees, but that a witness did anything illegal by asking

6    someone at the phone company, Can you check on this number, I

7    think that's highly misleading.

8           And then if she's asking, Did someone else break the

9    law by doing this, it's a legal opinion.  And I'm not even sure

10   if it's an administrative violation or a criminal violation.

11   So, again, we would ask that that question not be allowed.

12          THE COURT:  Yeah.  I'm going to sustain the

13   objection.

14          MS. CINTRON-COLON:  Okay.

15      (Sidebar conference concluded.)

16          THE COURT:  Other than that, any other item that we

17   need to touch on before going ahead with the jury?

18          MR. GOTTFRIED:  Just one quick thing.

19      (Sidebar conference commenced.)

20          MR. GOTTFRIED:  Just to, Sister Counsel had mentioned

21   yesterday certain videos' clips that she wanted to introduce,

22   and there was some back and forth about what those were and

23   whether or not we would object.  And we just agreed that she

24   would provide those.  We would review those, and let her know

25   if they were fine or not.

```
 1                    And so we understand we'll get those at noon, and
 2       review those.  And if there is an objection, we'll try to work
 3       it out informally.  If there is no objection, then we'll
 4       proceed.  We just wanted to let the Court know about that,
 5       since it was raised yesterday.
 6                    THE COURT:  Okay.  What time is it?
 7                    MS. CINTRON-COLON:  It's 11:13.
 8                    THE COURT:  11:13?
 9                    MS. CINTRON-COLON:  I'm almost done with this
10       witness.  I have around four or five questions.
11                    THE COURT:  You start your interaction with witnesses
12       saying:  I have a couple of questions.
13                    MS. CINTRON-COLON:  No, but I --
14                    THE COURT:  Right?
15                    MS. CINTRON-COLON:  I can proffer that I have, more
16       or less, not more than five questions, depending on her
17       answers.
18                    THE COURT:  I understand.
19                    Okay.  I do not know whether the government is going
20       to redirect, and then whether there is going to be recross.
21       I'm just trying to calculate time for the lunch break and your
22       next witness, whoever that might be.
23                    MR. GOTTFRIED:  Will be brief.
24                    THE COURT:  Brief?
25                    MR. GOTTFRIED:  Yes.  We're hoping to slide him in
```

1      before the break so --

2                    THE COURT:  Okay.  Thank you.

3                    MS. CINTRON-COLON:  Thank you.

4                    THE COURT:  Thank you all.

5          (Sidebar conference concluded.)

6                    THE COURT:  Let's bring the jury in.

7          (Whereupon the following proceedings were had in open court

8          in the presence of the jury.)

9                    THE COURT:  Welcome back to the courtroom.  Please

10     take a seat.

11                   Now, ladies and gentlemen, you will disregard the

12     last question that Counsel posed to the witness.

13                   Go ahead, ma'am.

14                   MS. CINTRON-COLON:  Thank you.

15     BY MS. CINTRON-COLON:

16     Q    Ms. Santiago, you previously had stated that you've always

17     been aware of Mr. Verdejo's infidelities.  In that sense,

18     you've always questioned him a lot about other women, right?

19     A    Yes.

20     Q    Even when he was already detained at MDC Guaynabo in

21     relation to this case, correct?

22     A    Could be.

23     Q    In fact, during some of the phone calls that you mentioned

24     earlier from the wall phone, you even questioned him if women

25     were visiting him in jail?

```
 1    A    I didn't question him.

 2    Q    Did you ask him if other women were visiting him in jail?

 3    A    No.

 4    Q    Ms. Santiago, are you aware that all of the phone calls

 5    that you receive from the wall phone at MDC Guaynabo are

 6    recorded?

 7    A    Yes.

 8    Q    Now let me ask you again:  Have you ever questioned Mr.

 9    Verdejo about if a woman is visiting him in jail?

10    A    I didn't question him.  I simply told him.

11    Q    What did you tell him?

12    A    Laughing, I said:  Wow, they told me that a girl already

13    went to visit you.  That.

14    Q    Did he respond to you about that woman that, supposedly,

15    was visiting him?

16    A    Yes.

17    Q    Did he tell you that it was his attorney who was visiting

18    him?

19    A    It could be.  I don't know.  I do not remember.

20    Q    Now, Ms. Santiago, I ask you:  Do you currently hold a

21    grudge against Mr. Verdejo for all of his infidelities?

22    A    It could be.

23    Q    Is that a yes?

24    A    Yes.

25    Q    And I ask you if you hold a grudge against all of the
```

```
1   women that you know he has been unfaithful with?

2   A    No.

3   Q    Would you be friends with all of the women he has been

4   unfaithful with you?

5   A    No.

6   Q    And, Ms. Santiago, as far as you know, aside from Ms.

7   Keishla, all these more than 10 women that Mr. Verdejo has

8   cheated on you with are alive and well?

9   A    Yes.

10              MS. CINTRON-COLON:  I have no more questions, Your

11  Honor.

12              MS. COLLAZO-ORTIZ:  May we redirect, Your Honor?

13              THE COURT:  Yes.

14                        REDIRECT EXAMINATION

15  BY MS. COLLAZO-ORTIZ:

16  Q    Good morning again, Ms. Santiago.

17              To Counsel's question, you spoke about going to an

18  attorney's office with your father?

19  A    Yes.

20  Q    And who was that attorney?

21  A    Prado.

22  Q    And why did you go there?

23  A    Because one of his employees was going to help me with

24  finding help from "Assistance to Women Victims," something like

25  that.
```

1    Q    And why were you seeking assistance from "Women Victims?"

2    A    Because I was afraid.

3    Q    What were you afraid of?

4    A    Of society.

5    Q    Why?

6    A    Because I was receiving multiple threats against me and

7    against Miranda.

8    Q    What kind of threats?

9    A    I wish the same thing would happen to Miranda; that the

10   one that should be dead should be me; that they wanted to kill

11   Miranda, those things.

12   Q    And Sister Counsel asked you about Felix and needles.  How

13   many times has he been vaccinated?

14            THE INTERPRETER:  I'm sorry, Counsel?

15   BY MS. COLLAZO-ORTIZ:

16   Q    How many times has he been vaccinated?

17            THE INTERPRETER:  She asked him about Felix and --

18            MS. COLLAZO-ORTIZ:  Needles.

19            THE WITNESS:  I don't know.

20   BY MS. COLLAZO-ORTIZ:

21   Q    And Sister Counsel asked you about the car seats.  Were

22   these car seats removable?

23   A    Yes.

24   Q    And Sister Counsel asked you about your conversation on

25   May 2nd with Felix and his mom?

1    A    Yes.

2    Q    Who told you that Felix was facing drug charges?

3    A    He did.

4    Q    And Sister Counsel asked you about the Holy Week trip to

5    Cabo Rojo.  What family members did you go with?

6              MS. CINTRON-COLON:  Objection, Your Honor, misquoting

7    the record.

8              THE COURT:  Overruled.

9              MS. CINTRON-COLON:  May we approach, Your Honor?

10              MR. GONZALEZ-DELGADO:  Your Honor, we didn't ask

11    anything about that April trip.

12              THE COURT:  Go ahead.  She did.

13              MR. GONZALEZ-DELGADO:  She did, but we didn't in

14    cross-examination.  That's outside the scope of the

15    cross-examination.

16              MS. COLLAZO-ORTIZ:  We can check the record, Your

17    Honor.

18              THE COURT:  Let's check the record, Your Honor.

19         (Record reviewed.)

20         (Sidebar conference commenced.)

21              THE COURT:  Okay.  We saw on the transcript what you

22    asked.

23              MS. CINTRON-COLON:  Well, Your Honor, my questioning

24    was very specific as to "usually."  The difference is that, in

25    the direct examination, she was asked, and she said "usually."

1    And then she was asked specifically as to 2021.

2                I did not go specifically as to 2021.  I went as to

3    that first question and that she had answered "usually."  It's

4    not specific as to that date.

5                So it's misquoting that she responded to me about

6    that week of Holy Week of April of 2021 because I did not ask

7    her about the week of April of 2021.  So that is why I am

8    saying that it's misquoting my question and her response

9    because I did not ask about that specific week, Your Honor.

10               MR. GONZALEZ-DELGADO:  Sister Counsel's question,

11   Your Honor, was -- Your Honor, it's just that I have to be

12   specific about what was asked.  Her question was:  Sister

13   Counsel asked you about the April 2nd, 2021, Holy Week

14   vacation.  And that was not what Attorney Cintron asked.

15               MS. COLLAZO-ORTIZ:  Your Honor, I believe by asking

16   about "usually," that is a general.  And I can ask about

17   specific instances.  I can rephrase.  I was trying to place the

18   witness in context of what she had been asked about, but all I

19   want to know is who went on this 2021 trip.  And that was, that

20   was addressed in cross, so I am allowed to address it on

21   redirect.

22               MS. CINTRON-COLON:  But, Your Honor, that week was

23   not addressed in cross.

24               MS. COLLAZO-ORTIZ:  Your Honor, if it's "usually,"

25   it's general, so I can be specific.

```
 1              MS. CINTRON-COLON:  There were two questions in
 2    direct, which were not separated or done in cross-examination.
 3    That is why I'm saying it's misquoting my cross-examination,
 4    Your Honor.  And I did not ask about that specific week.  That
 5    was not covered in cross.
 6              THE COURT:  Start with what she asked, and take it
 7    from there.
 8              MS. COLLAZO-ORTIZ:  Yes, Your Honor.  I'll rephrase.
 9              THE COURT:  Okay.
10         (Sidebar conference concluded.)
11    BY MS. COLLAZO-ORTIZ:
12    Q    Ms. Santiago, Counsel asked you if you usually went to
13    Cabo Rojo with your father, and I want to ask you specifically:
14    In 2021, who did you go to Cabo Rojo with for Holy Week?
15    A    Should I mention all of the members of my family that went
16    there?
17    Q    Sure.
18    A    My grandmother, my grandfather, my aunt, my uncle, my
19    cousins, their partners, my nieces and nephews, Miranda, Felix
20    and I.
21    Q    And why didn't you mention your father?
22    A    He did not go.
23    Q    And Sister Counsel asked you about Rabbit and whether he
24    knew your father.  What is the answer to that question?
25    A    That I believe they didn't, that they didn't know each
```

1    other.

2    Q    And Sister Counsel asked about the discussion that took

3    place in your house with Keishla, Bereliz and Felix.  I want to

4    ask you:  What was Felix doing during that discussion?

5    A    Nothing.  He was just standing.  He simply laughed.  That.

6    Q    And Sister Counsel asked you about the Dodge Durango.  I

7    want to ask you:  How often did you drive the Dodge Durango?

8    A    Very little.

9    Q    And who drove it on April 29th, 2021?

10          MR. GONZALEZ-DELGADO:  Objection under 602.  That

11   calls for speculation.

12          THE COURT:  If you know.

13          THE WITNESS:  I don't.

14   BY MS. COLLAZO-ORTIZ:

15   Q    Did you drive it on April 29, 2021?

16   A    No.

17   Q    And Sister Counsel asked about you using an application to

18   look at Felix's WhatsApp messages.

19   A    Yes.

20   Q    Did you ever send messages on his behalf?

21   A    No.

22          MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

23          MS. CINTRON-COLON:  No further questions, Your Honor.

24          THE COURT:  I do not have questions for the witness.

25          Ms. Santiago, thank you for your testimony.  You are

1    free to go.

2         (Witness excused.)

3              MR. GOTTFRIED:  Your Honor, the government calls Mr.

4    Carlos Colon-Vilches.

5              THE COURTROOM DEPUTY CLERK:  Mr. Colon, good morning.

6    Please raise your right hand.

7         (Witness sworn.)

8              THE COURTROOM DEPUTY CLERK:  So help you God.  You

9    may take a seat.

10             MR. GOTTFRIED:  May it please the Court?

11             THE COURT:  Go ahead.

12                        CARLOS COLON-VILCHES,

13             called as a witness on behalf of the Plaintiff,

14                  having been previously duly sworn,

15                 was examined and testified as follows:

16                        DIRECT EXAMINATION

17   BY MR. GOTTFRIED:

18   Q    Good morning, sir.

19   A    Good morning.

20   Q    Can you please tell us your name?

21   A    Carlos Colon-Vilches.

22   Q    And can you please spell your second last name?

23   A    C-O-L-O-N, V-I-L-C-H-E-S.

24   Q    And where do you work?

25   A    I work for JetBlue.

1    Q    What's your job title with JetBlue?

2    A    I'm a security manager.

3    Q    And what are your responsibilities as a security manager

4    with JetBlue?

5    A    Oversee all of the security of JetBlue facilities within

6    my area of responsibilities, also, personnel, in charge of

7    control access, CCTV systems, and the overall general security.

8    Also, I am the main point of contact, or liaison, for other

9    entities, such as law enforcement, TSA, or any other

10   organization that needs access to JetBlue information.

11   Q    Okay.  If I could ask you just pull up your microphone a

12   little bit closer to you?

13   A    Yes.

14   Q    Thank you.

15        You had talked about control access as one of your

16   responsibilities.  What do you mean by that?

17   A    We have certain doors in our facilities, airports, in all

18   of the facilities, that they're controlled that -- we have

19   multiple doors in our facilities, airports or other facilities

20   that JetBlue --

21        MR. GONZALEZ-DELGADO:  Your Honor, if I may, the

22   system is not working.

23        THE COURT:  Check.

24        MR. GONZALEZ-DELGADO:  We're ready, Your Honor.

25   Thank you.

```
 1                THE COURT:  Go ahead.
 2    BY MR. GOTTFRIED:
 3    Q    Sir, prior to working as a security manager with JetBlue,
 4    where else did you work prior to JetBlue?
 5    A    I was with the U.S. Secret Service.  I retired from the
 6    Secret Service in 2021.
 7    Q    How long did you work for the Secret Service?
 8    A    20 years.
 9    Q    And, generally speaking, what were your responsibilities
10    with the Secret Service?
11    A    Financial crimes investigations and protection assignments
12    to head of states and other foreign leaders.
13    Q    And as part of your responsibilities as a security manager
14    with JetBlue, can you tell us what is a flight manifest?
15    A    A flight manifest is the document that gets created when
16    the flight happens, so during the boarding of the flight or --
17    every person or passenger that is going to be flying on this
18    particular flight, goes -- this information, name, goes into
19    this document to document that -- to have an accurate count of
20    all of the persons that are within this particular flight.
21    Q    Okay.  And how does a passenger get placed, or the
22    passenger's information, how does it get placed on the flight
23    manifest?
24    A    That information comes directly from the reservation of
25    each passenger.  So once you book your flight and you provide
```

1    your information, that information goes into our database.

2    Those are reservations.

3            And when, during the process of, you know, boarding

4    the flight, checking in the flight, that document is being

5    updated as every person is boarding the flight.  As counting

6    the boarding pass, that document is being updated, until the

7    final person boards the flight.

8    Q    Now, if someone buys a ticket but doesn't get on the

9    plane, would they be on the flight manifest?

10   A    No.

11   Q    Why not?

12   A    No.  Because the manifest needs to list everybody that is

13   within that flight.  So if somebody scans the boarding pass,

14   boards the flight, but for whatever reason, gets removed from

15   the flight, the manifest gets automatically updated, and that

16   person's name and information gets offloaded from the flight.

17   So that name is no longer going to be part of that manifest

18   because he's not inside the aircraft.

19   Q    Okay.  So to be clear, only people who are physically

20   present on the plane and stay on that flight are on the flight

21   manifest; is that accurate?

22   A    Correct, yes.

23   Q    Now, how does JetBlue verify that the flight manifest is

24   correct?

25   A    So during the boarding process, each, each person scan a

1    boarding pass.  During the scanning of the boarding pass, it

2    gets verified right there at a computer screen that it's a

3    legitimate boarding pass, and it matches the person that is

4    boarding the flight.  So it automatically, when the person scan

5    the boarding pass, it automatically updates the manifest

6    one-by-one.

7            So if 125 people scan, checked in, but only 123 scan

8    the boarding pass, now we're short two, two people.  So we make

9    announcement for that person to report to the gate.  If they

10   don't make it to the gate, they get offloaded, and then their

11   name are no longer part of the manifest.

12   Q    Okay.  And how does JetBlue verify that the person on the

13   flight ticket is the same person who's actually physically

14   holding that ticket?

15   A    That process takes place when the person goes through TSA

16   security.  The only way you can go past TSA security is

17   providing your reservation and the government identification,

18   such as passport or driver's license, matching the reservation

19   information so --

20   Q    And I touched on this before, but I'd like to again expand

21   upon this.  The passenger information on the flight manifest,

22   where does that come from, and how is it verified?

23   A    That comes from the actual passenger.  When they book the

24   flight, they made the reservations, they had to provide that

25   information.  Without that information, you will not be able to

1    create or make a reservation.

2    Q    And then how is that information verified by JetBlue for

3    the flight manifest?

4    A    Once the person comes into the airport and completes the

5    check-in process, the information is verified through our

6    secure flight database, which is a TSA database that every

7    airline uses.

8    Q    Okay.  And how does JetBlue maintain the flight manifest

9    for each flight?

10   A    We create -- hard copies are created of the manifest, and

11   they're kept in an office under lock and key for a certain

12   amount of time.

13   Q    Okay.  Is that true of all flights, JetBlue flights?

14   A    Yes.

15            MR. GOTTFRIED:  Your Honor, I'm going to mark as

16   Government ID 154 the next item, which has been shown to

17   Brother Counsel, and request permission to approach the

18   witness.

19            THE COURT:  Granted.

20   BY MR. GOTTFRIED:

21   Q    Sir, do you recognize this document?

22   A    Yes.

23   Q    Okay.  Was this document made at or near the time of the

24   flights that they relate to?

25   A    Yes.

1    Q    Okay.  Were these documents created by a person with

2    knowledge of the flights that these documents relate to?

3    A    Yes.

4    Q    And was it a regular practice of JetBlue to create these

5    documents in 2021?

6    A    Yes.

7    Q    As a security manager for JetBlue, are you familiar with

8    these kinds of documents and under the system under which they

9    are made?

10    A    Yes.

11          MR. GOTTFRIED:  Your Honor, at this time, the

12    government would move Government ID 154 into evidence as

13    Government Exhibit 154.

14          MS. CINTRON-COLON:  No objection, Your Honor.

15          THE COURT:  Without objection, so ordered.

16    Government ID 154 becomes Government Exhibit 154.

17    (Exhibit No. 154 admitted into evidence.)

18          MR. GOTTFRIED:  Your Honor, permission to recover the

19    exhibit and publish it.

20          THE COURT:  Granted.

21    BY MR. GOTTFRIED:

22    Q    Sir, what is this?  What is Exhibit 154 that you're, a

23    portion of which you are seeing now on the screen?

24    A    It's a redacted manifest.

25    Q    Okay.  And I'm showing you page 3, and then I'm going to

1    show you now page 6.  And, sir, this, this -- can you tell us

2    what this is also?

3    A    This is another redacted manifest.

4    Q    Okay.  Going to, back to page 3, why, sir, are there

5    certain rows in black?

6    A    They're black.  The document was redacted to protect the

7    personal information, identifying information, of the other

8    passengers on that particular flight.

9    Q    And who redacted the other information?

10   A    It would be our legal department, the person who provided

11   the information.

12   Q    When you say "our legal department," you're referring to

13   JetBlue?

14   A    JetBlue legal department, correct, yes.

15   Q    And do you see at the top of page 3, it says "PNR?"  Do

16   you see that?

17   A    Yes.

18   Q    What is "PNR?"

19   A    "PNR" is also known as the "passenger name record."

20   Q    What is that?

21   A    It is, it's the unique code that is created when a person

22   purchase a flight or books a flight, makes a reservation.  That

23   is a six-letter code that is assigned to each reservation, and

24   under that code, you can locate all of the information that is

25   related to that particular reservation.

1    Q    Next to "PNR," do you see the column that states "PNR

2    create date?"

3    A    Yes.

4    Q    What is that?

5    A    That's the date the ticket was purchased, the reservation

6    was created.

7    Q    Okay.  Sir, what can you tell us, using the other rows in

8    this flight, for example, who was the passenger for this

9    particular row?

10   A    Yes.  I can tell that the passenger was Marcelino Perez.

11   Q    Okay.  And from where to where was that flight?

12   A    Based on the information provided, his flight was from New

13   York JFK Airport to San Juan.

14   Q    Okay.  And what flight number was that?

15   A    It shows Flight 2503.

16   Q    Okay.  Now, approximately, what time on April 29th, 2021,

17   did this flight from JFK to San Juan arrive here in San Juan?

18   A    According to the records, he arrived at 10:44 p.m.

19   Q    Okay.  Sir, going to page 6 -- sir, going back, I'm sorry,

20   to page 3.  And when would this reservation have been made,

21   based on what we see on page 3?

22   A    April 25th, 2021.

23   Q    And in the "Phone Number" column on the far right, what

24   information is there?

25   A    There is a telephone number:  (787)370-4265.

```
 1    Q    With whom is that associated?

 2    A    Associated with Mr. Marcelino Perez.

 3    Q    Okay.  Turning to page 6 now.  On what date was this

 4    reservation made?

 5    A    It shows March 24th, 2021.

 6    Q    Okay.  And on what date was that flight taken?

 7    A    On March 26th, 2021.

 8    Q    Who was the passenger listed on the flight manifest?

 9    A    Marcelino Perez.

10         MR. GOTTFRIED:  Okay.  Your Honor, no further

11    questions at this time.

12         MR. GONZALEZ-DELGADO:  We have no questions, Your

13    Honor.

14         THE COURT:  I have no questions for the witness.

15         Mr. Colon, thank you for your testimony.  You are

16    free to go.

17         THE WITNESS:  Thank you, Your Honor.

18    (Witness excused.)

19    (Sidebar conference commenced.)

20         MR. GOTTFRIED:  Your Honor, we would respectfully

21    suggest that we break now, and we can begin with the next

22    witness after, after lunch.

23         THE COURT:  Okay.

24         MR. GONZALEZ-DELGADO:  No problem.  No problem.

25    (Sidebar conference concluded.)
```

1          THE COURT:  Ladies and gentlemen, let's break for

2    lunch at this point.  We'll return to the courtroom at 1:15,

3    1:15 p.m.

4          Remember, do not talk about or communicate with

5    anybody about your impressions of the case or the evidence in

6    the case.  Do not view, read or hear reports, comments or

7    articles about the case.  Do not conduct any research about the

8    case, the matters in the case or the individuals involved in

9    the case.

10          I look forward to seeing you all back in the

11    courtroom at 1:15 p.m.

12      (Whereupon the following proceedings were had in open court

13         without the presence of the jury.)

14          THE COURT:  All right.  We'll be back in the

15    courtroom at 1:15 p.m.  The Court adjourns until such time.

16      (Whereupon a recess was taken at 11:54 a.m., until 1:19

17         p.m.)

18                              -oOo-

19

20

21

22

23

24

25

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

```
1    UNITED STATES DISTRICT COURT )
                                  )  ss.
2    DISTRICT OF PUERTO RICO      )

3

4                      REPORTER'S CERTIFICATE

5

6            I, CINDY LEE BROWN, RPR, Federal Official Court

7    Reporter for the United States District Court for the District

8    of Puerto Rico, appointed pursuant to the provisions of Title

9    28, United States Code, Section 753, do hereby certify that the

10   foregoing is a true and correct computer-aided transcript of

11   proceedings had in the within-entitled and numbered cause on

12   the date herein set forth; and I do further certify that the

13   foregoing transcript has been prepared by me or under my

14   direction.

15

16           Dated this 3rd day of July, 2023.

17

18

19                            /s/ Cindy Lee Brown

20                            _____
                              CINDY LEE BROWN, RPR, Federal
                              Official Court Reporter
21                            150 Carlos Chardon, Room 150
                              San Juan, PR  00918
22                            (787) 772-3478

23

24

25
```